ANDREW MAST (CSBN 284070)
GABRIEL MARTINEZ (CSBN 275142)
MICHAEL RABKIN (ILRN 6293597)
ALBERT B. SAMBAT (CSBN 236472)
U.S. Department of Justice
Antitrust Division
450 Golden Gate Avenue
Box 36046, Room 10-0101
San Francisco, CA 94102
Andrew.Mast@usdoj.gov
Telephone: (415) 934-5300

Attorneys for the United States

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | CASE NO. 14-CR-00534-CRB |
| v. | **UNITED STATES' SENTENCING MEMORANDUM** |
| JOSEPH GIRAUDO, | |
| Defendant. | |

US' SENT'G MEMO
*United States v. Giraudo*, 14-CR-00534-CRB

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................... ii

INTRODUCTION .............................................................................................. 1

BACKGROUND ............................................................................................... 1

ARGUMENT ................................................................................................... 3

  A.   Sentencing Guidelines Calculations .................................................. 3

     1.   Criminal History ..................................................................... 3

     2.   Offense Level ........................................................................ 4

     3.   Fine and Restitution ............................................................... 5

  B.   Specific Offense Characteristic Adjustments Are Warranted ........................ 6

     1.   Giraudo's Volume of Commerce is Above $10 Million ......................... 6

     2.   Giraudo's Conduct Involved the Submission of Non-Competitive Bids...................... 9

  C.   A Role in the Offense Adjustment is Warranted .................................. 10

     1.   Giraudo had control over others and exercised substantial decision-making authority (U.S.S.G. §3B1.1 factors (1) and (7)). ..................... 11

     2.   Giraudo was the primary organizer of the bid-rigging conspiracies and recruited accomplices to enable the bid-rigging to continue (U.S.S.G. §3B1.1 factors (3) and (5))... 12

     3.   The nature and scope of Giraudo's participation in the conspiracies exceeds that of other conspirators (U.S.S.G. §3B1.1 factors (2) and (6)). ..................... 13

     4.   Giraudo and the Big 5 claimed a larger share of payoffs than other conspirators (U.S.S.G. §3B1.1 factor (4)). ..................... 14

  D.   Sentencing Recommendation.......................................................... 16

CONCLUSION................................................................................................. 19

# TABLE OF AUTHORITIES

**Cases**

*Arizona v. Maricopa County Medical Soc.*, 457 U.S. 332 (1982) .................................................. 8

*Texaco Inc. v. Dagher*, 547 U.S. 1 (2006) ........................................................................................ 8

*United States v. Ali*, 620 F.3d 1062 (9th Cir. 2010) ......................................................................... 5

*United States v. Barker*, 771 F.2d 1362 (9th Cir. 1985) ................................................................. 17

*United States v. Barnes*, 993 F.2d 680 (9th Cir. 1993) ........................................................... 10, 15

*United States v. Grice*, 319 F.3d 1174 (9th Cir. 2003) ..................................................................... 7

*United States v. Koenig*, 952 F.2d 267 (9th Cir. 1991) ................................................................... 15

*United States v. Lawrence*, 189 F.3d 838 (9th Cir. 1999) ............................................................... 7

*United States v. Ruff*, 535 F.3d 999 (9th Cir. 2008) ....................................................................... 17

**Statutes**

18 U.S.C. §3553 ........................................................................................................................ 16, 17

18 U.S.C. §3583 ................................................................................................................................ 5

18 U.S.C. §3663 ................................................................................................................................ 5

**Rules**

U.S.S.G. §1B1.3 ................................................................................................................................. 7

U.S.S.G. §2B1.1 ................................................................................................................................. 8

U.S.S.G. §2R1.1 .......................................................................................................................... passim

U.S.S.G. §3B1.1 .......................................................................................................................... passim

U.S.S.G. §3E1.1 ................................................................................................................................. 5

U.S.S.G. §4A1.1 ................................................................................................................................. 4

U.S.S.G. §4A1.2 ................................................................................................................................. 4

U.S.S.G. §4A1.3 ................................................................................................................................. 4

U.S.S.G. §5A ...................................................................................................................................... 4

U.S.S.G. §5E1.1 ................................................................................................................................. 5

**Other**

1984 U.S.C.C.A.N. 3182 ................................................................................................................. 17

1

## INTRODUCTION

Of all the defendants charged for their participation in the bid-rigging conspiracies at San Mateo and San Francisco foreclosure auctions, defendant JOSEPH GIRAUDO is the most culpable.  Giraudo purchased more rigged properties than any other conspirator and received more payoffs not to bid than any other conspirator.  He has been engaging in unlawful bid rigging at the foreclosure auctions since the 1990s, long before the conspiracies charged in this case.  And he was the primary leader of the conspiracy, influencing the way payoff agreements were negotiated, organized, and paid.  Contrary to Giraudo's objections, the Presentence Report appropriately applies enhancements to Giraudo's offense level because his conduct involved the submission of non-competitive bids, affected a volume of commerce of more than $10 million, and demonstrated that he was a leader/organizer of the offense.  Accordingly, the United States respectfully requests that this Court sentence Giraudo to (1) serve 37 months of custody, (2) serve three years of supervised release, and (3) pay a criminal fine of $1,833,167, a $200 special assessment, and $232,132.77 in restitution.

## BACKGROUND

On October 22, 2014, an eight-count Indictment was filed, charging Giraudo with bid rigging and mail fraud.  Dkt. 1; Presentence Report ("PSR") ¶ 1.  Upon the government's unopposed motion, the Court dismissed the mail fraud charges, leaving two counts of bid rigging against Giraudo.  PSR ¶ 2.  On September 19, 2017, Giraudo pleaded guilty without a plea agreement to both bid rigging counts.  PSR ¶¶ 3-4.

Giraudo is charged with participating in the San Mateo conspiracy from August 2008 until January 2011, and in the San Francisco conspiracy from November 2008 until January 2011.  Dkt. 1; PSR ¶16.

