1   VINSON & ELKINS L.L.P.
    Matthew J. Jacobs (CSB 171149)
2        Email: mjacobs@velaw.com
    Erica Connolly (CSB 288822)
3        Email: econnolly@velaw.com
    Christopher W. James (CSB 289047)
4        Email: cjames@velaw.com
    555 Mission Street, Suite 2000
5   San Francisco, CA 94105
    Telephone: +1.415.979.6900
6   Facsimile:  +1.415.651.8786

7

    Attorneys for Defendant
8   JOSEPH J. GIRAUDO

9

10              **UNITED STATES DISTRICT COURT**

11           **NORTHERN DISTRICT OF CALIFORNIA**

12                    **SAN FRANCISCO**

13  UNITED STATES OF AMERICA,

14                        Plaintiff,                Case No.  CR 14-00534 CRB

15           vs.                                   **DEFENDANT JOSEPH GIRAUDO'S
                                                   SENTENCING MEMORANDUM**
16  JOSEPH J. GIRAUDO,

17                        Defendant.

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

Page

I.     INTRODUCTION ...................................................................................................... 1

II.    BACKGROUND AND PERSONAL HISTORY ....................................................... 3

    A.     Childhood and Career ................................................................................... 3

    B.     Generosity and Kindness............................................................................... 4

    C.     Health and Physical Condition...................................................................... 6

    D.     The Antitrust Offense.................................................................................... 7

    E.     Evolution of a Guilty Plea........................................................................... 10

III.   ARGUMENT ........................................................................................................... 11

    A.     The Government Bears the Burden of Proof................................................ 12

    B.     Mr. Giraudo Was Not a Leader or Organizer and Does Not Qualify for a
        Four-Point Enhancement.............................................................................. 13

    C.     The Government's Volume of Commerce Analysis Is Flawed ................... 16

        1.     The Government Incorrectly Seeks to Count the Full Amount of the
                Purchase Price.................................................................................... 17

        2.     The Government Double Counts its Volume of Commerce........................ 19

        3.     The Government Included Properties Outside the Limitations Period .......... 20

        4.     Resulting Proper VOC Calculation................................................................ 22

    D.     The Bid-Rigging Enhancement Point Is Improper for the Offense Conduct............ 23

    E.     Resulting Guidelines Range......................................................................... 24

IV.    PURSUANT TO 18 U.S.C. § 3553 AND U.S.S.G. §§ 5H1.1 AND 5H1.4,
      PROBATION IS THE MOST APPROPRIATE SENTENCE FOR MR. GIRAUDO.......... 24

    A.     The Court Should Consider Individual Circumstances under § 3553....................... 24

    B.     Mr. Giraudo's Age Would Make a Custodial Sentence Extremely and
        Unnecessarily Harsh..................................................................................... 25

    C.     Mr. Giraudo Has Contributed Significantly to the San Francisco Community
        And Will Continue to Do So.......................................................................... 26

    D.     Probation Would Be Sufficient to Meet the Goals of Sentencing. ................. 28

V.     CONCLUSION ........................................................................................................ 30

1

# TABLE OF AUTHORITIES

2

**Page(s)**

3

**Cases**

4

*Gabelli v. SEC,*
   568 U.S. 442 (2013) ................................................................................. 22

5

*Gall v. United States,*
6
   552 U.S. 38 (2007) .................................................................................... 28

7

*Kokesh v. SEC,*
   137 S. Ct. 1635 (2017) ................................................................. 21, 22, 23
8

9

*Lee v. Illinois,*
   476 U.S. 530 (1986) .................................................................................. 15

10

*Pepper v. United States,*
11
   131 S. Ct. 1229 (2011) .............................................................................. 25

12

*United States v. Armstead,*
   552 F.3d 769 (9th Cir. 2008) .................................................................... 12
13

14

*United States v. AU Optronics,*
   No. CR-09-110 SI (N.D. Cal. Sept. 11, 2012) ......................................... 19

15

*United States v. Avila,*
16
   95 F.3d 887 (9th Cir. 1996) ...................................................................... 14

17

*United States v. Chandler,*
   11-cr-511-WBS (E.D. Cal.) ...................................................................... 14
18

19

*United States v. Chavez,*
   549 F.3d 119 (2d Cir. 2008) ..................................................................... 13

20

*United States v. Diaz,*
21
   14-cr-607-PJH (N.D. Cal. Mar. 8, 2017 ................................................... 24

22

*United States v. Espinoza,*
   885 F.3d 516 (8th Cir. 2018) .................................................................... 13
23

24

*United States v. Florida,*
   14-cr-582-JD (N.D. Cal.) .......................................................................... 14

25

*United States v. Frega,*
26
   179 F.3d 793 (9th Cir. 1999) .................................................................... 15

27

*United States v. Galloway,*
   14-cr-607-PJH (N.D. Cal.) ................................................................. 10, 14

28

*United States v. Hardy*,
　289 F.3d 608 (9th Cir. 2002)................................................................................17, 18

*United States v. Hawkins*,
　866 F.3d 344 (5th Cir. 2017).......................................................................................13

*United States v. Heffernan*,
　43 F.3d 1144 (7th Cir. 1994)................................................................................20, 23

*United States v. Hitachi Auto. Sys., Ltd.*,
　No. 1:16-CR-78 (S.D. Ohio Feb. 6, 2017) .................................................................19

*United States v. Johnson*,
　685 F.3d 660 (7th Cir. 2012).......................................................................................26

*United States v. Marion*,
　404 U.S. 307 (1971) ....................................................................................................21

*United States v. Marr*,
　14-cr-580-PJH, (N.D. Cal. Dec. 18, 2017)................................................................16

*United States v. McKinzie*,
　11-cr-424-PJH (N.D. Cal. Oct. 4, 2017) ....................................................................24

*United States v. Olmstead*,
　11-cr-291-WBS (E.D. Cal. Sept. 12, 2016) ...............................................................24

*United States v. Pimentel-Lopez*,
　859 F.3d 1134 (9th Cir. 2017).....................................................................................15

*United States v. Ponce*,
　51 F.3d 820 (9th Cir. 1995).........................................................................................13

*United States v. Rezaian*,
　13-cr-246-CRB (N.D. Cal. May 2, 2013) .............................................................10, 16

*United States v. Rivera*,
　527 F.3d 891 (9th Cir. 2008).......................................................................................16

*United States v. Romer*,
　148 F.3d 359 (4th Cir. 1998).......................................................................................23

*United States v. Rose*,
　449 F.3d 627 (5th Cir. 2006).......................................................................................12

*United States v. Rosenbledt*,
　13-cr-587-CRB (N.D. Cal. Nov. 5, 2013) ..................................................................10

*United States v. Rosenthal*,
　266 F. Supp. 2d 1091 (N.D. Cal. 2003) .....................................................................14

*United States v. Sierra-Villegas*,
    774 F.3d 1093 (6th Cir. 2014)............................................................................13

*United States v. SKW Metals & Alloys, Inc.*,
    6 F. App'x 65 (2d Cir. 2001) .......................................................................12, 18

*United States v. Stewart*,
    No. 16-50093, 2018 WL 1476942 (9th Cir. Mar. 27, 2018)........................22

*United States v. Takei*,
    941 F.2d 738 (9th Cir. 1991)......................................................................26, 28

*United States v. Tomko*,
    562 F.3d 558 (3d Cir. 2009) .............................................................................28

*United States v. Treadwell*,
    593 F.3d 990 (9th Cir. 2010)......................................................................12, 17

*United States v. Trujillo*,
    713 F.3d 1003 (9th Cir. 2013)....................................................................24, 25

*United States v. Warner*,
    792 F.3d 847 (7th Cir. 2015)............................................................................28

*United States v. Weaver*,
    716 F.3d 439 (7th Cir. 2013)......................................................................13, 15

*United States v. Williams*,
    217 F.3d 751 (9th Cir. 2000)............................................................................22

**Other Authorities**

18 U.S.C. § 3282 ..................................................................................................21

18 U.S.C. § 3553 ............................................................................................passim

M.A. Cohen & D.T. Scheffman, *The Antitrust Sentencing Guidelines: Is the Punishment Worth the Costs?*, 27 Am. Crim. L. Rev. 331 (1989) ......................................................17

Press Release, DOJ, Eleven Northern California Real Estate Investors Indicted for Bid Rigging and Fraud at Public Foreclosure Auctions (Nov. 20, 2014), https://www.justice.gov/opa/pr/eleven-northern-california-real-estate-investors-indicted-bid-rigging-and-fraud-public) ......................10

Press Release, DOJ, Five Northern California Real Estate Investors Indicted for Bid Rigging and Fraud at Public Foreclosure Auctions (Dec. 3, 2014), https://www.justice.gov/opa/pr/five-northern-california-real-estate-investors-indicted-bid-rigging-and-fraud-public-0 ......................10

Press Release, U.S. Senate Permanent Subcommittee on Investigations, Sen. Levin Statement on DOJ Announcement on Goldman Sachs (Aug. 10, 2012). ..........................................29

Sherry L. Murphy et al., *National Vital Statistics Reports:  Deaths: Final Data for 2015* 7 (U.S. Dep't of Health and Human Servs., Vol. 66, No. 6, Nov. 27, 2017) ............................................ 26

U.S.S.G. § 2B1.1 ....................................................................................................................... 10, 22

U.S.S.G. § 2R1.1 ......................................................................................................................... passim

U.S.S.G. § 2R1.1(b)(1) ............................................................................................................... 24

U.S.S.G. § 2R1.1(b)(2) ............................................................................................................... 18, 21

U.S.S.G. § 3B1.1 ........................................................................................................................ 13, 16

U.S.S.G. § 4A1.3(b) ................................................................................................................... 24

U.S.S.G. § 5H1.1 ....................................................................................................................... 25

U.S.S.G. § 5H1.4 ....................................................................................................................... 25

United States Sentencing Commission Quarterly Sentencing Updates ............................................ 28

**Rules**

Criminal L.R. 32-3(c) ................................................................................................................ 12

## I.       INTRODUCTION

Joseph Giraudo is not your typical criminal defendant, and this is not your typical sentencing.

