VINSON & ELKINS L.L.P.
Matthew J. Jacobs (CSB 171149)
        Email: mjacobs@velaw.com
Erica Connolly (CSB 288822)
        Email: econnolly@velaw.com
Christopher W. James (CSB 289047)
        Email: cjames@velaw.com
555 Mission Street, Suite 2000
San Francisco, CA 94105
Telephone: +1.415.979.6900
Facsimile:  +1.415.651.8786

Attorneys for Defendant
JOSEPH J. GIRAUDO

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                         Plaintiff,<br><br>        vs.<br><br>JOSEPH J. GIRAUDO,<br><br>                         Defendant. | Case No.  CR 14-00534 CRB<br><br>**DEFENDANT JOSEPH GIRAUDO'S RESPONSE TO GOVERNMENT'S SENTENCING MEMORANDUM** |

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION .................................................................................................... 1

II.     ARGUMENT ........................................................................................................... 2

      A.      The Government Essentially Ignores § 3553 to Recommend an Extreme and Unjust Sentence .......................................................................................... 2

      B.      The Government Has Not Met Its Burden ................................................. 6

            1.      The 302s Cited by the Government Are Inherently Unreliable and the Court Should Give them Little or No Weight .................................. 6

            2.      There Is No Credible Proof Offered by the Government of Harm to Individuals ......................................................................................... 9

      C.      Joe Giraudo Does Not Qualify as a Leader/Organizer under § 3B1.1 ...... 10

      D.      The Government Failed to Meet Its Burden of Proof for the VOC .......... 14

      E.      The Bid Rigging Enhancement Is Not Warranted .................................... 17

III.    CONCLUSION ..................................................................................................... 18

1

# TABLE OF AUTHORITIES

2

**Cases**

3   *Copperweld Corp. v. Independence Tube Corp.,*
       467 U.S. 772 (1984) .................................................................................................. 16

4

    *Texaco v. Dagher,*
5      547 U.S. 1 (2006) ...................................................................................................... 16

6   *United States v. Ameline,*
       409 F.3d 1073 (9th Cir. 2005) ................................................................................... 3

7

    *United States v. Armstead,*
8      552 F.3d 769 (9th Cir. 2008) ..................................................................................... 6

9   *United States v. Avila,*
       95 F.3d 887 (9th Cir. 1996) ..................................................................................... 10

10

    *United States v. Carty,*
11     520 F.3d 984 (9th Cir. 2008) ..................................................................................... 3

12  *United States v. Fuller,*
       897 F.2d 1217 (1st Cir. 1990) ................................................................................. 14

13

    *United States v. Hanna,*
14     49 F.3d 572 (9th Cir. 1995) ................................................................................... 6, 9

15  *United States v. Heffernan.*
       43 F.3d 1144 (7th Cir. 1994) .............................................................................. 17, 18

16

    *United States v. Herrera,*
17     878 F.2d 997 (7th Cir. 1989) ................................................................................... 14

18  *United States v. Huckins,*
       53 F.3d 276 (9th Cir. 1995) ................................................................................... 6, 9

19

    *United States v. John Michael Galloway,*
20     Case No. CR 14-607 PJH (N.D. Cal. Mar. 15, 2017), ECF 330 ................................ 11

21  *United States v. JPMorgan Chase & Co.,*
       Case No. 3:15-cr-00079 (SRU), 2016 WL 7530414 (D. Conn. Dec. 1, 2016) ............. 17

22

    *United States v. LaDeau,*
23     734 F.3d 561 (6th Cir. 2013) ..................................................................................... 4

24  *United States v. McGowan,*
       668 F.3d 601 (9th Cir. 2012) ............................................................................ 6, 7, 9

25

    *United States v. Mitsubishi Corp.,*
26     Case No. CR 00-33 (E.D. Penn. April 19, 2001), ECF 164 ....................................... 16

27  *United States v. Rivera,*
       527 F.3d 891 (9th Cir. 2008) ................................................................................... 13

28

*United States v. Rose,*
   449 F.3d 627 (5th Cir. 2006) ............................................................................. 15

*United States v. Rosenthal,*
   266 F. Supp. 2d 1091 (N.D. Cal. 2003) ............................................................ 10

*United States v. SKW Metals & Alloys, Inc.,*
   6 F. App'x 65 (2d Cir. 2001) ............................................................................. 16

*United States v. Treadwell,*
   593 F.3d 990 (9th Cir. 2010) ................................................................................ 6

*United States v. Trujillo,*
   713 F.3d 1003 (9th Cir. 2013) .............................................................................. 3

*United States v. Weaver,*
   716 F.3d 439 (7th Cir. 2013) .............................................................................. 10

**Other Authorities**
18 U.S.C. § 3553 ..................................................................................................... 1, 3

18 U.S.C. § 2511 ....................................................................................................... 19

U.S.S.G. § 2R.1.1(b) ........................................................................................... 15, 17

U.S.S.G. § 3B1.1 ...................................................................................................... 10

U.S.S.G. § 6A1.3(a) ................................................................................................... 6

**Rules**
Crim. L.R. 32-3(c) ................................................................................................. 1, 12

1

## I.      INTRODUCTION

2

For seven years, and at every available opportunity, the Justice Department has failed to

3

exercise its prosecutorial judgment in an appropriate fashion.  Thus it is disappointing but not

4

surprising that the government has chosen to distort and inflate the Guidelines and the record to

5

support a sentence that is wildly disproportionate in comparison to the crime committed, to the harm

6

caused, to the recommended sentence for other participants, and to the factors and circumstances

7

concerning Joseph Giraudo as a husband, father, grandfather, and member of the community.

8

Beyond this, the government's Sentencing Memorandum suffers from four fatal flaws.

9

First, the prosecutors barely mention 18 U.S.C. § 3553, and ignore most of the factors that the

10

Court must, as a matter of law, consider in trying to impose a just and fair sentence.  In failing to

11

address the considerations that this Court must weigh, the government has altogether abandoned any

12

pretense of the exercise of judgment and sound discretion. Consistent with its track record of

13

overreaching at every turn, the government asks the Court to impose one of the longest antitrust

14

sentences in the history of Sherman Act enforcement for an 80 year old individual in frail health.

15

Second, the government makes numerous unsupported factual assertions.  The Justice

16

Department bears the burden of proof and must submit to the Court reliable evidence to meet its

17

burden.  Nearly all of the statements it relies on come from FBI reports of newly interviewed and

18

newly cooperating witnesses who have altered their stories.  These witnesses have never been subject

19

to cross examination and we strenuously dispute the accuracy and credibility of some of these

20

assertions.  The government either needs to bring these witnesses forward so that their untested

21

statements can be challenged, or the Court should disregard these statements and find that the

22

government has failed to meet its burden.[1]

23

24

_____

25

[1] It has come to our attention that the government interviewed defendant Raymond Grinsell in

26

December 2018 and that he made statements contrary to the government's portrayal of Mr. Giraudo as a leader and organizer, but failed to disclose this helpful evidence to either the defense or the Probation Officer until six weeks after the FBI memo was written and after the PSR was already

27

drafted, presumably so that the information could not be included in Probation's report.  The government further refused to disclose to the defense a copy of what it provided to the Probation

28

Department, in violation of the Local Rules.  *See* Crim. L. R. 32-3(c).

Third, as anticipated in Mr. Giraudo's Sentencing Memorandum, the government misconstrues both the law and facts to justify a four-level enhancement for role in the offense. If deprived of evidence that is not part of the court record, the government's sole basis for an enhancement is the number of properties bought and sold which, as a matter of law, is not a basis for a role in the offense enhancement. The prosecutors portray Mr. Giraudo as the lynchpin and mastermind who founded and controlled the entire conspiracy. The Court might ask itself: If this were true, how could it be that thousands of transactions and hundreds of payoffs occurred at the San Mateo and other courthouses in this state that Joe Giraudo did not know about and in which he did not participate?

Fourth, the government offers an illogical and unsupportable theory for its proposed Volume of Commerce ("VOC"). As discussed in more detail in our Sentencing Memorandum, the government has adopted a methodology that lacks legal support, is illogical, and flies in the face of its practice in other matters.

We address each issue in turn.

## II.   ARGUMENT

A.   The Government Essentially Ignores § 3553 to Recommend an Extreme and Unjust Sentence

The government proposes a 37 month sentence for Mr. Giraudo, which is at the *high end* of an absurdly inflated Guideline analysis and would be one of the longest sentences ever imposed in an antitrust case. This recommendation is vastly disproportionate to the Presentence Report ("PSR") recommendation and other recommendations in this case: it is almost 400 percent higher than the probation officer recommends; it is almost 400 percent higher than the sentence imposed on Mohammed ("Mo") Rezaian, the true architect and most active enforcer of discipline among the so-called "Big 5"; and it is nearly double the sentence for Raymond Grinsell who engaged in roughly the same conduct as Mr. Giraudo and who pled guilty *after* Joe Giraudo. The government's recommendation is 37 months higher than nearly every sentence Chief Judge Hamilton imposed on defendants who pled; she gave these defendants non-custodial sentences.

Clearly, the government has trained its highest powered cannons on this 80-year-old man. In addition to the disproportionate nature of the recommendation, the government's sentencing memo is starkly lacking because it fails to address key factors the Court must consider under 18 U.S.C. § 3553—as if the Justice Department has no role in trying to help the Court arrive at a just and appropriate sentence.  This is not what prosecutors are supposed to do.

"District courts *must consider* the factors provided in . . . § 3553(a) in fashioning the appropriate sentence for the individual defendant." *United States v. Ameline*, 409 F.3d 1073, 1092 (9th Cir. 2005) (emphasis added).  While a court need not formulaically "tick off each of the § 3553(a) factors," "when a party raises a specific, nonfrivolous argument tethered to a relevant § 3553(a) factor," the court should "explain why [it] accepts or rejects the party's position." *United States v. Carty*, 520 F.3d 984, 992-93 (9th Cir. 2008); *accord United States v. Trujillo*, 713 F.3d 1003, 1010 (9th Cir. 2013) ("[W]hile a district judge need not enumerate every factor supporting a particular sentence, '[A] statement of reasons is important.'").