However, Giraudo has engaged in bid rigging as early as the 1980s or 1990s, long before the charging periods in this case.[1]  PSR ¶ 16; *see also* Ex. P at 2; Ex. H at 2-3.  From the

---

[1] Giraudo contends that the PSR description of the duration of Giraudo's unlawful conduct is inaccurate.  But Raymond Grinsell and Daniel Rosenbledt, two of Giraudo's closest co-conspirators, describe Giraudo participating in bid rigging long before the charging period.  Grinsell indicated that he was involved in payoff agreements with Giraudo in the 1990s and

beginning, Giraudo was a "natural leader" at the auctions and determined who took properties, who got paid, and which partners were chosen.  Ex. H at 3.

Giraudo's involvement in bid rigging appears to have been consistent and pervasive from the 1990s until January 2011.  In the late 1990s, after learning of an unrelated investigation by the San Mateo County District Attorney's Office, Grinsell told Giraudo he would not participate in payoffs.  Ex. H at 4.  Giraudo told Grinsell he was not a very good businessman, and, on occasion, bid him up on properties in retaliation for Grinsell's refusal to participate in the bid-rigging conduct.  Ex. H at 4-5.  Nevertheless, Giraudo persisted in bid-rigging conduct, including on properties he purchased with Grinsell (unbeknownst to Grinsell).  Ex. H at 6.  It was not until Giraudo showed Grinsell as list of properties and demanded payment from Grinsell that Grinsell realized he had been involved in rigged sales.  Ex. H at 6.  Likewise, in 2003, when future co-conspirator Abraham Farag first attended a San Mateo auction, Giraudo insisted that Farag pay him $4,000 to refrain from bidding against Farag, and Farag agreed.  Ex. E at 2.

In 2008, Giraudo consolidated his influence at the auctions—and eliminated considerable competition—by banding together with four of the other most dominant bidders at the auctions. *See* Ex. I at 2-3.  This group of bidders, which consisted of Giraudo, Grinsell, Mohammed Rezaian, Daniel Rosenbledt, and Kevin Cullinane, became known to other bidders at the auctions as the "Big 5," the "Board of Directors," and "Joe's Group."  *See* Ex. U at 5; Ex. O at 3; Ex. L at 4; Ex. G at 5; Ex. V at 4.  Giraudo made the final decision as to whether each member joined the group.  Ex. H at 8; Ex. I at 2-4.  Fellow co-conspirator Laith Salma described Giraudo as the "King" of the Big 5.  PSR ¶ 17; Ex. U at 5.  Others referred to Giraudo as the "Godfather" of the auctions.  Ex. O at 3.

Thereafter, Giraudo and the Big 5 controlled all facets of the conspiracies, influencing the way payoff agreements were negotiated, organized, and paid.  PSR ¶ 18; Ex. P at 5.  For example, before another conspirator was eligible to receive payoffs, the Big 5 required the bidder to be present at the auction and to qualify to bid on the property by bringing sufficient capital in the form of cashier's checks.  Ex. U at 12.  Whereas the members of the Big 5 were each entitled

---

Rosenbledt indicated that he observed payoff agreements in the 1980s and that Giraudo was one of the bidders that attended the auctions during that time period.  *See* Ex. H at 2-4; *see* Ex. P at 2.

1   to receive their own payoff when they refrained from bidding on a property, other conspirators

2   that formed partnerships received only one payoff share for their partnership.  Ex. U at 12.

3   Giraudo served as an authority if disputes involving payoffs arose.  PSR ¶ 18.

4         Giraudo also managed other co-conspirators acting on his behalf.  PSR ¶ 17.  For

5   example, at Giraudo's request, co-conspirator Jim Appenrodt attended the auctions and entered

6   into bid-rigging agreements on behalf of Giraudo when Giraudo could not personally attend the

7   auctions.  PSR ¶ 17; Ex. C at 1.  Giraudo instructed Appenrodt over the phone about when to bid

8   and stop bidding, and directed him to offer payoffs to other bidders.[2]  PSR ¶ 17; Ex. C at 3-4.

9   But Giraudo's influence over other conspirators extended beyond Appenrodt.  After explaining

10  the rules of the conspiracy to Salma, Giraudo indicated that if Salma did not follow the rules,

11  Giraudo and the other members of the Big 5 would make it impossible for Salma and others to

12  purchase properties at the auctions.  PSR ¶ 17; Ex. R at 13.

13        As the "King" of the Big 5, Giraudo purchased more rigged properties, and accepted

14  more payoff money, than any other conspirator.  PSR ¶ 18; *see* Ex. A (List of Rigged

15  Properties); Ex. B (Chart Comparing Defendants).  Ultimately, Giraudo was involved in rigging

16  more than 200 properties, and received nearly $250,000 in payoff money.  Ex. A.  The value of

17  the properties purchased by Giraudo, coupled with the payoffs associated with each rigged

18  property, is $36,663,335.66.  Ex. A. This constitutes Giraudo's volume of commerce under the

19  relevant Sentencing Guidelines, as discussed further below.

20                           **ARGUMENT**

21  **A.**    **Sentencing Guidelines Calculations**

22           **1.**    **Criminal History**

23        The government agrees with the Presentence Report (PSR), which calculates Giraudo's

24  Criminal History Category as II based on criminal history involving three DUI arrests and two

25  _____

    [2] Giraudo objects to the description in the PSR stating that he maintained "complete control"

26  over Appenrodt.  But it does not appear disputed that Appendrodt purchased properties on

27  Giraudo's behalf.  Indeed, Appenrodt's plea agreement states clearly that "[t]o carry out the
    conspiracy, [Appenrdodt], on behalf of Joseph J. Giraudo, agreed with other conspirators not to

28  compete."  Appenrodt Plea Agmt. ¶ 4.  And Giraudo acknowledges Appenrodt was doing
    Giraudo a favor by attending the auctions.  PSR ¶ 17(a).