Joe Giraudo came to the United States as an immigrant when he was a child.  His family fled the Nazis in Occupied France and, after a long and difficult journey, made it safely to South America.  Joe's parents left him and his sister in an Argentinian orphanage for four years while they worked to try to make enough money to secure passage to America.  Ultimately the family emigrated to San Francisco.  At first, Joe's mother cleaned toilets and his father worked in a bakery in North Beach.  When Joe reached his teen-age years, he attended St. Ignatius High School ("SI"), like many Italian immigrants.  He had a storied basketball career at SI, beating Lowell (sorry, Judge Breyer!) in the 1956 finals with a half-court shot at the buzzer.  Joe was the first in his family to attend college.  He got his real estate license to help manage a building his parents had purchased with their savings, and from there he built a thriving real estate business.  Starting with nothing, and financially successful beyond his wildest expectations, Joe Giraudo never forgot the modest circumstances of his upbringing.  He has created a legacy of giving through his contributions to charities and his work with the Alexander J. Maisin Foundation that has made a lasting mark on San Francisco.  And as the Court will see in the letters and stories of people who have met Joe, his personal generosity to family, friends, and even casual acquaintances is remarkable.

But now Joe Giraudo is 80 years old and, after a terrible lapse in judgment and conduct, has pled guilty to violating the Sherman Act.  It would be difficult to overstate just how deeply remorseful Mr. Giraudo is for his crime—as one letter writer put it, "his disposition is spun in Catholic guilt." Ex. 14 (Letter of Support).  The Court will hear this from Mr. Giraudo directly at the sentencing hearing.  His guilt and shame are profound.

The question for the Court is how to assess this lapse in light of a lifetime of other contributions.  Then there is this: For a man who is 80 years of age and in frail health, suffering coronary disease, and living with 10 stents in his chest, any custodial sentence in a federal institution would be tantamount to a death sentence.

Mr. Giraudo pled open and without the benefits and protections of a plea agreement.  The Court should know why.  From the beginning of this investigation, Mr. Giraudo understood that he had made a terrible mistake.  The irony is that Joe Giraudo was essentially retired at the time of the instant offense.  He certainly did not need the money.  But he was buying and rehabbing properties to stay active and alert in his late 60s and early 70s, in contrast to many friends who had retired and were less vital.  Frequently Joe would just give away the proceeds of the sales to family members and friends.  Yet after the investigation began, Joe Giraudo could see that this casual and informal exchange of money to other bidders was wrong, and he wanted to deal with it forthrightly.  Unfortunately, the Justice Department's views of the law, the evidence, and Mr. Giraudo's role were so disproportionate and extreme that a plea deal was not possible.

First, the government insisted on charging mail fraud despite the absence of any misrepresentation or other scheme to defraud.  Mail fraud was legally and factually insupportable.  Mr. Giraudo's lawyers (and others) argued this point to officials at the highest levels of the Justice Department for the four years it took DOJ to indict the case—that a person should not be forced to plead to something that is not a crime just to resolve a case.  Indeed, we made the same point at Mr. Giraudo's initial appearance in District Court,[1] long before the unconstitutional taping at the San Mateo Courthouse had come to light.[2]

Indeed, the Justice Department's skewed views of the scale of criminality and harm in this case has been the one constant in an investigation that has spanned almost a decade.  This perspective has further infected the instant sentencing as reflected by inflated Guideline calculations.  Faced with the prospect of agreeing to improper calculations, Mr. Giraudo chose to plead open and put his faith in the judgment and wisdom of the Court.  Predictably, DOJ now seeks to exact revenge on Mr. Giraudo for that choice—to the point of giving cooperation credit to people who pled guilty *after* Mr. Giraudo.  The Justice Department's unrealistic and excessive views about

---

[1] Initial Appearance, *United States v. Giraudo*, 14-cr-534-CRB (N.D. Cal. Nov. 10, 2014), ECF No. 17.

[2] Motion to Suppress, *United States v. Giraudo*, 14-cr-534-CRB (Nov. 13, 2015), ECF No. 58.

this case may be one reason why other judges have consistently rejected the DOJ's sentencing recommendations.[3]

We address volume of commerce, role in the offense and the other Guideline issues below.[4] However, at the end of the day, we believe the Section 3553 factors should be more important to the Court's determination.  For the reasons set forth in detail below, the defense respectfully asks the Court to impose a sentence of probation, and certainly not a sentence beyond home confinement.[5]

## II.      BACKGROUND AND PERSONAL HISTORY

### A.      Childhood and Career

Joe's is the quintessential American immigrant story: a rise from poverty to prosperity through hard work, diligence, talent and luck.  He was an athlete and scholar; he loved his country and wanted to serve.  He got the education his parents never had.  He married his sweetheart, built a business, stayed close to his family, did good things in the community and was a great friend to many.

Born in 1938 in France, Joe Giraudo arrived in San Francisco at the age of eight years old. Presentence Investigation Report ("PSR") ¶¶ 53, 54, *United States v. Giraudo*, 14-cr-534-CRB (N.D. Cal. Mar. 7, 2018), ECF No. 290.  His parents fled France in 1942 at the height of the war after the Nazis occupied France.  They made a harrowing escape from Europe and landed in Argentina.  *See Id.* ¶ 54.  There, Mr. Giraudo's parents struggled to make ends meet and had no choice but to place Joe and his older sister in an orphanage.  *Id.* ¶ 54.  After four years of hard work and saving, and having received help from family members who had already emigrated to America, Joe's parents were able to take him and his sister to San Francisco.  *Id.* ¶ 54.  They have been here ever since.  They had almost no money when they arrived in North Beach; Joe's mother cleaned houses and his father worked at the Langendorf Bakery.  Ex. 14; Ex. 5 (Letters of Support).

---

[3] Our review of sentences handed down by Judge Hamilton in the East Bay revealed that 35 defendants who pled guilty were given non-custodial sentences of probation or supervised release, despite the government's request for custodial sentences ranging from four to eleven months on each.  The very few who did receive custodial sentences were significantly reduced.  Sentences sought in the E.D. Cal. cases were also significantly reduced in all instances.

[4] Mr. Giraudo's remaining objections to the PSR concern these issues, and are addressed by the analysis below.

[5] Mr. Giraudo is also able and willing to pay restitution and fines.

As a child, Joe attended St. Peter's, then he went like so many Italian and Catholic immigrants to St. Ignatius High School, where he excelled as an athlete and student. PSR ¶ 70. He graduated from SI in 1956 and attended Santa Clara University, where he earned a Bachelor of Science Degree in Commerce. *Id.* ¶ 70; Ex. 17. Mr. Giraudo did coursework toward a Master's Degree at the University of California, Berkeley. PSR ¶ 70. Throughout his schooling, Joe worked side jobs before and after school to help pay family expenses. Ex. 14 (Letter of Support). Anxious to serve his country, Joe decided to leave Cal. Berkeley and enlist in the Army, which he did in 1962. After serving on active duty and in the Reserves, Mr. Giraudo was honorably discharged in 1967. PSR ¶ 73; Ex. 16 (Army Records).

Mr. Giraudo first started in the real estate business to help his parents, who had managed to purchase an apartment building with their savings. That was the beginning of a storied career in the buying and selling of property. Ultimately Mr. Giraudo built an impressive real estate portfolio, purchased dozens of apartment buildings, mobile home parks and other properties. Joe married Beverly in 1963, and they have two devoted children and numerous grandchildren. PSR ¶ 56; Ex. 5 (Letter of Support).

B.     Generosity and Kindness

Even as he became successful, Mr. Giraudo was keenly aware of his humble beginnings. For many years, he has served as a trustee and on the Board of the Alexander M. and June L. Maisin Foundation Committee ("Maisin Foundation"), which provides grant money to numerous charities throughout the San Francisco community. PSR ¶ 55; Exs. 20-21 (Maisin Foundation Records). Mr. Giraudo helped establish the foundation and for many years oversaw grants to local charities such as the Bay Area Jewish Healing Center; the De Marillac Academy; the Jewish Community Federation; the Jewish Community Relations Council; the San Francisco Jewish Film Festival; the Tenderloin Neighborhood Development Corporation; the Hillel Foundation at Stanford University; Jewish Vocational Services; American Jewish Joint Distribution Committee, Inc.; Hand in Hand:  American Friends of the Center for Jewish-Arab Education in Israel; Jewish Home; and the Contemporary Jewish Museum. Ex. 21.

Mr. Giraudo has also donated millions personally to the community.  For example, Mr. Giraudo donated to the City of San Francisco property comprising the Visitacion Valley Community Center, valued at nearly a million dollars.  PSR ¶ 55; Ex. 19 (Letter from John Updike, City of San Francisco Director of Real Estate).  The City offered Joe a large sum of money for the property, but he refused, and instead donated the Community Center under the condition that the money he had been offered be used to remodel the property.  Ex. 14 (Letter of Support); Ex. 19.  The property has since become an important stalwart for seniors and the poor. *Id.*  Mr. Giraudo is a leading benefactor to the De Marillac Academy, a tuition-free independent Catholic School serving 240 children that live in the Tenderloin below the poverty line—96% of these students attend four-year colleges on scholarship assistance from Joe and others.  Ex. 14 (Letter of Support).  Joe is also a major contributor to St. Jude's Hospital, St. Anthony's, Shriners Hospitals for Children, Lifehouse, Bay Area Rescue Mission, the Salvation Army, Saint Sebastian Church, Paralyzed Veterans of America, GLIDE Church, the Marin Center for Independent Living, St. Peter's Grammar School, the St. Vincent de Paul Society of Marin County, and the San Francisco/Marin Food Bank.  Ex. 18 (Donation Letters).

Beyond donations and community work, Mr. Giraudo's character is defined by his personal interactions where he is a generous, caring friend, father, grandfather and husband who "has touched his family and so many, many more lives with his generosity, support, and wisdom." Ex. 13 (Letter of Support).   The stories of Mr. Giraudo's generosity in fact are legendary and his actions exhibit, as one acquaintance described, how Mr. Giraudo's "heart is open to help out." Ex. 5 (Letter of Support).  Joe's cousin, Lou Giraudo, who has known Joe for 70 years, "cannot think of anyone who is more generous and caring for the poor of San Francisco," and attests to the beauty of Joe's character and deeds, justly recognizing that Joe "has much more good to do." Ex. 14 (Letter of Support). One acquaintance happened to be a sub-contractor who worked for Mr. Giraudo.  When Joe found out that the subcontractor had lost his own home in foreclosure, Mr. Giraudo bought the house from the bank, rented it to the sub-contractor at nominal rent until the market improved, and years later sold the house back to the sub-contractor for the amount Mr. Giraudo paid for it.  *Id.*  He provided money to a favorite bartender after learning that his wife

had been diagnosed with ovarian cancer and that they were struggling with falling rents on property they had purchased for retirement.  Ex. 8 (Letter of Support).  With no compensation, Joe spent five years helping one friend negotiate a settlement when that man's business ran into financial trouble.  Ex. 1 (Letter of Support).  In his letter of support, Joe's friend said that he has "never met a man more helpful and concerned about others" than Mr. Giraudo.  *Id.*  For another individual, a friend of Mr. Giraudo's for over forty years, Mr. Giraudo lent him money to save his home (without interest) and "spent countless hours with [him] counseling [him] through [his] grief."  Ex. 2 (Letter of Support).