The Ninth Circuit has made clear that "[t]he district court must make an individualized determination based on the facts" of each case and each individual defendant.  *Carty*, 520 F.3d at 991.

As noted, Mr. Giraudo is 80 years old and in frail health—neither of which is discussed or considered in the government's memo.  There is no recognition of his overall contributions to society although these are spelled out in the PSR.  PSR ¶ 54-61. There is no discussion of his charitable works, which are extraordinary. There is not even a mention of his kindness toward people, including several instances when Mr. Giraudo figured out a way to return a home to its owner (something the "victim banks" would never consider doing) at little or no profit.  It is presumably the government's view that a lifetime of contributions, and the age and condition of the defendant, should be ignored. The government does not explain why that would be appropriate.  Well, it isn't. *See* PSR ¶ 98-100.

The government's sole discussion of a Section 3553 factor is deterrence.  Here, it is important to deconstruct the prosecutors' true meaning—because they apparently do not mean deterrence in the traditional sense of discouraging others from committing a criminal offense.  Rather, deterrence to these prosecutors means discouraging any defendant from challenging the Justice Department or

1    refusing to sign a plea agreement.  The message the government wants to send in the sentencing of

2    Mr. Giraudo is that one should not have the temerity to challenge the Department.

3        To level set on the facts:  Mr. Giraudo offered to plead guilty years ago to the Sherman Act

4    offense.[2]  He refused to plead to mail fraud because mail fraud had not occurred.  When told that

5    proposed mail fraud charges were baseless and unprovable, the Department's response was, literally,

6    "Others have pled to this so you have to as well."  Likewise, Mr. Giraudo dared to challenge the

7    Department by litigating the tapes issue along with other defendants when that belatedly came to

8    light.  The issue was hardly frivolous; the Court found that the taping scheme was unconstitutional

9    and excluded reams of evidence.  The only difference between Mr. Giraudo and those who pled long

10   before, such as Mr. Rezaian, is that *they agreed to plead to and admit to a factual basis for a crime*

11   *that did not occur.*  It cannot be the law that rebuffing the Justice Department by declining to take an

12   oath and swearing guilt to a crime that didn't occur—and *successfully* bringing to the Court's attention

13   an unconstitutional act by the Justice Department and FBI—represents a constitutional, legal basis

14   for imposing a higher sentence.  *See United States v. LaDeau*, 734 F.3d 561, 566 (6th Cir. 2013)

15   ("[T]he Due Process Clause [] prohibits the prosecution from punishing a defendant for exercising a

16   protected statutory or constitutional right."). This is acutely so where, as here, the defendant entered

17   a guilty plea without any of the protections or assurances of an agreement with the government.

18       There cannot be a credible assertion that others will be more or less likely to engage in

19   inappropriate conversations at real estate foreclosure auctions depending on whether the Court sends

20   an elderly man to federal prison, considering the number of cases prosecuted and the myriad press

21

22

23   [2] This Court is well aware of the long battle that occurred over the prosecution's faulty mail fraud

24   charges, and the evidence in the record demonstrates that Mr. Giraudo had been willing to accept
     the bid rigging charges almost immediately, and would have plead guilty but for the false mail fraud
     charges. *See, e.g.*, Exhibit M to Declaration of Andrew Mast in Support of United States Sentencing

25   Memorandum as to Joseph Giraudo (ECF 307) at 13 (hereinafter all references to the United States
     Sentencing Memorandum are identified as "US SM," and exhibits to the Mast Declaration are

26   identified by the shorthand "US SM Ex. [x]") (As early as 2011, Joe counseled Mo Rezaian to be

27   truthful with the government, and that he was willing to accept that he had committed bid rigging,
     but not fraud); US SM Ex. N at 14 (similar); US SM Ex. L at 16 (Joe told Michael Navone in 2014

28   that he would accept the bid rigging charges, but not mail fraud).

releases already issued by the Antitrust Division's public relations specialists.[3]  The proof that the government's definition of deterrence is to actually deter people from challenging the Antitrust Division is simple enough: Mo Rezaian, Dan Rosenblatt and Ray Grinsell engaged in exactly the same scheme of giving or accepting money not to bid.  While the government tries to make Mr. Giraudo much more culpable than these men based on the number of properties, that estimate is seriously misleading because the government agreed to ignore dozens of sales and payoffs in their plea agreements.[4]  Yet the government proposes vastly lower sentences for these defendants.  If the government were seriously contending that a 37 month sentence was required to deter similar conduct (a proposition for which they offer no evidence), then it would not be peddling a sentence of a year and a day for Rezaian.

Rezaian is, in fact, the only person about which there is evidence of threats or violence to coerce others to participate in the bid-rigging scheme—to the point that FBI Agent Roahn Wynar said he had to intervene to protect the personal safety of another bidder.  *See* Exhibit 2 to Defendant Joseph Giraudo's Response to Government's Sentencing Memorandum ("Gir. Resp. Ex. 2"), Transcript of 1/19/17 Hearing, ECF 200, at 311:19-25 (Agent Wynar describes intervening in a violent confrontation between Rezaian and Gajan Thia, stating "I was worried that Mr. Thia was going to be hurt by Mr. Rezaian. In particular Mr. Rezaian. I didn't believe that Mr. Giraudo had the gravitas required to calm Mr. Rezaian down.  I was able to observe this from a distance well enough to tell that Mr. Rezaian was going to do whatever he wanted to do, and nobody was going to stop him.").

In short, the government has failed to properly address the key factors that the Court must consider in the sentencing of Mr. Giraudo.[5]

---

[3] Witnesses who continued to attend the auctions have already reported that, "[s]ince the FBI's investigation became public, there is no evidence of bid-rigging during the auctions." US SM Ex. K at 2.

[4] Rezaian's records, which tracked his own bid-rigging activity, shows that he was involved in bid-rigging arrangements affecting nearly 190 properties. However, his plea agreement attributed only 143 properties to him. United States Sentencing Memorandum, *U.S. v. Rezaian*, Case No. CR 13-00246 (N.D. Cal.), ECF No. 48 at 2. Thus the comparisons in the Sentencing Memo filed by the government which portray Mr. Giraudo as the leading participant are seriously misleading. The same negotiated reduction in the number of payoffs applies to others as well.

[5] The government attempts to equate Mr. Giraudo with those who were convicted at trial, terming them all non-cooperating witnesses. This reinforces the point that the government's recommended

B.    The Government Has Not Met Its Burden

The government bears the burden to prove the facts offered at sentencing by a preponderance of the evidence, and it has not come close to satisfying that burden for any of the Sentencing Guideline enhancements it seeks.  *United States v. Armstead*, 552 F.3d 769, 776 (9th Cir. 2008); *United States v. Treadwell*, 593 F.3d 990, 1000 (9th Cir. 2010).

1.    *The 302s Cited by the Government Are Inherently Unreliable and the Court Should Give them Little or No Weight*

The evidence offered by the government about Mr. Giraudo's role in the offense and relative culpability consists almost entirely of Form 302 FBI witness interview summaries ("302s"), which carry their own unique concerns. These witness accounts are given by individuals who are not under oath, not subject to cross-examination, and who are incentivized to curry favor with the interviewing agents and DOJ trial attorneys who hold the keys to cooperation credit and a lower sentence.

Here, there is a serious factual dispute about the government's assertions based on the 302s. A defendant has a "due process right[]" not to be sentenced on the basis of "materially false or unreliable information."  *United States v. Hanna*, 49 F.3d 572, 577 (9th Cir. 1995).  While a sentencing court "may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial," that information must have a "sufficient indicia of reliability to support its probable accuracy."  U.S.S.G. § 6A1.3(a); *see also United States v. McGowan*, 668 F.3d 601, 606-08 (9th Cir. 2012); *United States v. Huckins*, 53 F.3d 276, 279 (9th Cir. 1995).  Statements "not made under oath, nor at trial where [a witness] could be cross-examined" are not "inherently reliable."  *Huckins*, 53 F.3d at 279.

Courts have regularly found unreliable "largely uncorroborated" allegations of co-conspirators who have "everything to gain and nothing to lose by implicating" their fellow defendants. *Hanna*, 49 F.3d at 578; *see also Huckins*, 53 F.3d at 278-79 (concluding that accomplice's statements to "federal agents" lacked sufficient "indicia of reliability" and were uncorroborated by sufficient

sentence is driven by punishment for challenging the Department.  As the Court is well aware, Mr. Giraudo did plead guilty, accept responsibility for his crime, and offered to cooperate with the government at the time of his open plea.

1    external evidence); *cf. McGowan*, 668 F.3d at 607-08 (holding that district court abused its discretion

2    by relying on informant's "uncorroborated" and "conflicting" statements in "an FBI interview" and

3    at trial in an unrelated case).

4         The information cited in the instant 302s suffers from exactly these faults as they are highly

5    unreliable and inconsistent.  Statements from Laith Salma, perhaps the most heavily cited witness in

6    the government's sentencing memorandum, are a prime example.  The government relies on Mr.

7    Salma's very recent December 15, 2017 statements (US SM Ex. U) for a number of assertions,

8    including that "[n]o one in the Big 5 had more influence than Giraudo" (US SM at 11:9-10), that

9    Giraudo told him "if he refused to abide by [the rules], Giraudo would outbid Salma on any property

10   he tried to purchase" (*id.* at 13:5-6), that "Giraudo first explained the rules of the conspiracy to Salma"

11   (*id.* at 13:4), and that "Giraudo required other bidders to show them their cashier's checks before

12   negotiating a payoff" (*id.* at 13:15-16).