DUI convictions.  PSR ¶¶ 46-52.  Giraudo's first DUI conviction falls outside of the applicable ten-year Sentencing Guideline time limit, and thus does not add any criminal history points. PSR ¶ 45; U.S.S.G. § 4A1.2(e)(3).  And his second DUI arrest did not result in a conviction. PSR¶ 52.  However, after his third DUI arrest, Giraudo was convicted on May 26, 2010, which results in one criminal history point.  PSR ¶ 46; U.S.S.G. §4A1.1(c).  As a term of that sentence, Giraudo was placed on probation for three years, and violated those terms by committing the instant bid-rigging offense during that period.  PSR ¶¶ 46-52.  This results in two additional criminal history points.  U.S.S.G. §4A1.1(d).  Giraudo's three criminal history points result in a Criminal History Category of II.  U.S.S.G. Chapter 5, Part A.

Probation recommends a departure based on Giraudo's criminal history category over-representing the seriousness his criminal history.  *See* U.S.S.G. § 4A1.3(b)(1).  The government notes, however, that, as part of his sentence for the DUI, his probation terms expressly required that he refrain from committing another offense.  And, the defendant knew that his bid-rigging conduct was wrong and illegal at the time he committed the offense.  *See* PSR ¶ 28 (Giraudo indicated that he knew his conduct was wrong).  In fact, Giraudo told an undercover informant that if he was ever approached by law enforcement, to deny knowing him.  *See* Ex. D at 6. Nonetheless, Giraudo continued to participate in a criminal conspiracy and rig bids on nearly 100 occasions while on probation.  This knowing violation of probation warrants the additional criminal history points.

## 2.    Offense Level

The government agrees with the PSR, which calculates the total offense level as 18.  PSR ¶ 42.  This calculation includes a one-level increase to the base offense level of 12 for conduct involving the submission of non-competitive bids, a four-level increase for a volume of commerce exceeding $10 million, a four-level increase for role in the offense, and a downward reduction of three levels for acceptance of responsibility.[3]  PSR ¶¶ 32-42.  U.S. Sentencing

---

[3] However, the government reserves the right to not make a motion for an additional point for acceptance of responsibility under USSG 3E1.1(b) depending on the defendant's representations at sentencing.

Guidelines Manual ("U.S.S.G.") §§2R1.1(b)(1), 2R1.1(b)(2), 3B1.1(b), 3E1.1(a), and 3E1.1(b) (U.S. Sentencing Comm'n 2016).

Under the Sentencing Guidelines, an offense level of 18 and Criminal History Category of II results in a sentence ranging from 30 to 37 months of imprisonment.

### 3.   Fine and Restitution

The United States agrees with the PSR, which calculates a fine range of $366,633.36 to $1,833,166.78.  PSR ¶ 81; U.S.S.G. §2R1.1(c)(1) (fine range shall be from one to five percent of the volume of commerce, but not less than $20,000).  The government recommends a $1,833,166.78 fine.  Given Giraudo's substantial assets, even a fine at the top of the Guidelines range will have little impact on Giraudo's overall finances and should be considered in conjunction with a custodial sentence.

The United States also agrees with the PSR, which calculates $232,132.77 in restitution. PSR ¶ 23; U.S.S.G. §5E1.1.  This represents payoff money Giraudo personally received to refrain from bidding on properties.  Ex. A.

While the Mandatory Victim Restitution Act, 18 U.S.C. § 3663, does not apply to Title 15 offenses such as bid rigging, the court has discretion to order restitution under 18 U.S.C. §3583(d) (restitution as a discretionary condition of supervised release).  *See* PSR ¶ 22.  In ordering restitution, a court must make a "reasonable estimate of the loss, given the available information." *United States v. Ali*, 620 F.3d 1062, 1074 (9th Cir. 2010) (citation omitted).  The evidence upon which the court makes its calculation is acceptable so long as such evidence is supported by "sufficient indicia of reliability." *Id.* at 1073.

In this case, the restitution amount is based on the bid-rigging payoffs that Giraudo personally received during the conspiracy.  The property list attached as Exhibit A to the Mast Declaration reflects the rigged auctions involving Giraudo, based on a detailed analysis of the evidence gathered during the investigation, which included reports from witness interviews, audio/video recordings made by cooperating sources and an undercover agent, and pay/owe ledgers made by the co-conspirators obtained by search warrants.  PSR ¶ 15.  The payoffs that

//

co-conspirators were willing to make to acquire a property are the best measure of the amounts that would have been bid at the public auction but for the bid-rigging conspiracies.

The victims in this case are the beneficiaries of the foreclosure auctions, who, but for the anticompetitive agreements would have received the full proceeds from a competitive auction. While Giraudo acknowledged the impact of his conduct on banks that initiated the foreclosure auction, he has yet to appreciate that his conduct impacted homeowners who maintained equity in their property despite the initiation of foreclosure proceedings. *See* PSR ¶ 27. In addition to the numerous lending institutions, the Presentence Report identifies three homeowners as victims of Giraudo's conduct. *See* PSR ¶ 23. And, as with the criminal fine, an order of restitution will have little impact on Giraudo's overall finances, but will have an important deterrent effect on criminal conduct that appears to be widespread and ongoing.[4] Thus, although restitution for bid rigging is discretionary, it is nevertheless necessary.