Mr. Giraudo's generosity pervades even his daily interactions with others: he will often pay a neighboring patron's check at a restaurant.  Ex. 5 (Letter of Support).  An "exceptional individual," as one letter of support states, Mr. Giraudo's "compassion for those who are down on their luck was frequently exhibited through his approach to those who lost their homes through lien sales."  Ex. 10 (Letter of Support).  Examples abound of Mr. Giraudo's kind approach toward homeowners at risk of losing their homes.  For one homeowner, a woman diagnosed with cancer who simultaneously was losing her home in foreclosure, Mr. Giraudo intervened, convinced the bank to rescind the foreclosure sale, and persuaded the bank to continue with the loan so the woman could stay in her home.  Ex. 5 (Letter of Support).  For another young couple who lost their home in foreclosure, Mr. Giraudo purchased the property, rented the house back to the young couple, and eventually sold it back to them at a price that was $200,000 below market value.  *Id.*  For some prior owners whom Joe found still occupied homes he purchased at foreclosure auctions, Joe simply and quietly turned the deeds over to them.  Ex. 14 (Letter of Support).

These are not the typical acts of a criminal defendant.  One cannot read the voluminous letters attached to this submission without coming away with respect and awe for this unassuming man.

C.    Health and Physical Condition

Not surprising for a man who is in his 80s, Joe has numerous physical ailments that require constant medical attention, and which would be severely compromised by a prison sentence.  Mr. Giraudo suffers from coronary artery disease, hyperlipidemia, gout, urinary incontinence,

1   elevated prostate specific antigen, spinal stenosis of the lumbar spine, and lumbar radiculopathy.

2   PSR ¶¶ 65-66; Ex. 15 (Medical Records).  Beyond the current conditions, Mr. Giraudo has a history

3   of cancer (skin), prostate problems (he has had to have prostate surgery) and eye disease, including

4   a retinal detachment.  PSR ¶¶ 65-66; Ex. 15 (Medical Records).

5           More to the point, Joe is at "high risk" for continuing heart disease.  He has had to have 10

6   stents implanted to address the hardening of his arteries.  PSR ¶ 66; Ex. 15 (Medical Records).

7   Stress, of course, exacerbates the heart condition, and the long and stressful course of this case has

8   taken a physical and mental toll on Joe that cannot be quantified, while most of his contemporaries

9   have settled into sedate retirement.  It is not difficult to appreciate the fact that an 80-year-old man

10  with ongoing, serious heart disease would be put under enormous stress and physical danger if he

11  were subjected to prison confinement, removed from the care of his doctors and taken away from

12  his family.  It is difficult to imagine how the principles of justice and deterrence would be served by

13  such a sentence.

14          D.      The Antitrust Offense

15          Search warrants were executed on Mr. Giraudo's house and office in January 2011.  It took

16  the government four more years to bring an indictment.  When Mr. Giraudo was  charged in

17  October 2014, the indictment included the instant bid rigging charge, but also mail fraud.[6]  It was

18  not until nearly two years later in October 2016 that the government at last sought leave of Court to

19  dismiss the mail fraud charges.[7]  At the time, the defendants were in the midst of litigating the effect

20  of other evidence collected through the illegal wiretapping scheme that had come to light during the

21  case.[8]  Shortly after the Court's ruling on taint, Mr. Giraudo tried to negotiate a plea; failing that, he

22  pled open on September 19, 2017.[9]

23          The crux of the instant offense is that Mr. Giraudo paid people, or accepted payments, to

24  refrain from bidding on certain properties during public foreclosure auctions.  The evidence

---

25  [6] Indictment, *United States v. Giraudo*, 14-cr-534-CRB (N.D. Cal. Oct. 22, 2014), ECF No. 1.

26  [7] Motion to Dismiss Counts 2 Through 5, 7, and 8, *United States v. Giraudo*, 14-cr-534-CRB (N.D. Cal. Oct. 12, 2016), ECF No. 177.

27  [8] Litigation of this issue lasted until July 2017.  Order Denying Motion to Suppress Further Evidence, *United States v. Giraudo*, 14-cr-534-CRB, (N.D. Cal. July 18, 2017), ECF No. 248.

28  [9] Minute Entry, *United States v. Giraudo*, 14-cr-534-CRB (N.D. Cal. Sept. 19, 2017), ECF No. 264.

indicates that the payments were typically between $2,000 and $5,000.[10]  Sometimes Mr. Giraudo received money; sometimes he paid money; in some sense it is as if the same $5,000 was being passed back and forth among the participants like a hot potato.  The arrangements to refrain from bidding were quite casual and conversational, as distinguished from the evidence in the Oakland cases where, apparently, there were formal and organized secondary auctions.  No overarching conspiracy existed in Mr. Giraudo's case, but rather a series of ad hoc independent agreements among whomever happened to attend an auction and sought to make a deal.[11]  The vast majority of transactions were not subject to any payoff agreement, and many of the payoff deals that were reached had nothing to do with Mr. Giraudo.

Mr. Giraudo had four primary partners:  Messrs. Grinsell, Cullinane, Rosenbladt and Rezaian.  They formed joint ventures to bid on properties.  Others would sometimes participate in the joint ventures as well; it was different property by property.  *See* Ex. 30, Rezaian 302, NDRE-FBI-I-001804 at 1807 (May 30, 2013).  To the extent any of the partners tended to be coercive or forceful in the auctions, it was Mr. Rezaian.  *See* Ex. 28, Salma 302, NDRE-FBI-I-000241 at 241 (Jan. 11, 2011) (Rezaian "controlled and manipulated the auctions by intimidation, threats, and bribes"); *Id*. at 242 ("Rezaian picked on a 60-year-old man and said 'If you ever disrespect me, I'll waste you.'"); *Id*. ("Rezaian was very vindictive.).  There is no evidence that Mr. Giraudo ever forced anyone to make a payoff, or recruited people to the scheme (other than Mr. Appenrodt, a friend and real estate agent who offered to step in for Mr. Giraudo when he was sick).

The impact of this activity is difficult to gauge.  The banks set a minimum price at which they were willing to sell a property on which they had foreclosed.  *See* Ex. 23, Goodell 302, NDRE-

---

[10] It is unclear what basis the PSR uses to cite a typical range from $5,000 to $30,000 for payoffs.  PSR ¶ 11. The data submitted by the government concerning Mr. Giraudo demonstrates the average payoff made was $4,703.05, and the median payoff was even less—$3,500.

[11] Indeed from mid-2008 to the end of 2010, there were approximately 3,000 properties up for auction in San Francisco and San Mateo.  Mr. Giraudo is only supposed to have been involved in a payoff with respect to 200 of these.  There was no overarching agreement affecting the entire industry, but a set of ad hoc agreements at opportune times.  This point is reflected in the language of Mr. Giraudo's guilty plea, which makes no mention of a conspiracy, but rather admits to "knowingly and voluntarily enter[ing] into **agreements** to refrain from or stop bidding against others."  Application for Permission to Enter Plea of Guilty, *United States v. Giraudo*, 14-cr-534-CRB (N.D. Cal. Sept. 19, 2017), ECF No. 263 (emphasis added).

FBI-I-000211 at 214 (Jan. 28, 2011) ("The banks are responsible for setting the opening bid at a price the banks think the properties are worth.").  Mr. Giraudo and his partners were diligent in inspecting the properties, researching the public records for liens, and estimating value.  *See* Ex. 24, Grinsell 302, NDRE-FBI-I-003008, at 3010 (Dec. 20, 2017); Ex. 25, Rezaian 302, NDRE-FBI-I-003017, at 3019 (Feb. 6, 2018) (each describing the work that went into each property).  They developed a reputation for being well-informed, such that a lot of other, less diligent bidders simply followed the lead set by Mr. Giraudo and his partners.  *See*, *e.g.*, Ex. 27, Rosenbledt 302, NDRE-FBI-I-001934, at 950 (Oct. 17, 2013) (describing the practice of "piggybacking").  Data suggests that the amounts of the winning bids relative to banks' opening minimum price actually tended to be *higher* in transactions where a payoff has been alleged by Mr. Giraudo or one of his partners.[12]

One of the mysteries of the case is why, with profits of $50,000 to $100,000 to be made on any property, would-be bidders would accept $2,000 or even $5,000 to stand down.  The logical inference is that the recipients of payoffs were, by and large, accepting money not to bid on properties in which they had only marginal interest or no interest at all.  This latter point is important because it calls into question the government's untested theory that every dollar paid to a would-be bidder would have made the "victim banks" richer.  In fact, there were some people who hardly ever bought a property, but were simply trying to get paid on properties they had no intention of buying. *See*, *e.g.*, Ex. 26, Rezaian 302, NDRE-FBI-001781 at 786-87 (June 6, 2013) (describing Miguel "Payday" DeSanz and his partners, who sometimes attended auctions without any money and rarely ever bought property, though expected payoffs.).

Mr. Giraudo and his partners, however, planned to and did improve the properties they bought, investing time and money into making them better, and then re-selling at a profit.  Thus there is little question that the improvements helped re-establish struggling neighborhoods, increased property values, and brought new families into different Bay Area communities.

---

[12] Though not our burden to demonstrate effect on commerce, we have performed analysis on auction records for more than 2,600 properties sold at auction in San Mateo County from April 2009 to December 2010.  On average, those properties that were subject to an alleged payment not to bid sold for a *higher* price as compared to their opening bid than the properties for which no alleged payment was made.