13        Remarkably, Mr. Salma's previous interviews, and those of his brother Riyad Salma,

14   attributed each of these activities to ***Mo Rezaian,*** not Joseph Giraudo.  For example, on Jan. 11, 2011,

15   Laith Salma identified Rezaian as  the "'auction rigger' who controlled and manipulated the auctions

16   by intimidation, threats, and bribes."  US SM Ex. Q at 2.  In April 2012, Mr. Salma told the FBI,

17   "Rezaian was responsible for collecting and paying for payoff agreements[,]" and "Rezaian also made

18   comments indicating Rezaian would [retaliate against him] if Salma did not agree to participate in the

19   payoff scheme."  US SM Ex. R at 9.  He said Rezaian "did most of the talking for the Big Five and

20   negotiated many of the payoff deals for the Big Five."  US SM Ex. S at 1.  Riyad Salma reported that

21   it was actually Rezaian, not Giraudo, who "explained 'the rules' Rezaian expected the Salmas to

22   follow if they wanted to purchase property at the trustee sales[,]" and that "[t]he rules Rezaian

23   enforced at the trustee sales changed whenever it benefited Rezaian."  *See* Gir. Resp. Ex. 4, Riyad

24   Salma 302, NDRE-FBI-I-001419, 421 (Sept. 27, 2012).  Riyad also attributed the setting of payoff

25   amounts and proof of funds requirement to Rezaian, and stated that he did not observe others (like

26   Mr. Giraudo) asking for payoffs.  *Id.* at 422.  Notably, these interviews all occurred ***before*** Mr.

27

28

1   Rezaian entered a plea agreement in May 2013.  Now the stories have changed, which should cause

2   the Court serious concern about the veracity of these reports.[6]

3          Mr. Rezaian has been similarly inconsistent. The government relies on Rezaian's May 15,

4   2013 interview to claim that Mr. Giraudo "explained to Rezaian how the payoff agreements worked."

5   US SM at 13:20-21.[7]  However, earlier in the same interview Rezaian stated that Norman Montalvo

6   (an early partner of Rezaian's) explained the payoff system to him, and the two subsequently engaged

7   in payoff arrangements together.  US SM Ex. M at 2-3.  Rezaian confirmed the same in 2015—"Prior

8   to the time Rezaian began working with Giraudo, Rezaian worked with … Montalvo."  US SM Ex.

9   N at 3 (describing payoff arrangements the two made).  Rezaian also initially characterized himself

10  as the last person to be accepted as a partner with Giraudo, Grinsell, Rosenbledt, and Cullinane (US

11  SM Ex. M, at 4), but later acknowledged that he was the one that suggested recruiting Cullinane and

12  Rosenbledt into the group (US SM Ex. N, at 3).  He confirmed the same in his most recent interview,

13  noting that "[i]nitially Giraudo and Grinsell said no," but "Rezaian drove to have all five of them

14  become partners."  US SM Ex. O, at 4.  Rezaian also confirmed that he himself had "tried to create a

15  relationship and form a partnership with Giraudo," not the other way around.  US SM Ex. O at 3.

16         Importantly, this is not just a battle of inconsistent 302s, which the government should lose as

17  it has the burden of proof.  There has been testimony before this Court subject to cross examination,

18  which has a much higher indicia of reliability, but which the government ignores as that evidence

19  undercuts the government's arguments in its Sentencing Memorandum.  For example, Agent Wynar

20  described numerous transactions negotiated without any involvement, influence, or control by Joe

21  Giraudo.  *See, e.g.*, Gir. Resp. Ex. 1, Transcript of 1/17/17 Hearing, ECF 196, at 87:7-88:12

22  (describing a deal involving Rosenbledt, Rezaian, and Thia); Gir. Resp. Ex. 2 at 324:3-21 and 350:16-

23  22 (describing JV agreements between Rezaian, Rosenbledt, and Cullinane, as well as "a collusive

24  agreement between Mr. Thia, Mr. Cullinane, Mr. Rosenbledt, Mr. Rezaian.").  As noted above, Agent

25

26  [6] The government recommended a sentence of 6 months, including a 50% reduction based on
    Salma's cooperation. *U.S. v. Salma*, Case No. CR 11-00801 (N.D. Cal.), ECF No. 58 at 5.

27  [7] This in itself is a very strained interpretation of the Rezaian 302, which actually states that Mr.
    Giraudo and Dan Rosenbledt explained some of the justifications they had devised as to why the
28  behavior was legitimate.  US SM Ex. M at 3.

1   Wynar also described Mo Rezaian as being beyond the control of Joe Giraudo. Gir. Resp. Ex. 2 at

2   311:19-25. And David Ward, prosecutor for the U.S., characterized Giraudo as being on equal footing

3   with each of the other members of the so called "Big 5."  Gir. Resp. Ex. 3, Transcript of 2/28/17

4   Hearing, ECF 229, at 621:22-622:1 ("They were the five ringleaders in the case:  Giraudo, Grinsell,

5   Kevin [Cullinane], Mo Rezaian, and Dan [Rosenbledt]."); *id.* at 644:8-645:9 (discussing seizing

6   documents Mo Rezaian and "other ringleaders" Grinsell, Rosenbledt, Giraudo and Cullinane).

7          These fundamental inconsistencies are central to key disputed facts for Mr. Giraudo's

8   sentencing.  Because the testimony of these witnesses is disputed, it is the government's burden to

9   put them forward so that they can be subject to cross examination; otherwise the government will

10   have failed to meet its burden and the unproven statements should be disregarded in their entirety.[8]

11   *Hanna*, 49 F.3d at 578; *Huckins*, 53 F.3d at 278-79; *McGowan*, 668 F.3d at 607-08.

12                *2.*       *There Is No Credible Proof Offered by the Government of Harm to Individuals*

13          Likewise, the government's contention that homeowners with equity suffered as a result of

14   this crime is a transparent effort to find a more sympathetic victim than corrupt banks that hired

15   sheriffs to evict unemployed people from their homes.  The government cites to the PSR, which

16   purportedly lists three homeowners who allegedly lost equity in their houses.  The other listed victims

17   are large financial institutions such as CitiMorgage, Deutsche Bank, JP Morgan, Morgan Stanley, GE

18   Capital and Wells Fargo.  The government offers no proof of these losses to individuals, which

19   purportedly account for less than 5 percent of the total losses listed in the PSR, and does not identify

20   what properties they own or say how they allegedly suffered a loss.

21           In reality, the situation where a homeowner had more equity in a house than the minimum

22   bid could almost never happen because the homeowner would have been able to avoid the foreclosure

23   _____

24   [8] The PSR has similarly adopted the government's baseless assertion that Mr. Giraudo has been
engaged in bid rigging since the 1980s and 1990s.  PSR ¶ 21.  Even a cursory review of the support

25   for that assertion—"Rosenbledt indicated that he observed payoff agreements in the 1980s and that
Giraudo… attended the auctions during that time period"—demonstrates how thin the government's

26   evidence is.  US SM at 1 n.1.  The evidence offered from Ray Grinsell is no better—he states he
"could tell" that Giraudo was engaged in payoffs in the 1990s, but admits Giraudo was "secretive"

27   and that he only observed Joe's interactions with others "from a distance"; they never discussed any
payoffs.  US SM Ex. H, at 3-4.  Because of the Court's ability to consider previous conduct in its

28   ultimate sentencing determination, even such a small overstatement can have a significant impact.

1   and either keep or sell the house and make a profit.  If there was a gap, it is only because a bank was

2   willing to accept a lower amount from a foreclosed-on property than from the homeowner herself.

3   To the extent that these homeowners did not get their equity back and the price exceeded the

4   mortgage, they should blame the banks and not Joe Giraudo.  But again, this is all speculation as the

5   government has not provided the Court or the defense with any actual evidence of harm.

6           C.      <u>Joe Giraudo Does Not Qualify as a Leader/Organizer under § 3B1.1</u>

7          The arguments supporting government's conclusion that Mr. Giraudo should be subject to a

8   four-point leadership enhancement under U.S.S.G. § 3B1.1 are insufficiently supported or improperly

9   reasoned.

10          The government superficially clings to a series of nicknames for Mr. Giraudo and his partners,

11   as though it is the end of the inquiry that someone once referred to it as "Joe's Group," or called an

12   elderly Italian man the "Godfather."  The government's sentencing memo acknowledges that "titles

13   such as 'kingpin' or 'boss'" are not an adequate basis for an enhancement under § 3B1.1 (US SM at

14   12 n.11), and a truthful examination of Mr. Giraudo's conduct in relation to the actual payoff scheme

15   demonstrates why.  In order to justify the enhancement the government must show "control or

16   authority over others."  *United States v. Avila*, 95 F.3d 887, 890 n.6 (9th Cir. 1996); *United States v.*

17   *Rosenthal*, 266 F. Supp. 2d 1091, 1094-95 (N.D. Cal. 2003) (no enhancement where defendant did

18   not "direct[] or exercise[] authority over" or "exercise[ ] some measure of control and responsibility

19   over others").  He must have had "the ability to coerce underlings," which is a "key indicator of

20   control or authority" necessary to support an enhancement.  *Unites States v. Weaver*, 716 F.3d 439,

21   444 (7th Cir. 2013).

22          The government's theory of control and coercion falls of its own weight.  The government

23   asserts that Mr. Giraudo was the "primary leader" and "controlled all facets of the conspiracy[.]"

24   US SM at 1, 11.  This overstatement not only is contradicted by the government's own evidence

25   cited above, but defies logic.  There were more than 3,000 transactions in San Mateo and San

26   Francisco from mid-2008 through the end of 2010, of which Mr. Giraudo is alleged to have been

27   involved in payoffs for roughly 200.  Mr. Giraudo disappeared from the auctions for most of 2010

28   due to illness, but they proceeded in his absence.  And as the government points out in its opening

1   memorandum, similar practices existed at foreclosure sales at other courthouses in six states;

2   somehow they seemed to start and continue without Mr. Giraudo.  US SM at 6 n.4.  As Chief Judge

3   Hamilton noted in a similar case "there wasn't one group that was directing all of the activity.

4   Everyone was in it for themselves…and everybody was making a decision for themselves…. I'm

5   not at all persuaded that there was any one group or any one person who was in charge of it all."[9]

6   *United States v. John Michael Galloway*, Case No. CR 14-607 PJH, Transcript of Sentencing

7   Hearing (N.D. Cal. Mar. 15, 2017), ECF 330 at 23.

8        While certainly Mr. Giraudo was known as someone who had business acumen and worked

9   hard, that is not the same as coercion or control.  Evidence suggests that the partners "had their own

10   money, and everyone did their own research on properties…[and] payoffs during this time were

11   again a group decision."  US SM Ex. H at 2-3.  Rezaian said the same: "The payoffs were a group

12   decision.…If someone in the group of five partners had a strong feeling about a property, everyone

13   would go along with it."  US SM Ex. O at 3, 4.  And other members of the Big 5 were perceived to

14   be in the driver's seat, not Joe.  *See, e.g.,* US SM Ex. C at 3 ("Rezaian and Rosenbledt were the ring

15   leaders[.]"); US SM Ex. O at 4 ("On several occasions, Cullinane had more influence then [sic]

16   Giraudo.").  The former lead prosecutor for the Justice Department similarly characterized Mr.

17   Giraudo and his partners as being on equal footing.  Gir. Resp. Ex. 3 at 621:22-622:1 ("They were

18   the five ringleaders in the case:  Giraudo, Grinsell, Kevin [Cullinane], Mo Rezaian, and Dan

19   [Rosenbledt].").