**B.  Specific Offense Characteristic Adjustments Are Warranted**

**1.  Giraudo's Volume of Commerce is Above $10 Million**

A four-level enhancement applies if the "volume of commerce attributable to the defendant" was more than $10 million. U.S.S.G. §2R1.1(b)(2). "The volume of commerce attributable to an individual participant in a conspiracy is the volume of commerce done by him or his principal in goods or services that were affected by the violation." *Id.* "When multiple counts or conspiracies are involved, the volume of commerce should be treated cumulatively." *Id.*

Giraudo's total volume of commerce is $36,663,335.66, which reflects the auction purchase price plus the total payoff amount for the 103 rigged properties purchased by Giraudo

---

[4] The United States has prosecuted similar bid-rigging conspiracies across the country, including Florida, Georgia, North Carolina, and Alabama. Notwithstanding the volume of bid-rigging charges filed in this district over the past several years, such conduct appears to be ongoing, as three individuals pleaded guilty to a recent bid-rigging conspiracy in Mississippi earlier this month. *See* U.S. Department of Justice Press Release, "Mississippi Real Estate Investors Plead Guilty," http://www.atrnet.gov/subdocs/2018/350327.pdf.

and his partners.[5]  Ex. A.  Giraudo contends no enhancement applies because his volume of commerce should only include (1) rigged properties he purchased within five years of indictment, but not those rigged before; (2) the payoff amounts, but not the value of the rigged properties; and (3) his ownership stake in the properties he rigged, rather than the properties' full value.  None of these bases warrant excluding commerce attributable to Giraudo.

First, there is no reason to exclude properties Giraudo rigged more than five years before before the Indictment.[6]  PSR, Objection No. 3.  When a defendant is involved in a conspiracy, conspiracy, conduct that predates the statute of limitations should be considered so long as the as the defendant or his co-conspirators committed an act in furtherance of the conspiracy within within the statute of limitations period.  *See United States v. Grice*, 319 F.3d 1174, 1178-79 (9th Cir. 2003).  Here, Giraudo pleaded guilty to joining a conspiracy that began no later than August 2008.  There is no basis to exclude Giraudo's rigged purchases between August 2008 and October 2009, five years prior to the filing of the indictment, because Giraudo (and his co-conspirators) plainly committed an act in furtherance of the conspiracy after October 2009.[7]

Second, the value of the properties—not simply the payoff amount—constitutes Giraudo's volume of commerce.  In contending that the payoff amounts made to purchase the properties are the only commerce attributable to Giraudo's violations, *see* PSR, Objection No. 3, Giraudo conflates volume of commerce with loss or harm.  But the Guidelines make clear that volume of commerce is calculated based "in goods or services that were affected by the violation."  Under the Guidelines for antitrust offenses, the "offense levels are not based directly on the damage caused or profit made by the defendant . . . . The volume of commerce is an

---

[5] As discussed *infra*, Giraudo's total volume of commerce does not reflect the 100 instances in which Giraudo received payoffs not to bid or the instances in which a rigged sale was subsequently canceled.

[6] Giraudo was indicted on October 22, 2014 and seeks to exclude any rigged sales prior to October 22, 2009.

[7] And although the government does not attribute any rigged purchases prior to August 2008 to Giraudo's volume of commerce, the court may consider "acts of related conduct for which the defendant was not convicted."  *United States v. Lawrence*, 189 F.3d 838, 846 (9th Cir. 1999); *see also* U.S.S.G. §1B1.3.  Hence Giraudo's involvement rigging properties prior to the charging period is relevant conduct that should be considered to determine Giraudo's sentence.

---

US' SENT'G MEMO                                      7
*United States v. Giraudo*, 14-CR-00534-CRB

acceptable and more readily measurable substitute." U.S.S.G. §2R1.1, <u>Background</u>.  The goods affected by Giraudo's violation are the properties he purchased at auction, and the auction price (as well as the payoff amount) is appropriately included in Giraudo's volume of commerce.  In fact, if Giraudo's offense level were based on loss, as specified under the Guidelines for Basic Economic Offenses, his offense level would be significantly higher.[8]  Based on this, it is not surprising that the Antitrust Guidelines state that "the volume of commerce is liable to understate the seriousness in some bid rigging cases." U.S.S.G. §2R1.1, <u>Background.</u>

Finally, commerce should not be excluded because Giraudo held only a partial ownership stake in the rigged property.  When Giraudo purchased properties pursuant to a partnership or joint venture agreement, his volume of commerce appropriately reflects the total acquisition costs of the properties purchased by that partnership or joint venture.  *See* U.S.S.G. § 2R1.1(b)("[T]he volume of commerce attributable to an individual participant in a conspiracy is the volume of commerce done by him *or his principal* in goods or services that were affected by the violation.") (emphasis added); *Texaco Inc. v. Dagher*, 547 U.S. 1, 3 (2006) ("When 'persons who would otherwise be competitors pool their capital and share the risks of loss as well as the opportunities for profit . . . such joint ventures [are] regarded as a single firm.'") quoting *Arizona v. Maricopa County Medical Soc.*, 457 U.S. 332, 356 (1982).  For purposes of calculating volume of commerce, Giraudo and his partners are "regarded as a single firm."[9]  *Id.*

---

[8] The Sentencing Guidelines for Basic Economic Offenses, such as fraud, use loss to calculate the offense level.  The offense level under these Guidelines, however, rise much more rapidly, s*ee* U.S.S.G. §2B1.1(b), and were those Guidelines applied to Giraudo's conduct his offense level would be higher.  The economic loss from Giraudo's conduct, as measured by the total amount of payoffs either paid or received is $1,346,820.  *See* Ex. A.  Thus, if the Basic Economic Offenses Guidelines applied, Giraudo's total offense level would be 28, resulting in a Guidelines range of 87 to 108 months for a Criminal History Category of II (Giraudo would be subject to a base offense level of 6, *see* §2B1.1(a), a 16-level enhancement based on loss, §2B1.1(b), 2-level enhancement because the offense involved more than 10 victims, *see* §2B1.1(b)(2), and the 4-level enhancement based on his role in the offense, *see infra*.).