1      E.      Evolution of a Guilty Plea

2           Mr. Giraudo's remorse and guilt are profound—"his disposition is spun in Catholic guilt."

3   Ex. 14 (Letter of Support).  The decision to plead open after litigating other aspects of the case

4   should not be misconstrued by the Court as being inconsistent with that remorse and acceptance of

5   responsibility.  By this point the Court is familiar with the mail fraud charges that were the

6   centerpiece of the charges for the first six years of the investigation.[13]  The mail fraud charges

7   substantially increased the Guidelines,[14] which the government compensated for by implicitly

8   offering pleading defendants 50% off their sentences—an efficient system except for the

9   inconvenient fact that no mail fraud had been committed.[15]  Judge Hamilton finally rejected the

10   Justice Department's mail-fraud theory in the series of indictments against co-conspirators who

11   engaged in secondary round auctions, which was predicated on the fact that the true winner and

12   final bidding price were not reflected on trustee sale documents.[16]  In Mr. Giraudo's case, the mail

13   fraud theory could not even rely on similar activity; thus the argument that the purchase price

14   entered by the auctioneer was false because it did not include the payoff amount was even more

15   baseless.[17]  Putting aside materiality and reliance, the price reflected on the sale was not false; it

16   was, in fact, the actual price agreed to at the auction.  Only after the government's hand was forced

17

18   _____

19   [13] *See* Indictment, *Giraudo*, ECF No. 1.

20   [14] *Compare* U.S.S.G. § 2B1.1, *with* U.S.S.G. § 2R1.1; *see also* Plea Agreement ¶ 9, *United States v. Rosenbledt*, 13-cr-587-CRB (N.D. Cal. Nov. 5, 2013), ECF No. 11 (mail fraud offense level of 26,

21   antitrust offense level of 20); Plea Agreement ¶ 9, *United States v. Rezaian*, 13-cr-246-CRB (N.D. Cal. May 2, 2013), ECF No. 5 (same).  The mail fraud charges also permitted the government to

22   tout that it was combating "fraud at foreclosure auctions" and "schemes to defraud mortgage holders and others."  *See, e.g.,* Press Release, DOJ, Five Northern California Real Estate Investors

23   Indicted for Bid Rigging and Fraud at Public Foreclosure Auctions (Dec. 3, 2014), https://www.justice.gov/opa/pr/five-northern-california-real-estate-investors-indicted-bid-rigging-

24   and-fraud-public-0; Press Release, DOJ, Eleven Northern California Real Estate Investors Indicted for Bid Rigging and Fraud at Public Foreclosure Auctions (Nov. 20, 2014),

25   https://www.justice.gov/opa/pr/eleven-northern-california-real-estate-investors-indicted-bid-rigging-and-fraud-public).

26   [15] *See* Pretrial Order No. 1, *United States v. Galloway*, 14-cr-607-PJH (N.D. Cal. Aug. 15, 2016),

27   ECF No. 139 (dismissing mail fraud charges because government failed to allege crime).
     [16] *Id.*

28   [17] Indictment, *Giraudo,* ECF No. 1.

1  by Judge Hamilton did the prosecutors reluctantly agree to drop the mail fraud charges against Mr.

2  Giraudo and others.

3  Meanwhile, the illegal taping system at the San Mateo Courthouse had come to light.[18]

4  While the Court ultimately declined to find that other parts of the prosecution were tainted, the

5  government is now focused on punishing Mr. Giraudo and others who had the temerity to challenge

6  investigative practices this Court found to be unconstitutional and to reject unsupportable Guideline

7  calculations by pleading open.  Mr. Giraudo pled guilty on September 19, 2017.  In fact, he pled

8  *before* other defendants who are now seeking cooperation credit for somehow providing substantial

9  assistance to the prosecutors.[19]  In addition, Mr. Giraudo offered in writing to cooperate with the

10  Antitrust Division even in the absence of a plea agreement, and also agreed to be interviewed.[20]

11  The government has never availed itself of this offer.

12  **III.    ARGUMENT**

13  The issue before the Court is how to treat the conduct of an 80-year-old man who has lived

14  an exceptional life but who made a mistake by paying or accepting money not to bid at real estate

15  auctions.  The Court will have to judge the harm caused, the deterrent effect, and the appropriate

16  punishment.   Obviously, the Court will sentence many defendants who have committed a similar

17  offense.  We submit that the number of properties purchased is not the primary factor that should

18  drive the sentence.  Rather, the Court should look to each person as an individual.  That analysis

19  will, we believe, lead the Court to conclude that a sentence of probation, and certainly no more

20  home confinement, is the appropriate and just sentence for Mr. Giraudo.

---

[18] Order Suppressing Electronic Surveillance Evidence Collected at San Mateo County Courthouse, *United States v. Giraudo*, 14-cr-534-CRB (N.D. Cal. Aug. 1, 2016), ECF No. 149.

[19] James Appenrodt, Raymond Grinsell, and Abraham Farag each entered into their plea agreements *after* Mr. Giraudo pled open. *See* Plea Agreements, *United States v. Giraudo*, 14-cr-534-CRB (N.D. Cal.), ECF No. 270 (Oct. 6, 2017) (Appenrodt), ECF No. 273 (Oct. 17, 2017) (Grinsell), ECF No. 277 (Oct. 25, 2017) (Farag).

[20] *See* September 12, 2017 letter from Matt Jacobs to Thomas Greene re *United States v. Giraudo*, Case No. CR 14-534.  Ex. 31.

1   We address the Guideline calculations in the first instance because we recognize the Court

2   must make a determination about the Guidelines before moving on to other, critical factors under

3   Section 3553.[21]

4   A.   The Government Bears the Burden of Proof

5   Mr. Giraudo has pled guilty to the charged offenses, and is before this Court to accept

6   responsibility for his actions.  However, his sentence should be predicated on facts supported by the

7   evidence and only after the government has met its burden.  It is, of course, the government's

8   burden to prove the facts offered at sentencing by a preponderance of the evidence.  *United States v.*

9   *Armstead*, 552 F.3d 769, 776 (9th Cir. 2008); *United States v. Treadwell*, 593 F.3d 990, 1000 (9th

10   Cir. 2010) (recognizing that an even higher clear and convincing standard may apply where the

11   sentencing factor has a disproportionate effect on the sentence relative to the offense).

12   In the present case, the government has not presented any of its evidence against

13   Mr. Giraudo to a fact-finder, and the evidence apparently submitted to the Probation Office is

14   insufficient to carry its burden.  Because the government has not met its burden, either in terms of

15   its attribution of role in the offense to Mr. Giraudo, how it calculated the volume of commerce, or

16   its application of a bid rigging enhancement, its overinflated and unsupported sentencing arguments

17   should be given little to no weight.[22]  *United States v. Rose*, 449 F.3d 627, 634-35 (5th Cir. 2006)

18   (concluding that the district court "erred by adopting the [government's] volume of commerce

19   figure" because the government offered "no evidence" to support its position); *United States v. SKW*

20   *Metals & Alloys, Inc.*, 6 F. App'x 65, 66 (2d Cir. 2001) (rejecting government's appeal of

21   sentencing in part because the government "did not satisfy [its] burden" of "proving which sales

22   were affected," and upholding the district court's determination to disregard untimely evidence).

23

24   [21] The remaining objections to the PSR concern the Guidelines calculations, and particularly the

25   government's failure to satisfy its burden of proof to justify certain enhancements.  The substance
    of those objections is addressed in the analysis below.

26   [22] To some extent we have inferred the government's position from the PSR, statements made by
    the Probation Officer, previous assertions by the government, and the position they have taken in

27   various plea agreements with other defendants.  For reasons we do not understand, the government
    refused—despite repeated requests from the defense—to provide copies of information it supplied

28   to the Probation Officer.  This refusal is directly contrary to the local rules. Criminal L.R. 32-3(c).

B.   <u>Mr. Giraudo Was Not a Leader or Organizer and Does Not Qualify for a Four-Point Enhancement</u>

The government contends that Joe Giraudo should receive a four-level enhancement as a leader or organizer under U.S.S.G. § 3B1.1.  First, it appears that Joe Giraudo is the only person in this case to whom the government would give a four-level enhancement, which is remarkable when Mr. Giraudo and his four partners operated as equals; Mr. Giraudo did not recruit others to the scheme; participants decided whether or not to participate in auctions; and there is no evidence of a criminal organization, hierarchy, coercion or control over others.

The four-level enhancement is intended for sophisticated drug cartels or organized crime syndicates, not octogenarian real estate investors.  *See United States v. Weaver*, 716 F.3d 439, 444 (7th Cir. 2013) ("[S]ome hierarchy among those involved in the criminal activity must exist to qualify a defendant for an enhancement under § 3B1.1.").  *See*, *e.g.*, *United States v. Espinoza*, 885 F.3d 516, 525-26 (8th Cir. 2018) (concluding that there was "ample evidence" to support four-level enhancement for head of cross-border methamphetamine operation); *United States v. Hawkins*, 866 F.3d 344, 347 (5th Cir. 2017) (holding that four-level enhancement was warranted for ringleader of methamphetamine conspiracy); *United States v. Sierra-Villegas*, 774 F.3d 1093, 1101 (6th Cir. 2014) (concluding that district court did not err in imposing four-level enhancement on leader of multistate methamphetamine ring); *United States v. Chavez*, 549 F.3d 119, 135-36 (2d Cir. 2008) (affirming four-level enhancement for defendant who "supervised" the U.S. operations of an international cocaine trafficking organization); *United States v. Ponce*, 51 F.3d 820, 826-27 (9th Cir. 1995) (per curiam) (finding four-level enhancement appropriate where defendant "oversaw the procurement and distribution of colossal quantities of cocaine").

The purpose of the leader enhancement is to increase punishment on those who designed and masterminded a criminal scheme, who recruited others to that scheme, who directed the activities of a significant organization, and who enforced allegiance to the organization by prohibiting people from withdrawing from the syndicate.  *See Ponce*, 51 F.3d at 827; U.S.S.G. § 3B1.1.  None of those conditions exists here:

1  Mr. Giraudo did not invent this scheme; it existed long before him; and indeed, as evidenced

2  by the existence of other cases across the Bay Area, managed to spring up and thrive elsewhere

3  without Mr. Giraudo's participation.[23]  There is also no reliable evidence that Joe Giraudo went out

4  and recruited others to join the criminal enterprise, other than Mr. Appenrodt who actually

5  volunteered to step in and attend the auctions when Joe was sick.  Mr. Appenrodt offered to step in

6  and go to the auctions in Mr. Giraudo's place when Joe got sick.  Ex. 22, Appenrodt 302, NDRE-

7  FBI-I-002967, at 2967-68 (Nov. 14, 2017).  There is not even a hint that Mr. Appenrodt, who was

8  dear friend of Joe's, was coerced to participate in any way.