20        The only person even arguably "controlled" by Mr. Giraudo is Mr. Appenrodt.  But

21   Appenrodt, by the government's own admission, did not participate in the scheme himself; he

22   merely participated on Mr. Giraudo's behalf when Joe was sick.  *U.S. v. Appenrodt*, Case No. CR

23

24   [9] This is clearly evidenced in this case by the activity conducted without Mr. Giraudo.  For example, Rezaian and Norman Montalvo were engaged in payoff arrangements before being involved with Mr. Giraudo.  US SM Ex. M at 3; US SM Ex. N at 3.  Michael Navone said he "never made a

25   payoff agreement with Giraudo" but made many with Rezaian and Patrick Campion.  US SM Ex. L at 7-8.  Many actions by the so-called Big 5 occurred without Mr. Giraudo.  *See, e.g.,* US SM at 15

26   (describing a secret auction that was arranged for 125 Merced); *but see* US SM Ex. M at 19 (evidencing that "[t]he people remaining [at the 125 Merced auction] included Rezaian, Rosenbledt,

27   Goodell, and [the Salmas]," not Mr. Giraudo).  *See also* Gir. Resp. Ex. 2 at 350:16-22 (Agent Wynar describing a "a collusive agreement between Mr. Thia, Mr. Cullinane, Mr. Rosenbledt, Mr.

28   Rezaian."); Gir. Resp. Ex. 3 at 655:2-21 (describing a payoff between Rezaian and Rosenbledt).

14-00534 (N.D. Cal.), ECF No. 303 at 4.  Thus he merely acted as an agent for Mr. Giraudo and was not truly recruited to the conspiracy.  In fact, evidence suggests Rezaian is the person who gave Appenrodt instructions during the auctions when Mr. Giraudo was not present.  US SM Ex. C at 4; US SM Ex. L at 16 ("Appenrodt collected $30,000 … at the direction of Rezaian.").  Certainly agreeing that Apprenrodt could attend an auction in his place is insufficient in and of itself to justify any enhancement for role, much less a four-level enhancement.

If anyone exercised control, or coercion, it was Rezaian for whom the government recommends a sentence of a year and a day.[10]  He was the "'auction rigger' who controlled and manipulated the auctions by intimidation, threats, and bribes."  US SM Ex. Q at 1.[11]  "Rezaian was responsible for collecting and paying for payoff agreements[,]" and threatened retaliation if people refused to participate. US SM Ex. R at 9.  He aggressively intimidated Craig Lipton into engage in the payoffs (US SM Ex. J at 4), and once head-butted Keith Goodman after an auction, starting a fight that needing to be broken up by security (US SM Ex. K at 10).  Even within the Big 5, Rezaian's partners were afraid of him—Ray Grinsell described him as "an evil person who could hurt you."  US SM Ex. I at 8.  And Agent Wynar testified in open court that even with Mr. Giraudo present, "Mr. Rezaian was going to do whatever he wanted to do, and nobody was going to stop him."  Gir. Resp. Ex. 2 at 311:24-25.

Rezaian also exercised authority and control over other payoff participants outside of the "Big 5."  Gir. Resp. Ex. 3 at 647:9-14 (Prosecutor Ward explaining that "Mo Rezaian had these two guys who worked for him, Norm Montalvo and Make Navone.  They came to the auction with him

---

[10] The government was so eager to make Mr. Giraudo look like the mastermind that it tried to bury contrary evidence.  Specifically, Ray Grinsell gave two interviews after reaching a plea agreement, one on December 18, 2017 (US SM Ex. H), and one on December 20, 2017 (US SM Ex. I).  Mr. Grinsell made statements that undermined the government's claims.  According to the bottom of the first page of each 302, the summaries were drafted on December 22, 2017.  The government then withheld this evidence for six weeks before entering the 302s into the investigative file on February 1, 2018—the draft PSR had already been drafted and submitted to the parties on January 26, one week earlier.  Contrary to Criminal L.R. 32-3(c), the government did not provide the defense with copies of the materials submitted to the Probation Office.

[11] Rezaian actually had a reputation for violence and threats. US SM Ex. Q, at 2 ("Rezaian picked on a 60-year-old man and said 'If you ever disrespect me, I'll waste you.'");  US SM Ex. K at 10 (describing the fight with Goodman); Gir. Resp. Ex. 2 at 311-312 (describing the violent altercation between Rezaian and Gajan Thia).

1    and they did stuff for him and helped him with his business, also participated in the payoffs and bid

2    rigging.").

3         When it came to organizing the payoff scheme, it was again Rezaian who held the reins.

4    Rezaian took it upon himself to track all payoff transactions on his BlackBerry, which was the de

5    facto method used to resolve any disputes.  US SM Ex. O at 1-2.  Rezaian devised the "float"

6    method of tracking payments to limit how much cash actually needed to exchange hands. US SM

7    Ex. H at 7.  Rezaian admitted to acting on his own to inflate payoffs in his BlackBerry records, and

8    using Mr. Giraudo's name at auctions to try to leverage better deals with other bidders (likely giving

9    the impression Joe was behind the transactions).  US SM Ex. O at 2, 5.  When Rezaian began to

10   suspect that law enforcement was interested in the auction schemes, he went around to other

11   bidders' homes to warn them and instruct them on how to engage in the payoffs going forward.  US

12   SM Ex. K at 6-7.

13        Perhaps the most telling description of  Rezaian's role comes from Ray Grinsell, who had

14   been Mr. Giraudo's property development partner before Rezaian came into the picture.  Grinsell

15   told interviewers that before 2008, he does not recall Mr. Giraudo making any payoffs or ever

16   instructing him not to bid on a property.  US SM Ex. H at 6-7.  "Things changed when Mo Rezaian

17   started attending the auctions in 2008."  *Id.* at 6.  He describes the "'seduction' of Giraudo by

18   Rezaian[,]" who aggressively sought to partner with Joe, and dramatically changed the course of

19   their dealings.  *Id.* at 7.  Shortly after Rezaian arrived, there was a "deluge" of purchases and Joe

20   came to Grinsell for the first time with a list of transactions, saying that Grinsell owed him money

21   for payoffs.  *Id.* at 6-7.  "In 2009, Rezaian became more aggressive about talking to others about

22   partnerships and payoffs."  US SM Ex. I at 3.  And it was Rezaian, not Giraudo, that "courted" both

23   Kevin Cullinane and Dan Rosenbledt to the group (US SM Ex. H at 9), a move Mr. Giraudo tried to

24   resist, but eventually deferred to Rezaian (US SM Ex. O at 4).

25        By law, Mr. Giraudo's relative culpability is an insufficient basis for applying a four-point

26   enhancement.  *United States v. Rivera*, 527 F.3d 891, 908 (9th Cir. 2008) ("For a four-point upward

27   adjustment to be appropriate, a preponderance of the evidence must support a finding that the

28   defendant was an organizer or leader, *not merely that the defendant was more culpable than others*

1   *who participated in the crime.*") (emphasis added).  The government's argument that the volume of

2   properties in which Mr. Giraudo was involved supports a four-level leadership enhancement "misses

3   the mark." *United States v. Herrera*, 878 F.2d 997, 1001 (7th Cir. 1989).  "[T]he 'nature and scope'

4   factor" relates to "the *size* of the enterprise." *Id.* (emphasis added). *See also United States v. Fuller*,

5   897 F.2d 1217, 1221 (1st Cir. 1990) (concluding that "the mere fact that Fuller had dealt with a large

6   *quantity* of marijuana does not support a finding that he was an organizer, leader, supervisor, or

7   manager") (emphasis added).

8       Even taking at face value the purported testimony in the 302s of credit-seeking individuals,

9   this highly questionable information does not establish Joe Giraudo was a leader.  The government's

10  brief appears to reflect mere horse-trading and wheeling-and-dealing among joint venture partners

11  and other willing participants to the payoff transactions, rather than evidence of coercion or power.

12  For instance, the lead evidence cited by the government involves a story in which Joe Giraudo was

13  extorted by Laith Salma to make a payoff of $30,000. US SM at 11. Somehow, under the

14  government's theory, the insistence to make that payment (coerced by Salma) by check instead of

15  cash is a measure of Joe's coercion and leadership.  *Id.*  Likewise apparently telling others "not to

16  make Joe mad" or "owing favors" or discussing payoff negotiations is some type of indicia of

17  leadership.  *Id.* at 11-12. The government has cited no caselaw that these are acts of leadership.  Even

18  if these statements were true, they are more consistent with the ordinary discussions of people

19  working together as partners to make decisions about bidding on properties and negotiating payoffs,

20  rather than evidence of conduct akin to a Mafia boss or a drug kingpin.

21       D.    The Government Failed to Meet Its Burden of Proof for the VOC

22       The government's discussion concerning VOC is extraordinary in its absence of proof, case

23  law, logic, and longstanding DOJ practice.