[9] If the Big 5 was not a single entity, many more properties than the government counted should be considered rigged.  The government did not count properties purchased by joint ventures or partnership as rigged unless they were purchased pursuant to a payoff agreement (with another bidder individually or a separate partnership).  Giraudo cannot, at the same time, claim the Big 5 should be counted as a single entity when determining whether an auction was rigged but not be

Rezaian, Rosenbledt, and Grinsell—Giraudo's primary partners—each accepted

responsibility for the volume of commerce based on the total value of the properties they rigged,

regardless of whether they owned a percentage of the property.[10]  Likewise, Appenrodt,

who represented Giraudo at the auctions, but did not purchase properties for himself,

accepted properties that he participated in rigging, even though he had *no ownership*

*stake* in any properties.  *See* Appenrodt Plea Agreement, Dkt. 270.

### 2. Giraudo's Conduct Involved the Submission of Non-Competitive Bids

The Guidelines for antitrust offenses prescribe a one-level enhancement if "the conduct

involved participation in an agreement to submit non-competitive bids."  U.S.S.G. §2R1.1(b)(1).

Here, the bid-rigging conduct clearly involved non-competitive bids.  The rationale for the

enhancement is that a defendant's "volume of commerce is liable to be an understated measure

of seriousness in some bid-rigging cases."  *See* §2R1.1, Background.  Such is the case here

where Giraudo's volume of commerce is based on properties he purchased in exchange for

paying others not to big against him, but does not account for the properties in which Giraudo

accepted money not to bid on properties.

Giraudo's assertion that his bid-rigging conduct occurred on a "bid-by-bid basis, not by

the carousel of bid rotation" *see* PSR, Objection No. 4, is irrelevant and does not preclude

application of the one-level enhancement under §2R1.1(b)(1).  Giraudo's conduct plainly

involved submitting non-competitive bids and Giraudo's objection should be denied.

The one-level enhancement is particularly warranted here because Giraudo's volume of

commerce *understates* the seriousness of the offense.  The bid-rigging conduct that is not

included in Giraudo's volume of commerce is considerable.  Giraudo accepted payoffs not to bid

on 100 auctioned properties.  Ex. A.  The total value of these properties, coupled with the total

amount of payoffs associated with those properties (of which Giraudo personally received

$232,132.77) is $36,776,990.00.  Ex. A.  None of this is attributed to Giraudo's volume of

---

counted as a single entity when counting for volume of commerce.  *See* Defs.' Post-H'rng Br.
Re. Direct and Indirect Use of Illegal Recordings (Dkt. 232) at 6.

[10] The Court should likewise reject the same argument from Kevin Cullinane, Giraudo's other
primary partner, who also pleaded guilty without a plea agreement.

commerce.  If this figure were included, his total volume of commerce would be $73,440,325.66 and would warrant a six-level enhancement (because it exceeds $50 million), instead of the four-level enhancement recommended by the government (because it exceeds $10 million).  Therefore, Giraudo's volume of commerce understates the seriousness of Giraudo's conduct and the one-level enhancement for bid rigging conduct is warranted.

### C.    A Role in the Offense Adjustment is Warranted

The government agrees with the Presentence Report that a four-level enhancement based Giraudo's role in the offense is warranted.  Giraudo is the most culpable among the 23 defendants charged and was considered the "King" and the "Godfather" of the auctions.  Ex. U at 5; Ex. O at 3.  He purchased more rigged properties and accepted more payoff money than any other conspirator.

The Guidelines provide for a four-level enhancement if "the defendant was an organizer or leader of a criminal activity that involved five or more participants."  U.S.S.G. §3B1.1(a).  To qualify for the upward adjustment, the crime must have involved at least five participants and defendant must have exercised control over one other participant involved in the commission of the crime  *United States v. Barnes*, 993 F.2d 680, 685 (9th Cir. 1993).  There is no requirement, however, "that the defendant exercise authority over at least five participants before the enhancement can be applied."  *Id.* at 685.

The following factors are relevant in determining whether a defendant was a leader or organizer of a criminal activity: (1) the exercise of decision-making authority; (2) the nature of participation in the commission of the offense; (3) the recruitment of accomplices; (4) the claimed right to a larger share of the fruits of the crime; (5) the degree of participation in planning or organizing the offense; (6) the nature and scope of the illegal activity; and (7) the degree of control and authority exercised over others.  U.S.S.G. §3B1.1 cmmt. n. 4.

//

//

//

Here, it cannot be disputed that the conspiracies involved more than five participants: 23 have pleaded guilty. And Giraudo's influence was second to none. Each of the factors listed above support application of the four-level leader/organizer enhancement.

### 1. Giraudo had control over others and exercised substantial decision-making authority (U.S.S.G. §3B1.1 factors (1) and (7)).

Giraudo controlled all facets of the conspiracy, influencing the way payoff agreements were negotiated, organized, and paid. PSR ¶ 18; Ex. P at 5. Giraudo made the final decision to accept Rezaian, Rosenbledt, and Cullinane into Giraudo's partnership with Grinsell, thereby forming the Big 5. Ex. H at 8; Ex. I at 2-4. No one in the Big 5 had more influence than Giraudo. Ex. U at 10; Ex. O. With Giraudo in charge, the Big 5 established the rules of the conspiracy, including when conspirators were eligible to receive payoffs. Ex. U at 12.

Giraudo served as an authority if disputes involving payoffs arose. PSR ¶ 18. For example, when Salma called Cullinane to complain about the sale of 125 Merced, which the Big 5 arranged to be conducted in secret, Cullinane offered to "make this right." PSR ¶ 18; Ex. T at 3-4. However, when Salma insisted on a $30,000 payoff for the property, Cullinane needed permission from Giraudo, which Giraudo initially denied. Ex. T at 3-4. Later, Giraudo agreed to pay $30,000, but insisted it be by check so that Salma would have to pay taxes on the payment. PSR ¶ 18; Ex. T at 4.

Similarly, when co-conspirator Henri Pessah asserted to an undercover FBI agent that he was entitled to a payoff of $2,000 instead of $1,500 for a bid-rigging agreement, a confidential informant called Giraudo to settle the dispute. PSR ¶ 18; Ex. X. Likewise, Craig Lipton, Keith Goodman, and Rezaian turned to Giraudo to resolve a dispute over the partnership share for a property purchased jointly. Ex. K at 10.