9  This was a disorganized group of people who would show up at auctions and make ad hoc

10 agreements to bid or not bid when an opportunity arose.[24]  The only organized aspect of the scheme

11 was the coordination on properties and the rehabilitation of those properties among the joint venture

12 partners; yet all evidence indicates that the joint venture partners shared risk and decided

13 independently whether to join a particular transaction.  That is the opposite of a criminal

14 syndicate.[25]

15 Importantly, there is no evidence that Mr. Giraudo exercised control or coercive authority

16 over others.  The government must show "control or authority over others."  *United States v. Avila*,

17 95 F.3d 887, 890 n.6 (9th Cir. 1996); *United States v. Rosenthal*, 266 F. Supp. 2d 1091, 1094-95

18 (N.D. Cal. 2003) (no enhancement where defendant did not "direct[] or exercise[] authority over" or

19 "exercise[ ] some measure of control and responsibility over others").  He must have had "the

20 [23] *See, e.g., United States v. Galloway*, 14-cr-607-PJH (N.D. Cal.); *United States v. Florida*, 14-cr-

21 582-JD (N.D. Cal.); *United States v. Chandler*, 11-cr-511-WBS (E.D. Cal.) (and many others).
   [24] As this Court pointed out in denying the government's request to close portions of the trial to the

22 public, this is not the type of racketeering case where people are being killed or where there was
   generally danger to the well-being of undercover FBI agents and cooperators.  Hr'g Tr. 54-55,

23 *United States v. Giraudo*, 14-cr-534-CRB (N.D. Cal. Apr. 5, 2016), ECF No. 129.  These were
   regular individuals trying to make a living and making mistakes along the way.

24 [25] Much is made in the PSR about what some witnesses have referred to as "rules" of the scheme.

25 PSR ¶¶ 17, 19, 20. There were no such set rules.  Mr. Giraudo and his partners were often
   approached by individuals seeking payoffs on properties on which they had no intention of bidding.

26 *See, e.g.*, Ex. 26, Rezaian 302, NDRE-FBI-001781 at 786-87 (June 6, 2013) (describing Miguel
   "Payday" DeSanz and his partners, who sometimes attended auctions without any money and rarely

27 ever bought property, though expected payoffs.). The partners asked for proof that these individuals
   at least had the ability to bid before agreeing to pay them. These were not the ground rules for a

28 complex conspiracy, but actions taken to avoid being extorted by other attendees.

1  ability to coerce underlings," which is a "key indicator of control or authority" necessary to support

2  an enhancement.  *Weaver*, 716 F.3d at 444.  *See, e.g.*, Ex. 24, Grinsell 302, NDRE-FBI-I-003008, at

3  3010 (Dec. 20, 2017) ("Everyone had their own money and everyone did their own research on

4  properties…. Payoffs during this time were again a group decision."); Ex. 25, Rezaian 302, NDRE-

5  FBI-I-003017, at 3019 (Feb. 6, 2018) ("When Rezaian, Giraudo, and Grinsell purchased a property

6  as partners, each one of them gathered their own information.… They then set the price to bid for

7  the property, and decided if they were going to allow payoffs…. The payoffs were a group

8  decision.").  Mr. Giraudo purchased nearly all of his properties with his co-defendants as partners in

9  the properties, generally on equal terms and with equal splitting of the profits on those properties.

10  *See United States v. Frega*, 179 F.3d 793, 811 (9th Cir. 1999) (four-point enhancement not

11  warranted where "all defendants were in effect in it together" and that "[t]here was not one leader

12  supervising or directing the activities of the others.").[26]

13      The government may suggest that Joe Giraudo should receive a four-level enhancement

14  based primarily on the number of properties Mr. Giraudo purchased in comparison to his co-

15

16  [26] The PSR relies almost exclusively on statements from co-defendants with cooperation agreements
17  who have an incentive to provide self-serving statements against Mr. Giraudo.  For example, Salma,
   who is trying to justify a 5K departure, changed his story to satisfy the government.  In his initial
18  interviews, he said that Rezaian was the organizer.  After Rezaian pled, Salma switched and started
   saying that Mr. Giraudo was the organizer.  *See* Ex. 28, Salma 302, NDRE-FBI-I-000241 at 241, 243
19  (Jan. 11, 2011) (Rezaian was "an 'auction rigger' who controlled and manipulated the auctions by
   intimidation, threats, and bribes"; "GIRAUDO wanted to tell [CRAIG] LNU it was a second
20  mortgage, but REZAIAN would not let him.").  Statements like Salma's are the reason the Ninth
   Circuit has cautioned that "a co-defendant's confession inculpating the accused is inherently
21  unreliable."  *United States v. Pimentel-Lopez*, 859 F.3d 1134, 1144 (9th Cir. 2017) (quoting *Lee v.
   Illinois*, 476 U.S. 530, 546 (1986)).  Many of the statements Salma made in search of that cooperation
22  are nonsensical, internally inconsistent, and demonstrably false, and a sample of these seem to have
   influenced the Probation Office. For instance, Salma says Joe was referred to as the "King" at the
23  auctions (Ex. 28, Salma 302, NDRE-FBI-I-000241 at 241), a name the PSR latches on to and repeats
   five times as a basis for the leadership enhancement.  PSR ¶¶ 9, 17, 18, and Sentencing
24  Recommendation.  Mr. Giraudo has certainly been called names at the auctions, but the name "King"
   does not appear in a single other witness 302, nor are we aware of it appearing on any audio
25  recordings.  Salma asserted in his most recent interview that a $150,000 payment went to Mr. Giraudo
26  on the 611 Fairway property. Ex. 29, Salma 302, NDRE-FBI-002986 at 987 (Dec. 15, 2017). Again,
   the PSR latched onto that figure (PSR ¶ 11), but this statement is not verified by any other evidence
27  and the government did not even find it credible enough to include the property on Mr. Giraudo's list
28  (a fairly low bar).

defendants.  *See*, *e.g.*, PSR ¶¶ 16, 18, 21.  By law, Mr. Giraudo's relative culpability is an insufficient basis for finding that the four-point enhancement is appropriate.  *United States v. Rivera*, 527 F.3d 891, 908 (9th Cir. 2008) ("For a four-point upward adjustment to be appropriate, a preponderance of the evidence must support a finding that the defendant was an organizer or leader, *not merely that the defendant was more culpable than others who participated in the crime.*") (internal quotation marks omitted) (emphasis added).  Even a three-level enhancement is too much under this theory.  The role in the offense enhancement is intended to address "concerns about relative responsibility," U.S.S.G. § 3B1.1, not relative culpability.  Judge Hamilton rejected a similar argument for a four-point enhancement by the government in the sentencing of Michael Marr.  Sentencing Hr'g Tr. 60:8-15, 60:23-61:9, *United States v. Marr*, 14-cr-580-PJH, (N.D. Cal. Dec. 18, 2017), ECF No. 396.  Judge Hamilton noted that although Mr. Marr "had a lot of clout" because "he had the most resources," "just having the largest organization or having the most money [did not] necessarily make[] [Mr. Marr] an organizer and a leader."  *Id.* at 58:11-16.

To the extent any of the co-defendants actually approached this standard of coercive control or authority, Mo Rezaian is the only person who comes close.  *See*, *e.g.*, Ex. 28, Salma 302, NDRE-FBI-I-000241 at 241 (Jan. 11, 2011) (Rezaian "controlled and manipulated the auctions by intimidation, threats, and bribes"); *Id.* at 242 ("Rezaian picked on a 60-year-old man and said 'If you ever disrespect me, I'll waste you.'"); *Id.* ("Rezaian was very vindictive."); Ex. 22, Appenrodt 302, NDRE-FBI-I-002967, at 2969 ("Rezaian and Rosenbledt were the ring leaders.").  And the government determined that only a three-point enhancement was appropriate for Rezaian.[27]

### C.     The Government's Volume of Commerce Analysis Is Flawed

Volume of commerce ("VOC") is intended as a proxy in an antitrust case of the harm caused by the Sherman Act offense.  U.S.S.G. § 2R1.1 (Background).  Here, the government's methodology for calculating volume of commerce is flawed in that it: (1) seeks to hold Mr. Giraudo accountable for the full purchase price of properties that were acquired at auction, without being able to demonstrate how Mr. Giraudo's behavior affected this price; (2) ignores that nearly every

---

[27] *See* Plea Agreement ¶ 8, *United States v. Rezaian*, No. 13-cr-246-CRB (N.D. Cal. Oct. 11, 2017), ECF No. 41.

1  property was acquired by multiple individuals, and attributes the full burden of the commerce to Mr.

2  Giraudo (though it has already been attributed to other defendants); (3) includes transactions that

3  occurred outside the statute of limitations; and (4) includes properties that lack factual support.  The

4  Probation Office seemed to accept the government's VOC calculations at face value.  However,

5  when properly calculated, the amount of affected commerce should be less than $1 million which

6  does not warrant any enhancement calculated under U.S.S.G. § 2R1.1(b)(2).  The PSR found that

7  Mr. Giraudo should receive a four-level enhancement based on a VOC of $36,663,335.66. PSR ¶

8  21.[28]   In fact, the VOC should be less than $100,000 which would result in no enhancement at all.

1.     *The Government Incorrectly Seeks to Count the Full Amount of the Purchase Price*

11     The government's methodology for volume of commerce includes the full purchase price of

12  all properties won at auction—plus the alleged sum of payments made to competing bidders to fix

13  the purchase price and secure the property. Addendum to PSR ¶¶ 8-9. The government offers no legal

14  or factual support for this conclusion; but rather relies on the fact that other defendants have accepted

15  this formulation as part of their plea agreements.

16     The Sentencing Guidelines state that VOC includes only the "goods or services" that were

17  "affected" and "done by" the defendant.  U.S.S.G. § 2R1.1(b)(2).[29]

18     It is worth emphasizing that the government bears the burden of proving to the Court that its

19  methodology is factually and legally supportable.  *Treadwell*, 593 F.3d at 1000.  While of course we

20  have not yet seen the government's sentencing memo, we are not aware of any law that would support

21  the entire purchase price of every single property being included in a VOC calculation, and then

22  adding bribe payments on top of that number.  Where there is doubt, the rule of lenity requires an

[28] Note that the PSR inaccurately cites a different VOC in paragraph 33.  In response to Mr. Giraudo's objections, the government has already admitted to numerous mistakes and inaccuracies in its property list, resulting in the lower figure in paragraph 21.