24       Let's start with a very fundamental point: the government contends over 200 properties were

25  impacted by Joe Giraudo's conduct.  Where is the proof?  After nearly eight years and the government

26  having numerous records and many cooperating witnesses, the government has failed to offer a single

27  piece of the evidence to the Court to support the 206 property entries listed in US SM Ex. A.  It

28  apparently wants the Court to assume this list is correct because it says so, but that is not what the

law requires of the government. *United States v. Rose*, 449 F.3d 627, 634-35 (5th Cir. 2006) (concluding that the district court "erred by adopting the [government's] volume of commerce figure" because the government offered "no evidence" to support its position). The government's memo makes passing reference to "a detailed analysis of the evidence gathered during the investigation" (US SM at 5:24-25), but submits none of it. As already addressed in Mr. Giraudo's Sentencing Memorandum, the defense has identified numerous errors and inaccuracies in the government's supposed list of "rigged properties," which cast doubt on the entirety of the submission. *See* Defendant Joseph Giraudo's Sentencing Memorandum, ECF 313 ("Gir. SM") at 22. This includes properties where no evidence of Mr. Giraudo's involvement exists whatsoever; properties where the evidence suggests Mr. Giraudo only became involved with certain properties ***after*** the auction and alleged payoffs took place; and properties where Mr. Giraudo is not even among the partners of the ultimate JV agreements. *Id.* at 22 n.34. And though the government admits they should not be included in Mr. Giraudo's calculation, its Ex. A includes "Canceled Sales" in an attempt to make the list appear more impressive. US SM at 7 n.5; *see, e.g.*, US SM Ex. A at 3.

DOJ cites not a single precedent to suggest that VOC should include the entire purchase price of a house plus the amount of the payoff for that house. The government apparently hired no economic expert to justify its methodology. Indeed, the government offers no logic why it should be so, other than merely asserting the proposition and noting that other defendants (lured by the promise of a "cooperation discount") agreed to such a calculation. But since 18 defendants before this Court also agreed to plea to a charge that was not a crime, it is hardly persuasive that DOJ managed to coerce defendants to accept their calculation of VOC.

The government makes the point that VOC is not the same as loss under the Fraud Guidelines—true enough. But that does not answer the question of how to calculate VOC. The Guidelines themselves make clear that the VOC for an individual defendant in a conspiracy is the volume of commerce "done by him or his principal in goods and services that were affected by the violation." U.S.S.G. § 2R1.1(b)(2). The government attributes every dollar of every sale to Mr. Giraudo even though other people participated in the sale and Mr. Giraudo owned only a small percentage. Presumably "done by him or his principal" means exactly that—done by ***him*** or his

principal, not done by *others*.  Despite the fact that the government has the burden, it has offered no support that the Court should ignore the "done by him" language in the Guidelines.  *United States v. SKW Metals & Alloys, Inc.*, 6 F. App'x 65, 66 (2d Cir. 2001) (rejecting government's appeal of sentencing in part because the government "did not satisfy [its] burden" of "proving which sales were affected," and upholding the district court's determination to disregard untimely evidence).

The government relies on *Texaco v. Dagher*, 547 U.S. 1, 6 (2006), to support its argument that "[f]or purposes of calculating volume of commerce, Giraudo and his partners are 'regarded as a single firm'" to avoid the problem of counting Mr. Giraudo's participation as identical to those of others.  US SM at 8.  That is nonsensical.[12]  If  "Giraudo and his partners" are in fact considered "a single firm" as the government contends, *id.*, they "are *incapable* of conspiring with each other for purposes of § 1 of the Sherman Act," *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 772, 777 (1984) (emphasis added).  In *Dagher*, the Supreme Court concluded that Texaco and Shell Oil comprised a "single firm" for purposes of the conduct at issue and, therefore, their agreement to fix prices "is not price fixing in the antitrust sense."  *Dagher*, 547 U.S. at 6.

The inclusion of the full purchase amount seriously overstates the impacted VOC and, in fact, includes commerce that by definition could not have been affected—namely, the amounts up to the minimum bid price.  *See* Gir. SM at 17-19.  Those amounts were not affected because the bank was going to obtain the minimum bid amount any time there was a sale.  The actual amount of commerce that was affected by the activity—the payoff amount—was essentially unchanged regardless of whether the house was worth $100,000 or $500,000.

The government's position regarding Mr. Giraudo is inconsistent with its practice in other matters.  For example, DOJ states it is appropriate to count all sales even though Mr. Giraudo had only a fractional ownership share.  In the Mitsubishi graphite electrodes prosecution, for example, the government reduced by half Mitsubishi's VOC because it was a 50 percent owner of a joint venture business.  Sentencing Mem. of the U.S. at 4, *United States v. Mitsubishi Corp.*, Case No. CR 00-33 (E.D. Penn. April 19, 2001), ECF 164, *available at* https://www.justice.gov/atr/case-document/file/

---

[12] It is also contrary to the government's own factual evidence.  Grinsell explicitly stated that "they did not function like a corporation at the auctions." US SM Ex. H at 8.

1   504471/download.   Likewise, in a recent price fixing case involving foreign exchange rates, the

2   government reduced JPMorgan Chase & Co.'s VOC by 50 percent so that it would not double count

3   for collective losses.  Sentencing Mem. at 5, *United States v. JPMorgan Chase & Co.*, Case No. 3:15-

4   cr-00079 (SRU), 2016 WL 7530414 (D. Conn. Dec. 1, 2016).  It is mystifying why the Antitrust

5   Division would give a break that cut hundreds of millions of dollars from VOC for JPMorgan Chase

6   and Mitsubishi, but not for an 80-year-old real estate investor.

7            Lastly, the government tries to avoid the Supreme Court's limitation decision in *Kokesh* by

8   suggesting Mr. Giraudo's conduct was covered by one overarching conspiracy.  That is not what Mr.

9   Giraudo pled to, and the facts show that every transaction had different partners and different

10  dynamics.[13]

11            E.        The Bid Rigging Enhancement Is Not Warranted

12            Without citing any case, the government contends that the conduct at issue warrants a bid-

13  rigging enhancement under U.S.S.G. § 2R1.1(b)(1), despite the fact that the conduct does not fall

14  within the narrow category of "non-competitive bids," as defined by Judge Posner in *United States v.*

15  *Heffernan*.  43 F.3d 1144, 1147 (7th Cir. 1994) (the enhancement is reserved for schemes involving

16  strictly defined "bid rigging" in the form of "bid rotation," and "cannot be given a broader meaning").

17  The agreements being made at the San Mateo and San Francisco auctions were not bid rotation, but

18  ad hoc bid-by-bid agreements, more akin to fixing the auction price at a certain level.

19            And contrary to the government's assertions, the VOC attributed to individual defendants does

20  not understate the seriousness of the offense.  The government argues that transactions where Mr.

21  Giraudo was not the actual purchaser are not accounted for in his volume of commerce, but the same

22  is true in price-fixing cases—only the sales ***made*** by a member of the price-fixing conspiracy are

23  attributed to them, even though the price-fixing behavior may influence sales by other conspirators.

24

25

26  [13] Of course, if the government were really correct that there was one massive overarching
    conspiracy that presumably started in the 1980s and continued until late 2010, then its
27  "cooperating" defendants such as Mr. Rezaian and Mr. Grinsell would be responsible for every sale;
    clearly the government did not negotiate for that absurdly sweeping theory in its plea deals with
28  those defendants.

1   This is exactly the point made by Judge Posner, as to why the bid-rigging enhancement must not be

2   applied to "bidding shenanigans" outside of the bid-rotation context. *Heffernan*, 43 F.3d at 1148.

3           Moreover, the government is incorrect that the properties where Mr. Giraudo received a

4   payoff are not accounted for in the proposed sentence—each of those transactions is reflected in the

5   proposed restitution amount, which Mr. Giraudo stands ready and willing to accept.

6   **III.    CONCLUSION**

7           Mr. Giraudo has lived an extraordinary and exemplary life with, of course, a few lapses and

8   now a major black mark.[14]  Mr. Giraudo has suffered significantly during the pendency of this case

9   from anxiety, embarrassment and shame.  To send a man who is 80 years old and suffering from

10  coronary disease to prison just to vindicate the length and expense of this investigation is

11  unwarranted.  The government does not need another press release.[15]

12  _____

13  [14] The government makes much of the fact that Mr. Giraudo was on probation for a DUI in 2010 during a short portion when certain sales were done.  The inclusion of an offense from the 1970s, and an arrest that was dismissed without charges, are irrelevant.  We agree with the Probation Officer that Mr. Giraudo is a Category 1 offender.

14

15  [15] The Government's proposed 37 month sentence would be one of the longest antitrust sentences in the history of Sherman Act enforcement—an extraordinary overreach.  In the auto parts cases that affected literally billions in sales and involved coordination by senior executives, no individual received more than 24 months and in most instances received much less.  *See, e.g.,* DENSO Corporation Executive Agrees to Plead Guilty to Price Fixing and Bid Rigging on Auto Parts Installed in U.S. Cars (March 26, 2012) (executive sentenced ranging from a year and a day to 18 months), *available at* https://www.justice.gov/opa/pr/denso-corporation-executive-agrees-plead-guilty-price-fixing-and-bid-rigging-auto-parts; Press Release, Autoliv Inc. and a Yazaki Corp. Executive Agree to Plead Guilty to Price Fixing on Automobile Parts Installed in U.S. Cars (June 6, 2012) (executive sentenced at 14 months), *available at* https://www.justice.gov/opa/pr/autoliv-inc-and-yazaki-corp-executive-agree-plead-guilty-price-fixing-automobile-parts; Press Release, Executive of California Aftermarket Auto Lights Distributor Agrees to Plead Guilty in Price-Fixing Conspiracy (February 8, 2011) (executive sentenced at 6 months), *available at* https://www.justice.gov/opa/pr/executive-california-aftermarket-auto-lights-distributor-agrees-plead-guilty-price-fixing.

16

17

18

19

20

21

22

23

24  The Libor cases—again affecting billions—resulted in one 24 month sentence and another half that.  *See* Press Release, Two Former Rabobank Traders Sentenced to Prison for Manipulating U.S. Dollar and Japanese Yen LIBOR Interest Rates (March 10, 2016), *available at* https://www.justice.gov/opa/pr/two-former-rabobank-traders-sentenced-prison-manipulating-us-dollar-and-japanese-yen-libor.

25

26

27  In the Optical Disk Drive prosecutions, executives received sentences of 7 or 8 months.  *See* Press Release, Three Hitachi-LG Data Storage Executives Agree to Plead Guilty for Participating in Bid-Rigging and Price-Fixing Conspiracies Involving Optical Disk Drives (Dec. 13, 2011) (two executives sentenced at 8 months, and the third executive sentenced at 7 months), *available at*

28

1   It is a serious question whether this crime of passing $5,000 back and forth while standing

2   around and waiting for an auction to begin warrants one of the longest sentences ever in 100 plus

3   years of Sherman Act enforcement and what would amount to a death sentence for Joseph Giraudo.