Giraudo also used other conspirators to wield his influence at the auction. Giraudo made clear that the other bidders understood that Appenrodt was his surrogate at the auctions. PSR ¶ 18. On an auction for 91 El Portal Way in Daly City, after Salma initially refused Appenrodt's payoff offer, Appenrodt stated, "You don't want to piss off Joe," and Salma accepted $9,000 not to bid. PSR ¶ 18; Ex. S at 9. On another occasion, after Salma refused to pay Appenrodt a

commission for finding a tenant for a property owned by one of Salma's clients, Appenrodt called Salma and said, "You don't want Joe to get mad at you."  PSR ¶ 18; Ex. T at 1. Appenrodt then handed his phone to Giraudo who stated that if Salma did not pay Appenrodt, Giraudo would owe Salma less money for an outstanding payoff.  PSR ¶ 18; Ex. T at 1.

Similarly, after Lipton rebuffed an offer from Appenrodt to refrain from bidding against him (on behalf of Giraudo), Appenrodt told Lipton that Lipton owed Giraudo a favor.  Ex. J at 2. Several days later, Giraudo told Lipton he should not bid against him because Giraudo let Lipton buy the previous property.  Ex. J at 2.

In addition to Appenrodt, Giraudo had considerable influence over Rezaian, who Salma perceived would do anything Giraudo told him.  Likewise, Lipton observed Rezaian receive directions from Giraudo at the auctions and indicated that Giraudo had control over bidders during the auctions.  Ex. J at 5.  Grinsell indicated that Rezaian would go along with whatever Giraudo wanted, Ex. I at 2, and Gajan Thia stated that whenever he negotiated a payoff agreement with Rezaian, Rezaian discussed the matter with Giraudo before finalizing the agreement.  Ex. V at 6.  It is not surprising that other bidders recognized Giraudo as the "King," the "Don," or the "Godfather" of the auctions, and labeled Giraudo and his partners as "the Big 5," the "Board of Directors," or "Joe's Group."[11]  Ex. U at 5; Ex. O at 3; Ex. L at 4; Ex. G at 5; Ex. V at 4.

### 2. Giraudo was the primary organizer of the bid-rigging conspiracies and recruited accomplices to enable the bid-rigging to continue (U.S.S.G. §3B1.1 factors (3) and (5)).

Giraudo recruited others to participate in the conspiracies.  Most directly, Giraudo recruited Appenrodt to attend the auctions as his surrogate and participate in bid rigging on his behalf.  PSR ¶ 19; *see* Ex. C at 3-4.  Appenrodt willingly complied when Giraudo directed Appenrodt to engage in bid-rigging conduct.  PSR ¶ 19; Ex. N at 4.  Appenrodt's entire

---

[11] The Guidelines make clear that "titles such as 'kingpin' or 'boss' are not controlling.  §3B1.1 cmmt. n. 4.  Nevertheless, the fact that co-conspirators consistently perceived Giraudo as the "Godfather" of the auctions is indicative of the degree of decision making authority retained by Giraudo.  Indeed, even Al Florida a leader of a bid rigging conspiracy in Alameda County referred to Giraudo as "the Godfather."  Ex. O at 3.  Florida received a four-level enhancement for his role as a leader/organizer.  Ex. W.

involvement in both the San Mateo and San Francisco conspiracies was on behalf of Giraudo and Appenrodt did not invest his own money when purchasing properties.  Ex. C at 2.

In addition to Appenrodt, Giraudo recruited others to participate in the conspiracies. Giraudo first explained the rules of the conspiracy to Salma.  Ex. U at 8.  When Salma resisted, Giraudo told him those were the rules, "period," and if he refused to abide by them, Giraudo would outbid Salma on any property he tried to purchase.  Ex. U at 5, 8.  Similarly, Giraudo made it known to Michael Navone and others that in order for people to purchase property at the auctions, they would have to participate in payoff agreements to stop bidding.  PSR ¶ 19; Ex. L at 4.  Likewise, after Lydia Fong was outbid by Florence Fung, Fung explained that "the guys" (who included Giraudo) had asked Fung to outbid Fong and her partner in order to drive them away from the auctions.  PSR ¶ 19; Ex. F at 3.

Giraudo also organized how the conspiracy operated and directed other conspirators about how to conduct themselves at the auctions.  Giraudo admonished Craig Lipton to bid slowly, in increments no greater than $100, in order to provide time to negotiate payoff agreements.  Ex. K at 2; Ex. J at 4.  Both Florence Fung and Salma stated that Giraudo required other bidders to show them their cashier's checks before negotiating a payoff.  PSR ¶ 18; Ex. U at 4.

Giraudo was the most influential member within the Big 5 as well.  Rezaian longed to work with Giraudo because he was the "best in the business," and Giraudo took Rezaian under his wing and mentored him at the auctions.  PSR ¶ 18; Ex. N at 2.  As part of this mentorship, Giraudo explained to Rezaian how the payoff agreements worked.  PSR ¶ 18; *see* Ex. M at 3. Likewise, Giraudo explained to Rosenbledt how the payoffs worked.  PSR ¶ 18; Ex. P at 2 and 5. Giraudo had the final say as to whether to bring Rezaian, and subsequently Rosenbledt and then Cullinane into his group. Ex. H at 8.

### 3.   The nature and scope of Giraudo's participation in the conspiracies exceeds that of other conspirators (U.S.S.G. §3B1.1 factors (2) and (6)).