[29] Volume of commerce is a notoriously ambiguous concept in the Guidelines.  *See* M.A. Cohen & D.T. Scheffman, *The Antitrust Sentencing Guidelines: Is the Punishment Worth the Costs?*, 27 Am. Crim. L. Rev. 331, 349 (1989) ("The main ambiguity in the Antitrust Guideline appears to be its application of 'volume of commerce.'").  And where there is doubt, the rule of lenity applies to ambiguities in the Sentencing Guidelines.  *United States v. Hardy*, 289 F.3d 608, 614 (9th Cir. 2002) (supporting a sentence that allowed for community or home confinement).

interpretation of ambiguities in the Guidelines that favors the defendant.  *Hardy*, 289 F.3d at 614.  The Antitrust Guidelines rely on "volume of commerce" as a "substitute" for harm because "the damage caused or profit made by the defendant" is typically "difficult and time consuming to establish." U.S.S.G. § 2R1.1 commentary (background).  "But this lightening of the government's burden does not excuse altogether the government's need to prove that the prices charged were 'affected by' the conspiracy." *United States v. SKW Metals & Alloys, Inc.*, 195 F.3d 83, 91 (2d Cir. 1999).  The principle of "'general deterrence' can be adequately served without sentencing on the basis of a tenuous presumption that commerce is affected … regardless of what effects, if any, the conspiracy may have had." *Id.* at 92.

Here, unlike most cases, the need for a "proxy" for the effect on commerce is unnecessary because there is a clear indication of the amount of affected commerce: the payoff.  The banks set a minimum price at which they were willing to sell.  If the offer was below that amount, the bank simply would retain the house.  *See* Ex. 23, Goodell 302, NDRE-FBI-I-000211 at 214 (Jan. 28, 2011) ("The banks are responsible for setting the opening bid at a price the banks think the properties are worth…. Approximately 80% of properties are not being sold at auction and are being sent back to the beneficiary.").  This is an important point because it means that if the minimum bid set by the bank was $100,000, the bank would have sold the property for $100,000 or any amount beyond $100,000. In this fact pattern, the property might sell for $100,000 or $120,000 if the bidding went there, but in no instance could it sell at $80,000.  Thus it makes no sense to include $100,000 in commerce because, by definition, that amount was going to be paid to the bank whether or not there was a payoff in any case where the property was sold.  In other words, the $100,000 paid to the bank was not affected in any way by a payoff.

The only portion of a bid that would have or could have been affected by a payoff is the amount in excess of the minimum bid that someone would have in theory been willing to bid on the property.  We know this number exactly.  Thus, there is no need to find a proxy for the value of the affected commerce because we know what it was:  the affected commerce was equal to or less than the $5,000 payoff because that is what the bank would have presumably received in a competitive

1   bidding war.  Even that amount probably overstates the impacted VOC because of non-serious bidders

2   who were simply nuisances and piggybacked on the bidding in order to receive payoffs.

3        In any case, inclusion of the full value of a house as affected VOC regardless of whether the

4   house sold for $100,000 or $500,000 seriously overstates the seriousness of the offense, particularly

5   where the amount of payoffs is so small.  There is simply no justification for including in VOC the

6   portion of the sale the bank was going to receive regardless of whether there was a payoff.

7        There are few litigated cases in this area because the government typically negotiates VOC

8   settlements with companies that have engaged in cartel conduct.  Thus it is illuminating to look at

9   how the Department treats those cases.  Typically, VOC is calculated based solely on the specific

10  portion of commerce that is actually affected by the cartel conduct.  For example, in the autoparts

11  cases which involved billions in sales of cars with parts that were price fixed, the government never

12  took the position that the entire price of the car should be included in the VOC calculation.  U.S.

13  Sentencing Mem. 4, *United States v. Hitachi Auto. Sys., Ltd.,* No. 1:16-CR-78 (S.D. Ohio Feb. 6,

14  2017), ECF No. 18.  Rather, the government sought to count only the price of the individual part—

15  whether it was a shock absorber or brake or steering wheel.  The same was true in the LCD and

16  computer components cases.  *See*, *e.g.*, U.S. Sentencing Mem., *United States v. AU Optronics*, No.

17  CR-09-110 SI (N.D. Cal. Sept. 11, 2012), ECF No. 948 (manufacturers of LCD panels were held

18  accountable for only the cost of the panels themselves, not the full sale price of the televisions,

19  monitors, and mobile devices that incorporated those panels).

20        The Justice Department takes this component-based position because attributing the full price

21  of the car would vastly overstate the commerce affected by the individual defendants, and it would

22  never be able to prove up its burden for that assertion.  The same is true here.  Counting the full cost

23  of the house where only a tiny portion of the purchase price could have been affected is the same as

24  saying that the entire cost of a car is affected VOC where the steering wheel was the subject of price

25  fixing.

26              2.     *The Government Double Counts its Volume of Commerce*

27        The government compounds its VOC miscalculation by counting the full amount of every sale

28  where Mr. Giraudo received a payment, despite the fact that Mr. Giraudo was in nearly every instance

1   only one of two, three or more joint venture partners who entered into the sale. The Sentencing

2   Guidelines are clear that "the volume of commerce attributable to an individual participant in a

3   conspiracy is the volume of commerce *done by him* … in goods or services that were affected by the

4   violation." U.S.S.G. § 2R1.1(b)(2) (emphasis added). In other words, the "antitrust guideline does

5   not" "attribute the sales of each member of the conspiracy to all the others." *United States v.*

6   *Heffernan,* 43 F.3d 1144, 1147 (7th Cir. 1994). Rather, "the guideline counts every sale just once,"

7   and "[t]he only sales attributed to the conspirator are his own sales … ." *Id.* at 1147-48. It would

8   therefore be inappropriate to double, triple, and even quadruple count the full purchase price for each

9   partner involved. To attribute the full amount of commerce to Mr. Giraudo overstates the overall

10  impact of the violation. The principle of proportionality, as well as the language of the Sentencing

11  Guidelines, demand that Mr. Giraudo only be held culpable for the portion of the volume of commerce

12  attributable to himself as an individual. U.S.S.G. § 2R1.1(b)(2).[30]

13          *3.      The Government Included Properties Outside the Limitations Period*

14          A "volume of commerce" adjustment under U.S.S.G. § 2R1.1 must be calculated based

15  solely on transactions that occurred within the applicable five year statute of limitations. Some 48

16  of 102 transactions the government would attribute to Mr. Giraudo occurred outside the statute of

17  limitations. The Court should disregard these transactions in calculating Mr. Giraudo's sentence.[31]

18

19  [30] Ex. 32 tracks Mr. Giraudo's proportional ownership of the properties in the government's
20  provided list of transactions attributable to Mr. Giraudo (where any evidence suggests he actually
    had an ownership interest). There are several instances where the records from Mo Rezaian, which
21  the government is likely to rely on heavily, are inconsistent with the best evidence available of an
    individuals' involvement with a particular property—the joint venture agreements reached after the
22  sale. In many cases, Joe is not involved at all in the joint venture, and in others Joe is joined by
    different or additional partners. Where discrepancies exist, we have submitted the supporting
23  agreements as exhibits for the Court. Even under the government's full purchase price plus payoff
    approach, and including all properties the government asserts (without sufficient support), the
24  amount attributable to Mr. Giraudo is at most $10,190,127.20. Considering only the payoffs made,
    which we believe is the correct approach for VOC, Mr. Giraudo's proportion is at most
25  $121,816.84.
26  [31] The transactions that occurred before October 22, 2009, five years before Mr. Giraudo's
    indictment, account for $16,709,933.66 according to the government's most recent formulation of
27  its volume of commerce calculation. The government lists an additional 31 transactions where Mr.
    Giraudo is alleged to have received payoffs prior to this date, accounting for $74,708.31 in
28  restitution attributed to Mr. Giraudo. All of these transactions should be excluded.

As the Supreme Court recently held in *Kokesh v. SEC*, 137 S. Ct. 1635 (2017), a defendant may not be subjected to a "penalty" based on conduct that occurred outside the otherwise applicable limitations period.  In *Kokesh*, the government brought an enforcement action against the owner of two investment/adviser firms, alleging that he fraudulently misappropriated $34.9 million over a 15-year period between 1995 and 2009.  *Id.* at 1641.  The government sought a disgorgement judgment for that amount, despite that nearly $30 million of the alleged losses resulted from violations outside the limitations period.  *Id.*  The district court entered judgment for $34.9 million, reasoning that disgorgement is not a "penalty," and thus no limitations period applied.  *Id.*  The Supreme Court reversed, holding that disgorgement is a penalty subject to the statute of limitations, and therefore disgorgement should be ordered only for losses that occurred within the five-year limitations period.  *Id.* at 1643-44.

*Kokesh* is of course a newly decided case that involved a disgorgement by the Securities and Exchange Commission.  The same reasoning should apply to the Department of Justice and a sentence of imprisonment tied to a calculation of VOC.  The question in *Kokesh* was whether disgorgement constituted a penalty.  The Justices ruled that it did.  Here, the issue is not a financial payment but a prison sentence, which clearly constitutes a penalty under the law that necessitates due process and special protections.  *See United States v. Marion*, 404 U.S. 307, 321 & n.14 (1971) (criminal statute of limitations are "the primary guarantee against bringing overly stale criminal charges," "provide predictability by specifying the limit beyond which there is an irrebuttable presumption that a defendant's right to a fair trial would be prejudiced," and "should be liberally interpreted in favor of repose").  There is no reason to believe a limitations period would be more liberally interpreted in a criminal case than a monetary penalty in a civil case.  *See* 18 U.S.C. § 3282 ("no person shall be prosecuted, tried, *or punished* for any offense, unless the indictment is found… within five years next after such offense shall have been committed") (emphasis added).  *See Kokesh*, 137 S. Ct. at 1641 (statutes of limitations are "'vital to the welfare of society' and rest on

1   the principle that 'even wrongdoers are entitled to assume that their sins may be forgotten.'")

2   (quoting *Gabelli v. SEC*, 568 U.S. 442, 448 (2013)).[32]

3       This is, after all, not a case of a continuing conspiracy where the government could reach

4   back and include commerce as part of one overarching charge.  Each transaction was separate—

5   with separate properties, different partners, purchased at different auctions, and with different

6   agreements (if any) to pay would-be bidders from refraining from the sale. [33]

7            *4.*    *Resulting Proper VOC Calculation*

8       Even assuming each of the government's asserted properties is correct (which they are

9   not),[34] if the VOC were properly calculated, accounting for (1) only the payoff portion of the

10  transactions where Mr. Giraudo purchased an interest in a property, (2) only Mr. Giraudo's

11  individual proportion of those payoffs, and (3) excluding transactions outside the statutory period, it

12  would amount to a total of less than $100,000.  If the Court decides not to adopt this approach, it

13  should still consider the impact these calculations have for the purposes of determining whether the

14  government's calculation overstates the VOC so dramatically as to warrant a downward departure.