4   Might some banks have made an additional $5,000 on the sale of a foreclosed property and might

5   that have slightly increased the value of a portfolio they were going to package and sell to

6   investors?  Perhaps.  But certainly justice has been served already, and would be further served by a

7   sentence of probation and a healthy fine and restitution, which Mr. Giraudo is prepared to pay.  And

8   surely a life of kindness and generosity and hard work should mean something.

9   Other judges have disregarded the government's overwrought sentencing recommendations,

10   yet this Court will have to exercise its own judgment.  Mr. Giraudo pled open in the belief that the

11   Court would see through the hazy gunpowder fired in his direction by an angry and (hopefully)

12   embarrassed Justice Department.  There are not many cases where DOJ has had to re-negotiate 18

13   pleas after the leading crime charged was dismissed, and not many cases where a federal court has

14   found that the Antitrust Division and FBI violated the Constitution and otherwise committed a

15   crime in the midst of a federal investigation.[16]

16   //

17   //

18   //

19

20   https://www.justice.gov/opa/pr/three-hitachi-lg-data-storage-executives-agree-plead-guilty-participating-bid-rigging-and.

21   In the air freight prosecutions, two executives from Cargolux Airlines International SA received sentences of 13 months.  *See* Press Release, Cargolux Airlines International Executives Plead Guilty

22   for Fixing Surcharge Rates on Air Cargo Shipments (Dec. 8, 2011) (executive sentenced at 13 months), *available at* https://www.justice.gov/opa/pr/cargolux-airlines-international-executives-

23   plead-guilty-fixing-surcharge-rates-air-cargo.

24   And in one of the largest antitrust cases ever prosecuted in this district, where the company received a half billion dollar fine, three executives who went to trial and lost (thus refusing to accept

25   responsibility), and who held top management positions including the CEO, received lower sentences than what the Justice Department seeks for Mr. Giraudo.  *See* Press Release, Au

26   Optronics Corporation Executive Sentenced for Role in LCD Price-Fixing Conspiracy (April 29, 2013) (executives sentenced at 24 months after an eight-week trial), *available at*

27   https://www.justice.gov/opa/pr/au-optronics-corporation-executive-sentenced-role-lcd-price-fixing-conspiracy.

28   [16] *See* 18 U.S.C. § 2511.

1      We respectfully request that the most just, appropriate and fair sentence would be for the

2  Court to impose on Mr. Giraudo a term of probation or a term of home confinement not to exceed

3  six months.

4                                         Respectfully submitted,

5

6  DATED: April 23, 2018                  VINSON & ELKINS L.L.P.

7
                                  By:  _____/s/ Matthew J. Jacobs_____
8                                        Matthew J. Jacobs
                                         Attorneys for Defendant JOSEPH J. GIRAUDO
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## CERTIFICATE OF SERVICE

2      The undersigned certifies that on April 23, 2018, the foregoing document was electronically

3   filed with the Clerk of the Court for the UNITED STATES DISTRICT COURT, NORTHERN

4   DISTRICT OF CALIFORNIA, using the Court's Electronic Case Filing (ECF) system.  The ECF

5   system routinely sends a "Notice of Electronic Filing" to all attorneys of record who have consented

6   to accept this notice as service of this document by electronic means.

7

8                                      VINSON & ELKINS L.L.P.

9

10                          By:  */s/ Matthew J. Jacobs*
                                  _____
11                                Matthew J. Jacobs
                                  Attorneys for Defendant JOSEPH J. GIRAUDO
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 1

**Volume 1**

**Pages 1 - 145**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE CHARLES R. BREYER, JUDGE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| VS. | ) | **No. CR 14-0534 CRB** |
| | ) | |
| JOSEPH GIRAUDO, RAYMOND | ) | |
| GRINSELL, JAMES APPENDRODT, | ) | |
| ABRAHAM FARAG and | ) | |
| KEVIN CULLINANE, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | San Francisco, California |
| | | Tuesday, January 17, 2017 |

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

For Plaintiff:            U.S. DEPARTMENT OF JUSTICE
                          Antitrust Division
                          450 Golden Gate Avenue
                          Box 36046, Room 10-0101
                          San Francisco, California 94102
                    BY:   **KEVIN HART**
                          **ANDREW J. NICHOLSON-MEADE**
                          **E. KATE PATCHEN**
                          **TRIAL ATTORNEYS**

For Defendant            VINSON AND ELKINS, LLP
Giraudo:                 555 Mission Street, Suite 2000
                          San Francisco, California 94105
                    BY:   **MATTHEW J. JACOBS, ESQUIRE**
                          **COLIN PATRICK McDONELL, ESQUIRE**
                          **ERICA CONNOLLY, ESQUIRE**

(Appearances continued on next page)

Reported By:   Katherine Powell Sullivan, CSR #5812, RPR, CRR
                Official Reporter - U.S. District Court

**APPEARANCES (CONTINUED):**

```
For Defendant            SIDEMAN AND BANCROFT
Grinsell:                One Embarcadero Center, 8th Floor
                         San Francisco, California 94131
                  BY:    LOUIS P. FEUCHTBAUM, ESQUIRE
                         NANCI L. CLARENCE, ESQUIRE


For Defendant            LAW OFFICE OF DORON WEINBERG
Cullinane:               523 Octavia Street
                         San Francisco, California 94102
                  BY:    DORON WEINBERG, ESQUIRE


For Defendant            ROSEN BIEN GALVAN GRUNFELD, LLP
Appendrodt:              50 Fremont Street, 19th Floor
                         San Francisco, California 94105
                  BY:    JEFFREY L. BORNSTEIN, ESQUIRE
                         VAN SWEARINGEN, ESQUIRE


For Defendant            LATHAM & WATKINS, LLP
Farag:                   505 Montgomery Street, Suite 2000
                         San Francisco, California  94111-6538
                  BY:    DANIEL WALL, ESQUIRE
                         ASHLEY M. BAUER, ESQUIRE
                         ALICIA JOVAIS, ESQUIRE
```

<u>**I N D E X**</u>

Tuesday, January 17, 2017 - Volume 1

<u>**DEFENDANTS' WITNESSES**</u>                            <u>**PAGE**</u>  <u>**VOL.**</u>

<u>**WYNAR, ROAHN**</u>
(SWORN)                                              9    1
Direct Examination by Mr. Jacobs                    10    1


- - - - -

<u>**E X H I B I T S**</u>

| <u>**DEFENDANTS' EXHIBITS**</u> | <u>**IDEN**</u> | <u>**EVID**</u> | <u>**VOL.**</u> |
|---|---|---|---|
| 2-70 | | 10 | 1 |
| 2-71 | | 22 | 1 |
| 2-72 | | 34 | 1 |
| 2-73 | | 35 | 1 |
| 2-74 | | 35 | 1 |
| 2-75 | | 35 | 1 |
| 2-76 | | 38 | 1 |
| 2-77 | | 40 | 1 |
| 2-78 | | 54 | 1 |
| 2-79 | | 57 | 1 |
| 2-80 | | 58 | 1 |
| 2-81 | | 64 | 1 |
| 2-82 | | 68 | 1 |
| 2-83 | | 71 | 1 |
| 2-84 | | 83 | 1 |
| 2-85 | | 90 | 1 |
| 2-86 | | 92 | 1 |

```
 1    basically the subject matter?  In other words, all this

 2    colloquy relates to that property?  Not to the one on Nimitz;

 3    is that right?

 4              MR. JACOBS:  I believe that is correct, Your Honor.

 5    Let me see if I can establish that through Agent Wynar.

 6    BY MR. JACOBS

 7    Q.    Agent Wynar, if you go back to the transcript, which is

 8    2-82?

 9    A.    84.

10    Q.    84?

11    A.    Yes, sir.

12    Q.    And let me direct your attention to the page that is 605.

13    A.    Yes, sir.

14    Q.    You can see that there is discussion from -- with

15    Mr. Rezaian, Mr. Rosenbledt, and Mr. Thia, where Mr. Rezaian

16    says -- and I apologize for the language --

17          "You're a fucking piggybacked off you.  He didn't know

18    shit!

19          "The trustee called 'sold.'

20          "You're bullshit.  You're bullshit.

21          "He called 'sold' and Dan brings --

22          'That's crap.  That's crap.'"

23          And it goes on from there.

24          And that is a discussion about a particular bid that was

25    made on that day, January 28th; correct?
```

WYNAR - DIRECT / JACOBS

1   **A.**   Yes, sir, that's right.

2   **Q.**   Okay.  And then in response to that there's discussion

3   about whether the previous deal, regarding Park Pacifica, which

4   involved Mr. Thia and Mr. Rosenbledt and Mr. Rezaian, would be

5   allowed to continue; correct?

6   **A.**   Yes, that's correct.

7   **Q.**   Okay.  And, in fact, the decision is made to kick Mr. Thia

8   out of that deal because of his actions in bidding here on

9   January 28th; correct?

10  **A.**   Yes.  That's -- that's a correct characterization of this.

11  That's my interpretation of all of this, and consistent with

12  the statements made by Mr. Thia to us.

13  **Q.**   Okay.  Okay.  Now, if I can have you turn back to -- let

14  me get the exact exhibit here -- 2-75, which is the list of

15  recordings that the government would include in its

16  case-in-chief.

17  **A.**   Yes, sir, I have it.

18  **Q.**   Okay.  Let me direct your attention to page 1.

19        And can you see that the recordings from January 28th,

20  2010, were listed by the government as evidence that it

21  intended to use in its case-in-chief?  Is that correct?

22  **A.**   According to that letter, yes, sir.