Giraudo was involved in the purchase of more rigged properties and he accepted more payments not to bid than any other conspirator.  PSR ¶ 21; Ex B.  Giraudo was involved in the

rigging of more than 200 properties and received nearly $250,000 in payoff money.  PSR ¶ 21; Ex. A.  These figures exceed all other conspirators in San Francisco and San Mateo.  PSR ¶ 21; Ex. B.  Moreover, Giraudo's property list does not account for all of the properties for which he was involved in bid rigging.  Rosenbledt reported that Giraudo's involvement at the auctions dates back to the 1980s and Grinsell stated that he entered bid rigging agreements with Giraudo in the 1990s.  Ex. P at 2; Ex. H at 2.  Cullinane explained to Salma that Giraudo had been attending the auctions for approximately thirty years and that the bid rigging had been occurring since Cullinane began purchasing properties at foreclosure auctions in the early 2000s.  Ex. S at 1.  Likewise, in 2003 Giraudo insisted that Farag enter a payoff agreement in order to purchase a property at a San Mateo auction.  Ex. E at 2.  While the government does not have the same quantum of evidence for rigged properties before 2008, testimony from multiple witnesses indicates that Giraudo's bid-rigging conduct was occurring regularly long before the charge period in the indictment.  *See* PSR ¶ 16.

Not only did Giraudo rig a larger quantity of properties, but his participation in the conspiracy was qualitatively different from most conspirators.  Navone, for example, indicated that Giraudo was the primary person negotiating payoffs.  PSR ¶ 19; Ex. L at 3.  Moreover, when Giraudo stopped attending the auctions on a regular basis, he left Rezaian—his mentee—in control of negotiating payoffs.  PSR ¶ 19; Ex. P at 5.

### 4. Giraudo and the Big 5 claimed a larger share of payoffs than other conspirators (U.S.S.G. §3B1.1 factor (4)).

Because Giraudo influenced the way payoff agreements were negotiated, organized, and paid, he devised these rules to benefit himself and the Big 5.  Pursuant to the rules, when two ordinary conspirators sought to purchase a property together, but then refrained from bidding in exchange for a payoff, the two partners were only entitled to one payoff share to split between them.  PSR ¶ 20; Ex. U at 12.  In contrast, when Giraudo and the Big 5 sought to purchase a property together, but then refrained from bidding, each member of the Big 5 was entitled to a pro rata payoff share.  PSR ¶ 20; Ex. U at 12.  For example, Lydia Fong explained that Rezaian insisted that she and her partner (Kuo Chang) only represented one person and therefore were

only entitled to one payoff share, whereas when the Big 5 refrained from bidding, each partner was paid not to bid.  PSR ¶ 20; Ex. F at 5.  Rezaian explained that if conspirators worked together, they would only receive one "seat" of the cash that was distributed as a payoff.  PSR ¶ 20; Ex. F at 5.  Each member of the Big 5, however, was entitled to an individual seat.  PSR ¶ 20; Ex. F at 5.  Similarly, Giraudo told Lipton that when two unindicted conspirators attempted to take two shares of a payoff agreement, Giraudo called them out on it, which resulted in an argument between Rezaian and the unindicted conspirators.  Ex. J at 9.

Additionally, the Big 5 utilized their influence over the auctioneers to obtain special benefits.  For example, the Big 5 arranged the auction of the property located at 125 Merced in San Bruno to be conducted in secret.  PSR ¶ 18; Ex. U at 8.  Salma wanted to purchase 125 Merced, but the auctioneer left the courthouse without calling the auction.  PSR ¶ 20; Ex. U at 8-9.  Later that day, Salma learned later that the property was auctioned secretly to the Big 5.  PSR ¶ 20; Ex. U at 8-9.  Similarly, during the auction of 1750 Oakdell Drive in Menlo Park, the Big 5 agreed to partner with Salma and Kent, and Salma was designated the bidder for the partnership.  PSR ¶ 20; Ex. U at 10-11.  After Giraudo and Rezaian spoke to the auctioneer, she rushed through the sale to enable Salma to purchase the property.  PSR ¶ 20; Ex. U at 10-11.  Moreover, contrary to the standard practice, she allowed Salma to endorse his checks after he won the auction.  PSR ¶ 20; Ex. U at 10-11.

For all of the foregoing reasons, a four-level enhancement for Giraudo's role in the offense is appropriate.[12]

//

//

---

[12] If the Court concludes a four-level enhancement does not apply, it should apply the three-level enhancement for managers and supervisors (as opposed to leader/organizers).  In order to justify a three-level upward adjustment under §3B1.1(b), in a conspiracy involving five or more participants, a defendant need only have managed or supervised one other participant involved in the commission of the crime.  *United States v. Barnes*, 993 F.2d 680, 685 (9th Cir. 1993).  A defendant manages or supervises another if he exercises "some degree of control or organizational authority" over that person.  *United States v. Koenig*, 952 F.2d 267, 274 (9th Cir. 1991).  Giraudo indisputably exercised "some degree of control" over Appenrodt, who participated in bid rigging on Giraudo's behalf.

**D.    Sentencing Recommendation**

Giraudo's total offense level is 18 and his Criminal History category is II, yielding a Guidelines range of 30 to 37 months.  The government's recommendation of a 37 month sentence is reasonable and not greater than necessary in light of the factors articulated in 18 U.S.C. § 3553.  The bid rigging conspiracies in San Mateo and San Francisco were serious, far-reaching crimes that corrupted a fair and competitive process meant to compensate mortgage holders, homeowners, and other beneficiaries following a home foreclosure.  The conspiracy bred distrust in the auction process and discouraged investors from attending the auctions and bidding on properties because Giraudo and the other members of the Big 5 demanded payoffs.  Ex. Q at 1.  Giraudo's participation in the conspiracies was aggravated by the fact that he was one of the members of the Big 5, the group that orchestrated the bid-rigging conduct at the courthouse steps and was directly responsible for recruiting newcomers into the conspiracy.  Giraudo was the most culpable member of the conspiracies, and even after pleading guilty, does not appear to fully appreciate the harm caused by his conduct.  *See* PSR ¶ 27.  Accordingly, only a substantial, custodial sentence will adequately reflect the seriousness of the offense, promote respect for the law, and afford adequate deterrence to future bid-rigging offenses and white-collar crime generally.