15

16

---

17  [32] The Ninth Circuit held in a pre-*Kokesh* case that "relevant conduct," as defined in U.S.S.G.
    § 2B1.1 may include conduct that occurred outside of the limitations period.  *See United States v.*

18  *Williams*, 217 F.3d 751, 753-54 (9th Cir. 2000).  Although the Ninth Circuit recently cited *Williams*
    with approval in a non-published opinion, *see United States v. Stewart*, No. 16-50093, 2018 WL

19  1476942, at *2 (9th Cir. Mar. 27, 2018) (unpublished), it did not address *Kokesh*.

20  [33] Again, this point is made plain by the language of Mr. Giraudo's guilty plea, which makes no
    mention of a conspiracy, but rather admits to "knowingly and voluntarily enter[ing] into

21  ***agreements*** to refrain from or stop bidding against others." Application for Permission to Enter Plea
    of Guilty, *Giraudo*, ECF No. 263. (emphasis added).

22  [34] In addition to the flaws in methodology, the government also makes a series of factual errors that
    should undermine the Court's confidence in the accuracy of the government's calculations.  For

23  example, the government asserts that Mr. Giraudo engaged in misconduct related to a sale at 1319
    Monte Diablo.  The notes of this sale are from Mo Rezaian's phone and they indicate that Mr.

24  Giraudo was not involved until after the sale, and any payoff, was completed.  *See* NDRE-MR-VP-
    000026-27 (Notes of Mo Rezaian, stating "Sold to Joe/Ray/Dan ***gave Joe my share***; Paid Florance

25  $2000.") (emphasis added).  Similarly, the government attributes wrongdoing to Mr. Giraudo
    regarding 950 Old Mission Road.  However, Rezaian's notes do not indicate that Mr. Giraudo was

26  involved.  Likewise, the government includes 1788 45th Street in San Francisco to Mr. Giraudo, but
    the JV agreements seem to involve only Grinsell, Vlad Chernoguz, and David Rubinstein (Ex. 33,

27  NDRE-ABSG-EMAIL-001858).  These are just a slice of the errors, even putting aside the
    evidentiary and accuracy concerns that some have about Rezaian's notes.

28

D.      The Bid-Rigging Enhancement Point Is Improper for the Offense Conduct

The PSR includes a one-point enhancement under U.S.S.G. § 2R1.1(b)(1).  While most if not all defendants in this case have accepted the enhancement, the nature of the scheme does not actually fall within the category of "non-competitive bids" conspiracies that warrants the enhancement.  As Judge Posner wrote for the 7th Circuit in *United States v. Heffernan*, this enhancement is reserved for schemes involving strictly defined "bid rigging" in the form of "bid rotation," and "cannot be given a broader meaning." 43 F.3d at 1147.  That narrowly defined type of conspiracy involves an agreement to refrain from bidding or submit non-competitive bids in one round, in exchange for the promise of winning a different transaction in the future.  The apparent purpose of the bid rotation enhancement was to account for the possibility that some conspirators may never win a bid because their "turn" in the bid rotation may be unsuccessful, resulting in an underestimated volume of commerce.  U.S.S.G. § 2R1.1 (Commentary); *Heffernan*, 43 F.3d at 1147.  "[W]hen bidding shenanigans do not take the form of bid rotation, the problem of understating the volume of commerce is no more serious than in any other price-fixing case …." *Heffernan*, 43 F.3d at 1148.[35]

This concern does not exist in Mr. Giraudo's circumstances.  For one, the volume of commerce attributed to him under the government's methodology is significant.  But more to the point, Mr. Giraudo and the other conspirators in this case did not rotate bids in the fashion required for the enhancement.  Rather, they engaged, in the words of Judge Posner, in "bid shenanigans" by negotiating the price of payoffs necessary to secure the respective properties on a property-by-property basis. Any party interested in purchasing the property was able to participate in that negotiation, and either receive a payoff or purchase the property.  There was therefore no risk of a "lost turn."  And all transactions where payoffs were made are allocated to the appropriate

---

[35] The Fourth Circuit disagreed with *Heffernan* in a case that concerned secondary round auction rigging. *See United States v. Romer*, 148 F.3d 359, 371-372 (4th Cir. 1998). We believe Judge Posner's interpretation of the Guidelines to be better reasoned.  Even still, the *Romer* court determined that the secondary round auctions qualified as "bid rotation." *Id.*  Secondary round auctions represent the type of formal ongoing auction schemes where bid rotation is possible, whereas here, the ad hoc nature of these bid-by-bid agreements do not fit the necessary pattern or pose the same risks of understating VOC.

1   defendant—the person who acquired the property—so volume of commerce is not understated.  The

2   scheme therefore was not bid rotation, and the one-point enhancement is not proper.

3        E.     <u>Resulting Guidelines Range</u>

4        Taking each of these arguments into account, the proper Guidelines range is based on a base

5   offense level of +12, (U.S.S.G. § 2R1.1) with no enhancement for bid rigging, volume of

6   commerce, or adjusted role in the offense.  After applying a -2 adjustment for acceptance of

7   responsibility, the Total Offense Level amounts to 10.[36]  The Defense agrees with the Sentencing

8   Recommendation that a downward departure from a criminal history score of Category II to

9   Category I is appropriate in order to more accurately reflect Mr. Giraudo's history.[37]  Sentencing

10  Recommendation at 1; U.S.S.G. § 4A1.3(b).  This amounts to a Zone B sentence of 6-12 months,

11  which is consistent with the range other judges have sentenced other defendants involved in

12  foreclosure auction misconduct.[38]

13  **IV.    PURSUANT TO 18 U.S.C. § 3553 AND U.S.S.G. §§ 5H1.1 AND 5H1.4, PROBATION IS THE MOST APPROPRIATE SENTENCE FOR MR. GIRAUDO**

14

15       A.     <u>The Court Should Consider Individual Circumstances under § 3553</u>

16       In arriving at a sentence, the Court must carefully consider the Section 3553(a) factors to

17  ensure that any sentence it imposes is "sufficient, but not greater than necessary, to comply with the

18  purposes" of imprisonment, such as deterrence, punishment, and public safety.  *United States v.*

19  *Trujillo*, 713 F.3d 1003, 1008 (9th Cir. 2013) (citing 18 U.S.C. § 3553 (a), (a)(2)).  These factors

20  _____

21  [36] The PSR proposes 3 points for acceptance of responsibility based on its inflated calculation of the underlying Guidelines.  PSR ¶¶ 39-40.  To the extent the Court determines that Mr. Giraudo's

22  adjusted offense level calculation is greater than 16 points, the three points for acceptance of responsibility is appropriate in light of Mr. Giraudo's guilty plea and offer to the government to

23  cooperate.

24  [37] Mr. Giraudo has a DUI from many years ago that is not relevant to the present circumstances or case, and for which he was sentenced to non-reporting probation at the time of the present offense.

25  [38] Nearly every individual who pled guilty received probation rather than a custodial sentence, and of those sentenced by Judge Hamilton, the sentences ranged from 6-14 months. *See* Minute Entry,

26  *United States v. Diaz*, 14-cr-607-PJH (N.D. Cal. Mar. 8, 2017), ECF No. 278 (6 months); Minute Entry, *United States v. McKinzie*, 11-cr-424-PJH (N.D. Cal. Oct. 4, 2017), ECF No. 101 (14

27  months).  The maximum sentence handed out in E.D. Cal. for those who pled was 8 months. Criminal Minutes of Proceedings, *United States v. Olmstead*, 11-cr-291-WBS (E.D. Cal. Sept. 12,

28  2016), ECF No. 56.  As discussed below, Mr. Giraudo's individual characteristics warrant far less.

include the nature and circumstances of the offense and the history and characteristics of the defendant; the purposes of sentencing; the kinds of sentences available; the sentences and ranges established by the Sentencing Guidelines; relevant policy statements issued by the Sentencing Commission; the need to avoid unwarranted sentencing disparities among similarly situated defendants; and the need to provide restitution to victims.  18 U.S.C. § 3553(a).  Ultimately, "the punishment should fit the offender and not merely the crime," and thus judges should use "the fullest information possible concerning the defendant's life and characteristics" to determine the appropriate sentence.  *Trujillo*, 713 F.3d at 1008-09 (quoting *Pepper v. United States*, 131 S. Ct. 1229, 1235, 1240 (2011)).  As discussed below, Mr. Giraudo's age and health, contributions to the community, and the relative harm he has caused by his crimes warrant probation, and no more than a sentence of home confinement.

**B.**      Mr. Giraudo's Age Would Make a Custodial Sentence Extremely and Unnecessarily Harsh

At 80 years old and in frail health, suffering from congenital heart disease and living with 10 stents, there can be no serious question that a sentence in federal custody (even the lightest possible sentence as recommended by the Probation Officer) would carry life-threatening conditions for Mr. Giraudo.  That would not be warranted for even a violent felony; it is certainly not warranted here.

"Age may be a reason to depart downward in a case in which the defendant is elderly and infirm and where a form of punishment such as home confinement might be equally efficient as and less costly than incarceration."  U.S.S.G. § 5H1.1.  Likewise, "[a]n extraordinary physical impairment may be a reason to depart downward; *e.g.*, in the case of a seriously infirm defendant, home detention may be as efficient as, and less costly than, imprisonment."  U.S.S.G. § 5H1.4.  *See also* 18 U.S.C. § 3553(a)(1) ("The court, in determining the particular sentence to be imposed, shall consider … the history and characteristics of the defendant.").

As the Probation Officer acknowledges, a custodial sentence "would affect an 80-year-old much differently than someone in their 40s" and would, in light of Mr. Giraudo's age and health, "have an unwarranted sentencing disparity" compared to a younger, healthier defendant.  Sentencing Recommendation at 3.  As described above, Mr. Giraudo suffers from numerous

1  medical ailments and requires ongoing medications to address those ailments.  Ex. 15 (Medical

2  Records).  As recently as January 2018, Mr. Giraudo's physician observed that Mr. Giraudo

3  remains "at high risk" with regard to his coronary artery disease.