23  **Q.**   Okay.  Now, in your affidavit -- oh, and, by the way, this

24  particular recording is one that you believed showed evidence

25  of incriminating conduct by the participants; is that correct?

```
 1            THE COURT:  Right.  Okay.

 2            MR. WEINBERG:  Does the Court anticipate going the

 3   full day?  I have a very conflict at 3:00 p.m.

 4            THE COURT:  Well, here is the -- okay.  We're now

 5   concluding this testimony at this point.  So let's talk about

 6   scheduling.

 7        Off the record.

 8        (Discussion held off the record.)

 9        (The proceedings were adjourned, to continue on Thursday,

10   January 19, 2017.)

11                          -   -   -   -

12

13                      CERTIFICATE OF REPORTER

14        I certify that the foregoing is a correct transcript

15   from the record of proceedings in the above-entitled matter.

16

17   DATE:   Wednesday, January 18, 2017

18

19
                         Katherine Sullivan
20

21   _____

22        Katherine Powell Sullivan, CSR #5812, RMR, CRR
                        U.S. Court Reporter
23

24

25
```

# EXHIBIT 2

Volume 2

Pages 146 - 368

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE CHARLES R. BREYER, JUDGE

UNITED STATES OF AMERICA,      )
                               )
            Plaintiff,         )
                               )
  VS.                          )      No. CR 14-0534 CRB
                               )
JOSEPH GIRAUDO, RAYMOND        )
GRINSELL, JAMES APPENDRODT,    )
ABRAHAM FARAG and              )
KEVIN CULLINANE,               )
                               )
            Defendants.        )
_____)      San Francisco, California
                                       Thursday, January 19, 2017

TRANSCRIPT OF PROCEEDINGS

APPEARANCES:

For Plaintiff:           U.S. DEPARTMENT OF JUSTICE
                         Antitrust Division
                         450 Golden Gate Avenue
                         Box 36046, Room 10-0101
                         San Francisco, California 94102
                   BY:   KEVIN HART
                         ANDREW J. NICHOLSON-MEADE
                         TRIAL ATTORNEYS

For Defendant            VINSON AND ELKINS, LLP
Giraudo:                 555 Mission Street, Suite 2000
                         San Francisco, California 94105
                   BY:   MATTHEW J. JACOBS, ESQUIRE
                         COLIN PATRICK McDONELL, ESQUIRE

(Appearances continued on next page)

Reported By:   Katherine Powell Sullivan, CSR #5812, RPR, CRR
               Official Reporter - U.S. District Court

**<u>APPEARANCES (CONTINUED):</u>**

For Defendant          SIDEMAN AND BANCROFT
Grinsell:            One Embarcadero Center, 8th Floor
                 San Francisco, California 94131
        BY:  **LOUIS P. FEUCHTBAUM, ESQUIRE**
                 **NANCI L. CLARENCE, ESQUIRE**

For Defendant          LAW OFFICE OF DORON WEINBERG
Cullinane:           523 Octavia Street
                 San Francisco, California 94102
        BY:  **DORON WEINBERG, ESQUIRE**

For Defendant          ROSEN BIEN GALVAN GRUNFELD, LLP
Appendrodt:          50 Fremont Street, 19th Floor
                 San Francisco, California 94105
        BY:  **JEFFREY L. BORNSTEIN, ESQUIRE**

For Defendant          LATHAM & WATKINS, LLP
Farag:               505 Montgomery Street, Suite 2000
                 San Francisco, California  94111-6538
        BY:  **ASHLEY M. BAUER, ESQUIRE**

## I N D E X

Thursday, January 20, 2017 - Volume 2

**DEFENDANTS' WITNESSES**                                          **PAGE**   **VOL.**

**WYNAR, ROAHN**
(PREVIOUSLY SWORN)
Direct Examination resumed by Mr. Jacobs                 173      2
Direct Examination by Ms. Bauer                          239      2
Cross-Examination by Mr. Nicholson-Meade                 265      2

## E X H I B I T S

| **DEFENDANTS' EXHIBITS** | **IDEN** | **EVID** | **VOL.** |
|---|---|---|---|
| 2-93 | | 184 | 2 |
| 2-94 | | 199 | 2 |
| 2-95 | | 201 | 2 |
| 2-96 | | 202 | 2 |
| 2-97 | | 204 | 2 |
| 2-98 | | 207 | 2 |
| 2-99 | 210 | | 2 |
| 2-100 | | 217 | 2 |
| 2-101 | | 220 | 2 |
| 2-102 | | 223 | 2 |
| 2-103 | | 230 | 2 |

## E X H I B I T S

| **GOVERNMENT'S EXHIBITS** | **IDEN** | **EVID** | **VOL.** |
|---|---|---|---|
| 114 | | 268 | 2 |
| 83  (under seal) | | 275 | 2 |
| 84  (under seal) | | 275 | 2 |
| 85  (under seal) | | 275 | 2 |

WYNAR - CROSS / NICHOLSON-MEADE

**A.**   No, sir.

**Q.**   Prior to observing the altercation between Mr. Thia and Mr. Rezaian and Mr. Giraudo, did the FBI plan to recruit him as a source for their investigation?

**A.**   Absolutely not.

The investigation was a -- it's an undercover operation, right.  This is a very sensitive operation.  Once it goes and your undercover agent is in place and your cooperator is in place, you don't -- you don't expose the investigation by recruiting new informants.

That was absolutely and unequivocally not on the agenda. It was not part of the plan to recruit Mr. Thia on that day or any other day.

**Q.**   Then what prompted you to recruit him?

**A.**   A complex blend of my concern for his well-being and a little bit of cover my own butt.  I didn't want to be the person who took a photograph of Mr. Thia healthy and that's the last we ever saw of it.

But in particular, I was worried that Mr. Thia was going to be hurt by Mr. Rezaian.  In particular Mr. Rezaian.  I didn't believe that Mr. Giraudo had the gravitas required to calm Mr. Rezaian down.

I was able to observe this from a distance well enough to tell that Mr. Rezaian was going to do whatever he wanted to do, and nobody was going to stop him.  And it's sort of at that

1   point I knew it was up to me to either intervene and make the

2   difference.

3        It did occur to me, as I went out there, that the argument

4   that had ensued clearly bode well for the possibility of me

5   being able to engage Mr. Thia.  But that was not my primary

6   idea.  My idea was to go out there and stop the fight and play

7   by feel from there.  It wasn't very well-thought-out.

8   Q.   Did you subsequently review 1D69?

9   A.   Eventually I did, yes.  Not too long after the day was

10  over, not too many days later I reviewed that tape, yes.

11  Q.   What do you remember about your initial review of 1D69?

12  A.   I remember that it validated for me my decision to go out

13  there, because it did sound like a -- like -- even though all I

14  could do was see.  When I intervened, I couldn't even hear.  I

15  was behind double-paned glass across the street.  So, you know,

16  actually the hearing validated that Mr. Thia actually was in

17  danger.

18  Q.   Does 1D69 contain information indicative of agreements

19  being made to refrain from bidding in exchange for payoffs?

20  A.   It definitely had information regarding this sham joint

21  venture.  And I believe, and I still do, that that is exactly

22  what you just described.  It is an agreement to refrain from

23  bidding in exchange for a form of payoff.

24  Q.   Did it have information that was indicative of an exchange

25  of cash for stepping aside at the auctions?

1   Q.    What information is included?

2   A.    Testimony or evidence from some of the witnesses about

3   phone conversations they had associated with transactions that

4   were collusive in nature.

5   Q.    In your earlier testimony you indicated that you recall

6   1D143 as potentially incriminating.   What information on 1D143

7   did you consider potentially incriminating?

8   A.    Mr. Rezaian and Mr. Rosenbledt spoke about money that was

9   just paid to Mr. Rosenbledt.   And that money, I believe, was

10  money we had paid to the conspirators earlier in the day.   So

11  they were spontaneously discussing the payoff we had made

12  earlier.

13        This is incriminating because it's an independent

14  conversation between Mr. Rosenbledt and Mr. Rezaian about a

15  payoff for which we have a lot of details because we were --

16  our undercover operation was an active participant in the

17  payoff.   I think that was the most important thing.

18        But there was also a lot of conversation between

19  Mr. Rezaian, Mr. Cullinane on the phone, and Mr. Rosenbledt

20  regarding the nature of the joint venture partnership between

21  these men.

22        And the context of that conversation was very revealing.

23  And at the time this was a significant factor in my work.   And

24  it confirmed some of my suspicions about how their joint

25  venture was really a sham operation.

1    relevant information stream.

2    Q.   So starting with Mr. Rezaian, Mr. Rosenbledt,

3    Mr. Grinsell, and Mr. Giraudo, by the time of the recordings,

4    the date of which is referred to in these notes, did the FBI

5    consider these individuals to be suspects?

6    A.   Yes.

7    Q.   When were these individuals considered suspects?

8    A.   October 8th, 2009, was the first day of the first debrief

9    that highlighted them as suspects.

10        (Government's Exhibit 101 received in evidence.)

11   Q.   I want to turn next to Mr. Thia and Mr. Diaz and direct

12   your attention to Exhibit 101.

13        By the time of the dates referenced in your notes in early

14   January, did the FBI consider Mr. Gajan Thia to be a suspect?

15   A.   Yes.

16   Q.   How was Mr. Thia identified to the FBI?

17   A.   The cooperator observed -- and this is not surprising or

18   hard based on what we learned over time.  He observed a

19   collusive arrangement between Mr. Thia, Mr. Cullinane,

20   Mr. Rosenbledt, Mr. Rezaian.  And he reported that.  And he

21   reported it to us.  And we took that very seriously.  And that

22   was the day Mr. Thia became a suspect.

23   Q.   And is this information reflected in Exhibit 101?

24   A.   I'm -- I'm reviewing it from Exhibit 101.  So everything I

25   just said is found in Exhibit 101.  And more.  In fact, there's

1

2

3                       **CERTIFICATE OF REPORTER**

4            I certify that the foregoing is a correct transcript

5      from the record of proceedings in the above-entitled matter.