A sentence of 37 months accounts for the scale of Giraudo's participation in the offense.  No member of the conspiracy rigged more auctions than Giraudo.  The bid-rigging payoffs on the 200 properties where Giraudo suppressed competition amount to more than $1 million— money that was divvied up as the fruits of the conspiracy rather than paid to the rightful beneficiaries.  For these reasons, the Guidelines' directive on custodial sentences for antitrust offenders is especially apt in this case.  *See* U.S.S.G. §2R1.1, cmt. n. 5. ("[P]rison terms for [Antitrust] offenders should be . . . common"); *id.* Background ("[A]lternatives such as community confinement [should] not be used to avoid imprisonment of antitrust offenders.").  Moreover, the Guidelines calculation understates the seriousness of Giraudo's conduct, since his volume of commerce does not account for the 100 instances in which he received payoffs not to bid.  Thus, the Sentencing Commission noted that in some bid-rigging cases, "understatement of

1    the seriousness is especially likely," and that "[t]he court should consider sentences near the top

2    of the guideline range." U.S.S.G. §2R1.1 cmt. n.6.  Finally, Giraudo carried out his crime on

3    more than two hundred occasions at or near the steps of various county courthouses, sometimes

4    when law enforcement was nearby.  The government urges the Court to consider the brazen

5    nature of this criminal conduct in imposing an appropriate sentence.

6         A 37-month sentence is also necessary to adequately deter future violations of antitrust

7    laws and white-collar crime generally.  *See* 18 U.S.C. § 3553(a)(2)(B).  Indeed, "perhaps

8    paramount among the purposes of punishment is the desire to deter similar misconduct by

9    others." *United States v. Barker*, 771 F.2d 1362, 1368 (9th Cir. 1985).  And the Sentencing

10   Reform Act notes that for white collar crimes, "the heightened deterrent effect of incarceration

11   and the readily perceivable receipt of just punishment accorded by incarceration were of critical

12   importance."  S. Rep. No. 98-225, at 91-92 (1983) as reprinted in 1984 U.S.C.C.A.N. 3182,

13   3274-75.

14        A non-custodial sentence would not provide adequate deterrence.  First, given Giraudo's

15   substantial assets, even a fine at the top of the Guidelines range would not—in the absence of a

16   custodial term—serve as an adequate deterrent.  "To provide a mere slap on the wrist of those

17   convicted of serious economic crimes, with no or virtually no time imprisoned as punishment,

18   strikes a blow to the integrity of our criminal justice system." *United States v. Ruff*, 535 F.3d

19   999, 1006 (9th Cir. 2008) (Gould, J. dissenting).  This is especially true of antitrust crimes,

20   which are often hard to detect, taking place in the context of conspiracies that leave few physical

21   clues and take years of investigation to piece together.  Second, the bid-rigging conduct in this

22   case, and at auctions across California, was rampant.  In addition to the 23 defendants convicted

23   in this case, 51 defendants were convicted for participating in bid-rigging conspiracies occurring

24   in Alameda and Contra Costa counties, and 12 defendants were convicted for participating in a

25   bid-rigging conspiracy in San Joaquin County.  Bid rigging at foreclosure auctions is a national

26   problem.  Indeed, earlier this month, real estate investors pleaded guilty to bid rigging at

27   foreclosure auctions in Mississippi.  A non-custodial sentence will not serve as an effective

28   deterrent for others because a lenient sentence would be perceived as a minimal cost of doing

business in exchange for the potential windfall from ill-gotten financial gains. Sentences commensurate with the Guidelines—based on a conservative measure of the harm caused by this conduct—will send a clear message across the industry that bid rigging is unacceptable.

Additionally, a 37-month sentence is necessary to avoid unwarranted sentencing disparity. 18 U.S.C. § 3553(a)(6). Judge Hamilton, who has presided over the East Bay bid-rigging cases, has imposed Guidelines sentences for non-cooperating defendants like Giraudo. Michael Marr, one of the most culpable defendants in the East Bay, was sentenced to 30 months imprisonment. Marr's lieutenants, Javier Sanchez and Gregory Casorso, received 21 months and 18 months respectively.[13] Like these defendants, Giraudo's conduct warrants a substantial custodial sentence. In fact, Giraudo is substantially Sanchez, or Casorso and in a sense more culpable than Marr. Marr did not regularly attend the auctions personally, and Sanchez and Casorso predominantly purchased properties on behalf of Marr, rather than themselves. In contrast, Giraudo personally engaged in rampant bid-rigging conduct for his own profit.

Probation recommends a dramatic variance from Giraudo's Guidelines calculations, reducing his term of incarceration to less than half of the low end of the Guidelines range. As discussed above, and given the magnitude of the financial harm caused by Giraudo's conduct, a variance is not warranted. Giraudo was the leading member of the conspiracies, participated in the highest volume of rigged auctions, set the rules, recruited coconspirators, and ensured others adhered to the conspiracies. Hence, a sentence at the top of the Guidelines of 37 months is appropriate.

//
//
//
//
//

---

[13] Marr, Sanchez and Casorso were convicted after trial and did not receive credit for accepting responsibility. However, Judge Hamilton also sentenced defendants who pleaded guilty but did not cooperate with the investigation, to Guidelines sentences. *See, e.g.*, Stephan Florida (Guidelines sentence of 10 months) and Nicholas Diaz (Guidelines sentence of 6 months).

## CONCLUSION

For the foregoing reasons, the United States respectfully requests that this Court sentence defendant Joseph Giraudo to (1) 37 months of custody, (2) serve three years of supervised release, and (3) pay a criminal fine of $366,633, a $200 special assessment, and $248,799.44 in restitution.


Dated: April 19, 2018                           Respectfully submitted,

                                                /s/ ANDREW J. MAST
                                                United States Department of Justice
                                                Antitrust Division