4          According to the Centers for Disease Control, life expectancy in the United States is 78.8

5  years and for non-Hispanic white males, life expectancy is 76.3 years.  *See* Sherry L. Murphy et al.,

6  *National Vital Statistics Reports:  Deaths: Final Data for 2015* 7, 10 (U.S. Dep't of Health and

7  Human Servs., Vol. 66, No. 6, Nov. 27, 2017),

8  https://www.cdc.gov/nchs/data/nvsr/nvsr66/nvsr66_06.pdf (last visited Apr. 8, 2018).  Indeed, heart

9  disease, which Mr. Giraudo remains at "high risk" for, is the leading cause of death.  *Id.* at 9.

10         There is substantial case law for the proposition that the Court can and should consider this

11  factor.  *See United States v. Johnson*, 685 F.3d 660, 663 (7th Cir. 2012) ("Our court has concluded,

12  as have other courts, that a sentence which although it is a term of years is likely or even certain to

13  be a de facto life sentence because of the defendant's age is improper if the statute under which he

14  was convicted provides that only a jury can authorize a life sentence.").

15         C.      Mr. Giraudo Has Contributed Significantly to the San Francisco Community And Will

16                 Continue to Do So.

17         The Court should consider Mr. Giraudo's long history of charitable contributions and

18  personal generosity.  18 U.S.C. § 3553(a)(1) ("history and characteristics of the defendant" to be

19  considered in imposing sentence); *see United States v. Takei*, 941 F.2d 738, 744 (9th Cir. 1991)

20  ("Where a defendant has a blameless record, his or her outstanding generosity should be able to be

21  taken into account.").  Mr. Giraudo, who came to California as a child, has throughout his life

22  engaged in significant charitable work within the San Francisco community, including contributions

23  to Jewish and Catholic charities, underprivileged students, and the community at large.  Exs. 1-14,

24  18 (Donation Letters, Letters of Support).  Mr. Giraudo has donated millions to charities within the

25  San Francisco community.  PSR ¶ 55; Ex. 18 (donation records).

26         But Mr. Giraudo's generosity does not end with the writing of checks.  As the 14 letters of

27  support reflect, Mr. Giraudo has in every facet of his life prioritized helping others.  Mr. Giraudo's

28  son, Mark Giraudo, writes how Mr. Giraudo taught him to "care about people" through his own

1    example of "treat[ing] the cleaning person and gardener with the same respect and admiration as he

2    does with people of wealth and power."  Ex. 11 (Letter of Support).  Mark Giraudo describes how

3    Mr. Giraudo "would often find a way to sell the house back to [people who, through hard times, had

4    lost their homes to foreclosure] for little or no profit."  *Id.*  Lou Giraudo recounts occasions where

5    Mr. Giraudo simply turned the deeds over to prior owners when he discovered they were still

6    occupying the property.  Ex. 14 (Letter of Support).  Mr. Giraudo's daughter, Georgine Dixon,

7    writes that "[w]hen the going got tough for [her], other family members, friends, acquaintances, and

8    strangers, [Mr. Giraudo] was there" and knew "how helping others could positively impact and

9    change their lives."  Ex. 13 (Letter of Support).  Bob Giraudo, another of his relatives, explains how

10   Mr. Giraudo's "coaching and guidance" gave him "time to heal at [his] own pace and also gave

11   [him] time to reenter into the workforce" after the tragic death of his son.  Ex. 12 (Letter of

12   Support).

13          Mr. Giraudo's generosity and compassion extends beyond his family members to even

14   acquaintances that he happens to encounter who are down on their luck.  Grant Slavin, whose

15   parents were friends with Mr. Giraudo, describes how Mr. Giraudo helped his father stay in the

16   house he owned with his wife, who passed away, and would pick up his father, who is legally blind

17   and has trouble walking, "three to four times a month and take him to breakfast or lunch and spend

18   time with him."  Ex. 6 (Letter of Support).  Donald Urie, an associate of Mr. Giraudo's, writes

19   about how Mr. Giraudo "has assisted countless business associates in their careers" and how his

20   "compassion for those who are down on their luck was frequently exhibited through his approach to

21   those who lost their homes through lien sales."  Ex. 10 (Letter of Support).  And his longtime

22   assistant Karen Griggi, provides numerous examples of Mr. Giraudo's generosity, including

23   providing money to an individual who lost his home in foreclosure so he could start a business;

24   lending money at low or no interest to individuals at risk of losing their homes in foreclosure so

25   they can save their property; and rescinding foreclosures on properties he had acquired to protect

26   the homeowners.  Ex. 5 (Letter of Support).

27          These letters are only a sample of the expressions of gratitude and testaments to Mr.

28   Giraudo's lifetime of generosity and compassion for others.  It is appropriate for the Court to put the

instant offense in the context of an otherwise exemplary, indeed extraordinary, life of contribution and generosity. *Takei*, 941 F.2d at 744; *see also United States v. Warner*, 792 F.3d 847, 857-58 (7th Cir. 2015) (concluding that district court reasonably considered defendant's "letters of support" detailing his "charitable works and generosity" as "the primary mitigating factor … toward a lenient sentence"); *United States v. Tomko*, 562 F.3d 558, 571-72 (3d Cir. 2009) (finding no abuse of discretion where district court sentenced defendant to probation in light of "his negligible criminal history, his employment record, his community ties, and his extensive charitable works").

D. <u>Probation Would Be Sufficient to Meet the Goals of Sentencing.</u>

A sentence of probation serves the purposes of retribution and deterrence here.  As the Supreme Court has recognized, there is a "substantial restriction of freedom involved in a term of supervised release or probation."  *Gall v. United States*, 552 U.S. 38, 48 (2007).  "Probationers may not leave the judicial district [or] move … without notifying, and in some cases receiving permission from, their probation officer or the court," and "[t]hey must report regularly to their probation officer [and] permit unannounced visits to their homes."  *Id*.  Indeed, probation is a common sentence in antitrust cases.[39]  Furthermore, "even without a prison sentence," fines and restitution, which Mr. Giraudo stands ready-and-willing to pay, "provide[] a measure of deterrence." *Warner*, 792 F.3d at 861.

The government would be hard-pressed to contend that a custodial sentence is required to satisfy those goals.  No one could seriously contend that Mr. Giraudo is likely to reoffend.[40]  He is deeply remorseful, and has suffered greatly through the process of this case, and has no financial need to engage in this type of conduct ever again.  The government has also failed to show significant economic impact of the conduct.[41]  The government has not been shy in touting the

---

[39] In 2017, 58.1% of antitrust offenders were sentenced to probation, and, over the last three years, 46.3% were sentenced to probation.  *See* United States Sentencing Commission Quarterly Sentencing Updates, https://www.ussc.gov/research/data-reports/quarter/quarterly-sentencing-updates.

[40] *See* 18 U.S.C. § 3553(a) (sentence requires consideration of "the need for the sentence imposed … to protect the public from further crimes of the defendant").

[41] As noted above, we have performed analysis on auction records for more than 2,600 properties sold at auction in San Mateo County from April 2009 to December 2010.  On average, those properties that were not subject to any alleged payoff sold for only 3.31% higher than the opening

results of this and related cases as if Mr. Giraudo and others were the most egregious wrongdoers during the financial crisis.[42]  The "victims" of this offense were not the homeowners who were foreclosed on but the banks who made ill-considered loans in the first instance, and then seized the homes of low-income property owners as a result.  The role of the banks during the financial crisis has been the subject of much commentary and even cinema treatment; and the government's failure to prosecute banks or bank executives has also been the subject of significant discussion.[43]  We do not suggest that this excuses Mr. Giraudo's conduct; but it is certainly appropriate for this Court to consider the actual impact and harm caused and to whom.

Section 3553(a) directs courts to impose a sentence that is "sufficient, *but not greater than necessary*" in the circumstances of each case.  18 U.S.C. § 3553(a) (emphasis added).  If any case warrants a non-custodial sentence it is this one, given Mr. Giraudo's age, remorsefulness, character, and the limited economic impact of his conduct.  There can be little question that, despite these considerations, the government is seeking an especially harsh sentence against Mr. Giraudo because he had the temerity to refuse to plead to mail fraud; and to challenge the unconstitutional wiretapping at a California state courthouse; and to refuse to enter into a plea agreement containing unsupportable Guideline calculations.  Indeed, we expect the Government will tout the cooperation of people who actually pled guilty *after* Mr. Giraudo.[44]  This unfortunately fits a pattern of government overreaching and miscalculation such that even other judges have routinely rejected the Justice Department's sentencing recommendations.[45]

---

bid, while those where a payoff has been alleged sold for 7.10% higher than the opening bid.  The interest in a property created by Joe and his partners actually generated more economic *gain* for the banks that have been allegedly harmed.

[42] *See supra*, note 14.

[43] *See, e.g.,* Press Release, U.S. Senate Permanent Subcommittee on Investigations, Sen. Levin Statement on DOJ Announcement on Goldman Sachs (Aug. 10, 2012); The Big Short (Plan B Entertainment and Regency Enterprises 2015).

[44] *See supra,* note 19.

[45] The Justice Department's unrealistic and excessive views about this case may be one reason why other judges have consistently rejected the DOJ's sentencing recommendations.  Judge Schub did not give any defendant more than 8 months in custody; and Judge Hamilton did not give more than probation to any defendant who pled guilty and was willing to pay restitution.

1    Thus, Mr. Giraudo pled guilty and decided to place himself in the hands of the Court

2   without the protections of a plea agreement.

3   **V.     CONCLUSION**

4    For the reasons stated above, we respectfully request that the Court sentence Mr. Giraudo to

5   probation; and in no case more than 6 months of home confinement.

6                                           Respectfully submitted,

7

8   DATED: April 19, 2018                            VINSON & ELKINS L.L.P.

9

10                                     By:   _____
                                                 *Matthew J. Jacobs*

11                                           Matthew J. Jacobs
                                             Attorneys for Defendant JOSEPH J. GIRAUDO

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**CERTIFICATE OF SERVICE**

2        The undersigned certifies that on April 19, 2018, the foregoing document was electronically

3   filed with the Clerk of the Court for the UNITED STATES DISTRICT COURT, NORTHERN

4   DISTRICT OF CALIFORNIA, using the Court's Electronic Case Filing (ECF) system.  The ECF

5   system routinely sends a "Notice of Electronic Filing" to all attorneys of record who have consented

6   to accept this notice as service of this document by electronic means.

7

8                                   VINSON & ELKINS L.L.P.

9

10                        By:  */s/ Matthew J. Jacobs*
                               _____
11                             Matthew J. Jacobs
                               Attorneys for Defendant JOSEPH J. GIRAUDO
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28