6

7      DATE:    Friday, January 20, 2017

8

9

10                          _Katherine Sullivan_

11      _____

12            Katherine Powell Sullivan, CSR #5812, RMR, CRR
                          U.S. Court Reporter
13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT 3

**VOLUME 4**

**Pages 552 - 675**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE CHARLES R. BREYER, JUDGE

UNITED STATES OF AMERICA,      )
                               )
           Plaintiff,          )
                               )
  VS.                          )    **No. CR 14-0534 CRB**
                               )
JOSEPH GIRAUDO, RAYMOND        )
GRINSELL, JAMES APPENDRODT,    )
ABRAHAM FARAG and              )
KEVIN CULLINANE,               )
                               )
           Defendants.         )
_____)    San Francisco, California
                                     Tuesday, February 28, 2017

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

For Plaintiff:          U.S. DEPARTMENT OF JUSTICE
                        Antitrust Division
                        450 Golden Gate Avenue
                        Box 36046, Room 10-0101
                        San Francisco, California 94102
                   **BY: KEVIN HART**
                        **ANDREW J. NICHOLSON-MEADE**
                        **THOMAS GREENE**
                        **TRIAL ATTORNEYS**

For Defendant          VINSON AND ELKINS, LLP
Giraudo:               555 Mission Street, Suite 2000
                       San Francisco, California 94105
                   **BY: MATTHEW J. JACOBS, ESQUIRE**
                        **ERICA CONNOLLY, ESQUIRE**

(Appearances continued on next page)

Reported By:   Katherine Powell Sullivan, CSR #5812, RPR, CRR
               Official Reporter - U.S. District Court

**APPEARANCES (CONTINUED):**

| | |
|---|---|
| For Defendant<br>Grinsell: | SIDEMAN AND BANCROFT<br>One Embarcadero Center, 8th Floor<br>San Francisco, California 94131<br>BY: **LOUIS P. FEUCHTBAUM, ESQUIRE**<br>**NANCI L. CLARENCE, ESQUIRE** |
| For Defendant<br>Cullinane: | LAW OFFICE OF DORON WEINBERG<br>523 Octavia Street<br>San Francisco, California 94102<br>BY: **DORON WEINBERG, ESQUIRE** |
| For Defendant<br>Appendrodt: | ROSEN BIEN GALVAN GRUNFELD, LLP<br>50 Fremont Street, 19th Floor<br>San Francisco, California 94105<br>BY: **JEFFREY L. BORNSTEIN, ESQUIRE**<br>**VAN SWEARINGEN, ESQUIRE** |
| For Defendant<br>Farag: | LATHAM & WATKINS, LLP<br>505 Montgomery Street, Suite 2000<br>San Francisco, California  94111-6538<br>BY: **DANIEL WALL, ESQUIRE**<br>**ALICIA JOVAIS, ESQUIRE** |

**I N D E X**

Tuesday, February 28, 2017 - Volume 4

| DEFENDANTS' WITNESSES | PAGE | VOL. |
|---|---|---|
| **WHEELER, CHRISTINA MARIE** | | |
| (SWORN) | 573 | 4 |
| Direct Examination by Mr. Bornstein | 574 | 4 |
| Direct Examination by Mr. Wall | 601 | 4 |
| Cross-Examination by Mr. Greene | 611 | 4 |
| Redirect Examination by Mr. Bornstein | 616 | 4 |
| | | |
| **WARD, DAVID** | | |
| (SWORN) | 617 | 4 |
| Direct Examination by Mr. Feuchtbaum | 617 | 4 |
| Cross-Examination by Mr. Greene | 641 | 4 |
| Redirect Examination by Mr. Feuchtbaum | 658 | 4 |
| Recross-Examination by Mr. Greene | 660 | 4 |

**E X H I B I T S**

| GOVERNMENT'S EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 70 | | 611 | 4 |
| 71 | | 611 | 4 |
| 72 | | 611 | 4 |
| 73 | | 611 | 4 |
| 96 | | 611 | 4 |
| 97 | | 611 | 4 |
| 123 | | 611 | 4 |

**E X H I B I T S**

| DEFENDANTS' EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 2-213 | | 557 | 4 |
| 2-214 | | 558 | 4 |

**WARD - DIRECT / FEUCHTBAUM**

1   PowerPoints with any of the defense lawyers.

2   **Q.**   Okay.  And there were no FBI reports prepared for what

3   occurred during these reverse proffer sessions?

4   **A.**   No.

5   **Q.**   But there were often FBI agents present during the reverse

6   proffer sessions; correct?

7   **A.**   Don't know if it was the practice that they were there.  I

8   don't know.  I think maybe it's some, but I don't know if I

9   could say that they were there for all of them.

10  **Q.**   Well, taking my own example and the meetings I had with

11  the Antitrust Division, Agent Bond was present; correct?

12  **A.**   I wouldn't -- I wouldn't disagree.  I don't specifically

13  remember.  We didn't really -- it wasn't that we consciously

14  included or excluded them.

15  **Q.**   And in meeting with the defense attorneys, among the

16  evidence that you presented to them to convince them that their

17  client should plead guilty and cooperate with the government,

18  were recordings; correct?

19  **A.**   Well, again, you have to be specific as to which

20  defendants.  For the first 11 pleaders, we did not use the

21  recordings.

22      At a certain point we decided to use the recordings in

23  order to convince -- we had learned that the conspiracy

24  involved what everybody was calling "The Big Five."  They were

25  the five ringleaders in the case:  Giraudo, Grinsell, Kevin, Mo

1  Rezaian, and Dan.

2      We learned they were the core group, and none of them had

3  pled.  So after a couple years, we had all these other pleas,

4  we thought we would see if we could convince some of them to

5  plead and cooperate.

6  **Q.**  And so you -- you mentioned specifically you did not use

7  any recordings for the first 11 who came in, for the first 11

8  targets for whom there were reverse proffers, but at some point

9  you started using the recordings.

10     Do you recall when that was when you started displaying

11  the recordings during reverse proffer sessions?

12  **A.**  Yes.

13  **Q.**  And when was that?

14  **A.**  It was in November 2012, when we met with counsel for Mo

15  Rezaian.

16  **Q.**  Did you use those recordings -- and I'm just speaking now

17  generally about the recordings -- in reverse proffer sessions

18  in a consistent manner after November of 2012?

19     That's a bad question.  Let me rephrase it.

20     After November 2012, did you regularly employ recordings

21  during your reverse proffer sessions?

22  **A.**  We did use recordings in subsequent proffers with

23  attorneys, including meetings with Dan Rosenbledt and then the

24  other members of The Big Five; Ray Grinsell, your client, and I

25  believe Kevin and Joe.

**A.**   Yeah.   I think you got the wrong page up here on the screen.   It's this page (indicating).   Yeah, that's it.

So there were different categories of documents that we had.   And what we did here is describe the -- this was part of a presentation in which we wanted to describe the array of evidence that we had against these guys.   And so these were the categories of documents.

The first was the BlackBerry.   So Mo Rezaian kept -- had a BlackBerry at the auction, and he kept records of all the payoffs.   There were so many that they -- and the payoff occurred after -- in days or a week or so after the agreement, that they had to keep track of it.

So Mo started keeping a record in his BlackBerry, I think over -- we found over 200 properties in which he kept a record of the payoffs.   So when I say BlackBerry, that's what that is.

The second one is Mo's books.   And I learned this later. He told us he would take the information from the BlackBerry and he would go home and enter it into his computer.   And both of these we obtained through search warrants.

And then the next category is multiple corroborating docs from pleaders.   So the individuals who pled guilty, we received documents from them primarily through subpoena.   Sometimes they were voluntarily produced.

But because they were businessmen and because the bid-rigging payoffs were a cost of purchasing and flipping

1  really want to see if we can get these guys to plead.  And,

2  also, it took a long time to get the video and audio into a

3  usable format and coded and reviewed internally.

4      So we reached a point where we were like, let's do some --

5  let's show these.  And we picked Mo because he -- his lawyers

6  had -- he had some various reasons, which I don't know if I

7  should get into, but he had thought about wanting to plead for

8  some various reasons.

9      Additionally, I don't know if they explicitly said this,

10  but just prior to meeting with Mo -- Mo Rezaian had these two

11  guys who worked for him, Norm Montalvo and Mike Navone.  They

12  came to the auction with him and they did stuff for him and

13  helped him with his business, also participated in the payoffs

14  and bid rigging.

15      And so Norm Montalvo had just pled.  And I don't know if

16  they actually said that, but I do think that they were

17  certainly worried that, you know, here was a guy that worked

18  for Mo who was going to cooperate.

19      So, anyway, that's a long-winded answer.  Sorry.

20  Q.  Thank you.

21      Let's turn to the PowerPoint deck that you used with

22  Mr. Rezaian.

23          MR. GREENE:  If you'd bring that up, Celestine.

24      What I'd like you to do is to click through to slide 8,

25  which is where recording one-one is located.

1    Mr. Rezaian?

2    **A.**    It was generally the same except for the very end.    For

3    Mo, at the very end, I told you about this series of photos

4    where Mo was handing Dan cash.

5        For the Mo presentation, we just showed him the photos.

6    But after that presentation, then one of our paralegals figured

7    out, oh, we've got a sprinkler box, we could sync it.    And so

8    she did that.

9        And so when we did the second one for Dan Rosenbledt, it

10   included that stationary recording.    And that -- to be fair, it

11   was -- was a more substantive.    It wasn't like the Mo where it

12   was kind of a jokey thing.    They actually were discussing a

13   payoff on another property.

14       So Mo's like, you owe me $2,000 because we've got to give

15   this other guy money for this payoff.

16       And Dan says, I don't have any money.

17       And Mo says, I just saw you, you just got an envelope with

18   money.

19       And he's like, Oh -- he used an obscene word -- oh, yeah,

20   I remember I did.    And then he pulled it out and handed him

21   some money.

22   **Q.**    Okay.    In terms of alternate sources, Mr. Ward, did you

23   have alternate sources available to you that would reflect this

24   transaction, an offset between these individuals?

25   **A.**    Yes.    So we knew --

PROCEEDINGS

1       **THE COURT:**  Okay.  We're in recess.

2           (At 4:34 p.m. the proceedings were adjourned until

3   Wednesday, March 1, 2017.)

4                        - - - - -

5

6                   **CERTIFICATE OF REPORTER**

7           I certify that the foregoing is a correct transcript

8   from the record of proceedings in the above-entitled matter.

9   DATE: Thursday, March 2, 2017

10

11

12                    *Katherine Sullivan*

13   _____

14       Katherine Powell Sullivan, CSR #5812, RMR, CRR
                    U.S. Court Reporter

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT 4

Document Sought to be Sealed in Full